UNITED STATES DISTRICT COURT

THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| ARIC MCINTIRE, and HENRY WASIK, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>STEVEN M. MARIANO, THOMAS C. SHIELDS, JOHN R. DEL PIZZO, AUSTIN J. SHANFELTER, CHRISTOPHER PESCH, CHARLES H. WALSH, QUENTIN P. SMITH, BDO USA LLP, UBS SECURITIES LLC, BMO CAPITAL MARKETS CORP., SUNTRUST ROBINSON HUMPHREY, INC., JMP SECURITIES LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>        Defendants. | **CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 4

PARTIES ............................................................................................................................ 4

RELEVANT NON-PARTIES ............................................................................................ 7

CLASS ACTION ALLEGATIONS .................................................................................. 8

SUBSTANTIVE ALLEGATIONS .................................................................................. 10

    I.      Background .................................................................................................. 10

    II.     The IPO ....................................................................................................... 14

    III.    After the IPO, Mariano used Patriot National's new funds to enrich himself and his associates ................................................................................ 16

    IV.    Patriot National announces the Secondary Offering as pretext for Mariano to dump his shares and raise money for GIC .................................................... 19

    V.     Mariano had Patriot National enter into a PIPE transaction to get money for GIC ............................................................................................................... 21

    VI.    The PIPE Transaction backfires and threatens Mariano's control of Patriot National ......................................................................................................... 23

    VII.   Mariano causes Patriot National to launch a repurchase program so that he can maintain control .......................................................................................... 25

    VIII.  The Board's improper rejection of the warrants ........................................ 28

    IX.    Throughout 2016, Mariano had Patriot National undertake a Strategic Review to raise additional funds for himself and GIC ............................................ 29

    X.     Mariano had Patriot National enter a Leveraged Recapitalization to get money for GIC and cements his power over the Board ......................................... 32

    XI.    Plaintiff Wasik filed suit in Delaware challenging the Leveraged Recap and put Mariano and his various schemes at Patriot National under close scrutiny for the first time ............................................................................................ 38

    XII.   In early 2017, Mariano devised a new scheme for Patriot National to cover GIC's capital deficiencies ........................................................................... 38

ii

XIII.   The Wasik Action Sparks BDO Investigation ............................................. 39

XIV.   In August 2017, GIC fell under the Administrative Supervision of the FOIR. .......... 43

XV.   GIC goes into state receivership and Patriot National announces that it will be filing for bankruptcy protection .................................................................. 44

MISREPRESENTATIONS AND OMISSIONS ............................................... 46

I.   The Registration Statement was Materially False and/or Misleading ....................... 46

II.   BDO's Opinion was Materially False and/or Misleading............................................ 57

    A.   The 2014 Annual Report, dated March 31, 2015. ................................................. 63

    B.   First Quarter 2015 Press Release and Quarterly Report......................................... 79

    C.   Quarterly Report dated August 14, 2015............................................................. 91

    D.   Secondary S-1 was Materially False and/or Misleading. .................................... 102

    E.   Quarterly Report dated November 12, 2015. ...................................................... 116

    F.   Initial PIPE Announcements were Materially False and/or Misleading. ............. 127

    G.   Amended PIPE Form 8-K, dated December 23, 2015. ........................................ 130

    H.   Press Release, dated February 29, 2016. ........................................................... 131

    I.   Repurchase Program Form 8-K, dated March 7, 2016......................................... 133

    J.   Annual Report dated March 21, 2016. ............................................................... 134

    K.   Press Release, dated April 7, 2016. ................................................................... 154

    L.   Press Release and Quarterly Report dated May 12 & 13, 2016. ......................... 155

    M.   Press Release and Quarterly Report dated August 15, 2016. ............................... 167

    N.   October 17, 2016 Press Release (Ashmere I). ................................................... 179

    O.   October 26, 2016 Press Release (Ashmere II). .................................................. 180

    P.   Press Release and Quarterly Report dated November 14, 2016........................... 181

    Q.   March 3, 2017 Form 8-K (GIC Bailout). ........................................................... 202

    R.   Q4 2016 Form 8-K, dated March 14, 2017 ....................................................... 204

    S.   Form NT 10-K was Materially False and/or Misleading. ................................... 210

T.      April 3, 2017 Press Release (BDO investigation). ................................................. 211

U.      April 4, 2017 Press Release (Global HR SALE)................................................. 212

V.      April 4, 2017 Form 8-K................................................................................ 213

W.      April 27, 2017 Form 8-K (new Board members) ................................................. 214

X.      May 30, 2017 Form 8-K (2017 Special Committee)............................................ 216

Y.      May 5, 2017 Form 8-K ............................................................................... 216

Z.      May 9, 2017 Form 8-K ............................................................................... 217

AA.     July 14, 2017 Form 8-K (Mariano Resignation) ................................................. 217

BB.     July 20, 2017 Form 8-K. ............................................................................ 218

CC.     August 17, 2017 (Shields Resignation) Form 8-K ............................................. 218

DD.     September 29, 2017 (NYSE Delisting Risk) Form 8-K. ....................................... 219

EE.     November 22, 2017 (GIC Receivership) Form 8-K............................................ 219

FF.     November 28, 2017 Form 8-K (Patriot National Bankruptcy). .......................... 221

COUNT I ................................................................................................................... 222

COUNT II .................................................................................................................. 225

COUNT III ................................................................................................................. 228

COUNT IV ................................................................................................................. 229

LOSS CAUSATION AND ECONOMIC LOSS ........................................................................ 239

PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET................................................... 239

PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET................................................... 240

NO SAFE HARBOR .................................................................................................... 241

COUNT V ................................................................................................................. 242

PRAYER FOR RELIEF ................................................................................................. 245

JURY DEMAND .......................................................................................................... 246

Plaintiffs Aric McIntire and Henry Wasik ("Plaintiffs"), by their undersigned attorneys, allege in this Class Action Complaint the following upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation by their attorneys and review of documents and materials including but not limited to: (a) relevant filings made by Patriot National, Inc. ("Patriot National") with the United States Securities and Exchange Commission (the "SEC"); (b) public documents, conference calls, and press releases; (c) review of public information filed in a stockholder derivative and class action captioned *Wasik, et al. v. Mariano, et al.*, C.A. 12953-VCL (Del. Ch.) (the "Wasik Action") where Plaintiffs and their counsel filed a comprehensive 255-page Second Amended Complaint based upon, among other things, the depositions of Michael Corey and D&L Partners, multiple interviews and discussions with former independent directors, Michael Purcell and Jeffrey Rohr, their counsel and Patriot National's counsel, and other discovery; and (d) research analysts' reports concerning Patriot National. Certain of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.  Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth herein that will be obtained in discovery. In particular, discovery obtained in the Wasik Action consists of over 220,000 pages of documents produced by (1) Defendants Mariano, Todd Wilson, Thomas Shields, Christopher Pesch, Charles Walsh, Quentin Smith, John Del Pizzo, Austin Shanfelter, Guarantee Insurance Company, Inc., Cerberus Business Finance, LLC, and Houlihan Lokey Capital, Inc., and (2) third parties Michael Corey, Duff & Phelps LLC, UBS Financial Services Inc., J.P. Morgan, D&L Partners, and Ebix, Inc.  While Plaintiffs' counsel also served as counsel for plaintiffs in the Wasik Action, this Class Action Complaint For

Violations of Federal Securities Laws does not incorporate any confidential, non-public information produced in that matter.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Patriot National common stock from January 15, 2015 to November 22, 2017 (the "Class Period") who sustained significant losses due to defendants' violations of the federal securities laws.  From the moment Patriot National sold shares to the public in its initial public offering ("IPO") on January 15, 2015, defendants, led by Steven Mariano ("Mariano"), Patriot National's controlling stockholder and former Chairman, President, and Chief Executive Officer, presented a false image of Patriot National and its business.

2.     Specifically, defendants intentionally withheld information regarding its key customer, Guarantee Insurance Company, Inc. ("GIC"), another company controlled by Mariano. Even though GIC was responsible for 60% to 70% of Patriot National's income and revenue, and was identified as critical for Patriot National's future growth, defendants failed to disclose that GIC was on the brink of failure throughout the Class Period and to avoid insolvency, it was dependent on repeated loans and capital contributions by Mariano.  Mariano, in turn, used his position as controlling shareholder of Patriot National to extract money for himself that he used to support a lavish lifestyle and prop up GIC.  Meanwhile, Patriot National continued to fully recognize revenue based on its contracts with GIC even though it had no reasonable expectation of ever being paid in full.  In fact, Patriot National's receivable from GIC grew from $2,137,140 as of December 13, 2013 to $46,757,000 as of December 31, 2016.  At no point during the Class Period did Patriot National make any allowance for the doubtful recovery of this receivable.

3.     GIC was forced into receivership by the Florida Office of Insurance Regulation ("FOIR") on November 13, 2017 with the receivable unpaid.  Of course, it will never be repaid

1

because those funds have been siphoned by Mariano and his cohorts through GIC and are now gone.  Patriot National has announced that it intends to file for bankruptcy imminently.  Patriot National's stock, which was sold to plaintiff and other members of the public at $14.00 per share in its IPO in January 2015, is now worthless, as the restructuring agreement wipes out all existing equity and leaves stockholders with nothing.

4.       Other material aspects of Patriot National's business were misrepresented by defendants during the Class Period, including its adherence to its publicly disclosed Policy Regarding Transactions with Related Persons.  During the Class Period, defendants caused Patriot National to enter into numerous transactions with entities controlled by Mariano, his associates, or other members of Patriot National's board of directors (the "Board").  These transactions were on terms favorable to Mariano and/or his associates and harmed Patriot National and its public shareholders.  Further, Mariano organized private sales of his Patriot National stock generating over $30 million in proceeds for himself while the stock was trading at inflated prices.  Indeed, Patriot National's entire existence as a public company was a scheme to enable Mariano and his associates to enrich themselves at the public's expense.

5.       Finally, when the weakness of Patriot National's and GIC's business began to be exposed in 2017, Mariano made numerous blatant misrepresentations to the public about strategic alternatives the Board was supposedly exploring or potential transactions it was pursuing.  For example, after a November 8, 2016 press release stating that Patriot National had rejected an offer from Ebix, Inc. to acquire Patriot National for $475 million, Ebix's Chief Executive Officer responded: "[Mariano] is a complete liar - we disengaged not him and our offer was not $475 million - we reduced along the way.  It defies any ethics.  He did the release to create a negative event into a fake positive event."

6.      Rather than trying to save Patriot National, Mariano, its management, and the Patriot National Board pursued numerous transactions designed to help Mariano and other insiders at Patriot National's expense.  For instance, Patriot National announced a secondary offering in October 2015 that was designed generate funds to allow GIC to meet its capital requirements. When that secondary offering failed and the market reacted negatively, in December 2015, Patriot National arranged a private placement to generate $30 million in proceeds for Mariano but nothing for itself.  Mariano used a substantial part of these proceeds to prop up GIC (and the remainder to pay for his mega-yacht).  The failed secondary offering and private placement caused Patriot National's stock price to decline from $16.11 to $5.34.  Patriot National later used corporate funds to engage in a share repurchase program and leveraged recapitalization, which were designed to assist Mariano and enable him to maintain control of Patriot National.

7.      By 2017, however, the true impact of Mariano's self-interested and fraudulent schemes was being realized and/or disclosed.  For example, on March 3, 2017, Patriot National revealed that Mariano extorted a $30 million cash payment from Patriot National to Mariano's controlled company by forcing the only two independent Patriot National directors into an impossible position where Patriot National's future was at risk; (upon this news Patriot National's stock dropped from $4.39 to $3.67).

8.      Similarly, on November 22, 2017, Patriot National finally announced that GIC had been taken into state receivership and Patriot National may longer be able to operate as a going concern; (upon this news Patriot National's stock dropped from $1.06 to $0.36).

9.      In sum, Patriot National should never have become a publicly traded company. Defendants' misrepresentations induced the public to invest in a company that was destined to fail by all legitimate metrics.  Defendants' fraud prevented investors from learning of this risk and

avoiding Patriot National at all costs.  Patriot National's inevitable demise was a materialization of this risk, and investors have lost millions of dollars as a consequence.  In addition to wrongdoing by Mariano, Patriot National's management, and the Board throughout Patriot National's lifetime as a public entity, its auditors, BDO USA LLP ("BDO"), and the underwriters face liability for their roles in the IPO, including Patriot National's misleading registration statement, and the misleading audit opinions provided by BDO in the IPO and during the Class Period.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Patriot National has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

13.     Plaintiff Aric McIntire ("McIntire") purchased Patriot National common stock at artificially inflated prices in Patriot National's IPO on January 15, 2015, and was damaged upon the revelation of Defendants' fraud.  As detailed in his certification (attached hereto as Exhibit A), McIntire purchased approximately 100 shares of Patriot National stock during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

14.     Plaintiff Henry Wasik ("Wasik") purchased Patriot National common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.  As detailed in his certification (attached hereto as Exhibit B), Plaintiff Wasik purchased approximately 200,100 shares of Patriot National stock during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

15.     Defendant Mariano founded Patriot National, and served as Patriot National's Chairman, President, and Chief Executive Officer ("CEO") from its reorganization in November 2013 until his resignation on July 12, 2017.  Mariano is Patriot National's controlling stockholder, purportedly holding 54.5% of Patriot National's outstanding shares as of November 14, 2016.

16.     Defendant Thomas C. Shields ("Shields") served as Patriot National's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer from September 2014 until his resignation in September 2017.

17.     Defendant John "Jack" R. Del Pizzo ("Del Pizzo") has a twenty year relationship with Mariano.  In June 2014, Del Pizzo joined the Board and serves as the "Lead Director."

18.     Defendant Austin J. Shanfelter ("Shanfelter") joined the Board in June 2014 and served until he resigned for purported health reasons on October 17, 2016.  While serving on the Board, Shanfelter was the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

19.     Defendant, Christopher Pesch ("Pesch") served as Patriot National's Executive Vice President, General Counsel and Chief Legal Officer from September 2014 until March 10, 2017, when he was forced to resign.

20.     Defendant Charles H. Walsh ("Walsh") was a member of the Board from January 2015 until March 30, 2017. While serving on the Board, Walsh was a member of the Board's audit

and compensation committees ("Audit Committee" and "Compensation Committee," respectively), and the Chairman of the nominating and corporate governance committee ("Nominating and Corporate Governance Committee").

21.     Defendant Quentin P. Smith ("Smith") was a member of the Board from January 2015 until March 30, 2017.  While serving on the Board, Smith was a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Chairman of Compensation Committee.

22.     Defendant BDO was Patriot National's Independent Registered Public Accounting Firm and provided unqualified audit opinions on Patriot National's financial statements for the years ended December 31, 2013, December 31, 2014, and December 31, 2015. BDO's audit opinion on Patriot National's December 31, 2013 financial statements was included in Patriot National's Registration Statement for its IPO in January 2015.

23.     Defendant UBS Securities LLC ("UBS") served as an IPO underwriter. Specifically, UBS served as a joint book-running manager and as a representative of the underwriters for the IPO.  UBS assisted in the preparation and dissemination of the Registration Statement (defined below).

24.     Defendant BMO Capital Markets Corp. ("BMO") served as an IPO underwriter. Specifically, BMO served as a joint book-running manager and assisted in the preparation and dissemination of the Registration Statement (defined below).

25.     Defendant JMP Securities LLC ("JMP") served as an IPO underwriter. Specifically, JMP served as a joint book-running manager and assisted in the preparation and dissemination of the Registration Statement (defined below).

26.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") served as an IPO underwriter.  SunTrust served as a joint book-running manager and assisted in the preparation and dissemination of the Registration Statement (defined below).

27.     Defendant William Blair & Company, L.L.C. ("William Blair") served as an IPO underwriter.  Specifically, William Blair served as a joint book-running manager and assisted in the preparation and dissemination of the Registration Statement (defined below).

28.     Defendants UBS, BMO, JMP, SunTrust, and William Blair are collectively referred to as the "Underwriter Defendants".

### RELEVANT NON-PARTIES

29.     Guarantee Insurance Group ("GIG") is a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida.  GIG, formerly known as Patriot National Insurance Group, Inc., is the parent company of GIC.  Mariano controls GIG and owns 97% of the company.  GIG owns 3,950,000 shares of Patriot National stock as of December 21, 2016, which are beneficially owned and reported by Mariano.

30.     GIC is a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida.  GIC is a wholly-owned subsidiary of GIG and is controlled by Mariano.  GIC provided workers' compensation insurance in over 31 states and the District of Columbia, and offered guaranteed cost and alternative market solutions with a specific expertise in segregated portfolio captives and risk-sharing insurance programs.  GIC owns 1,936,535 shares of Patriot National stock as of December 21, 2016.  On November 17, 2017, GIC was placed into state receivership for, among other things, failing to maintain sufficient capital and falsifying financial records.

31.     Ashmere is a Florida corporation with its headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida.  Ashmere is a workers' compensation insurance

company. From October 6, 2016, Mariano indirectly owned and controlled Ashmere until he sold it and its parent holding company on November 28, 2017.

32.     Edward Snow ("Snow") is a long-time friend and business associate of Mariano. On February 23, 2016, Snow filed a Form 13-G with the SEC, disclosing that he owned 1,579,166 PN shares, representing 5.6% of Patriot National voting power. Snow has not made any public filings concerning his ownership of Patriot National securities since that filing.

33.     Del Pizzo & Associates is a tax and accounting firm owned by Del Pizzo. Purportedly, Del Pizzo & Associates provides tax advisory services to Patriot National despite the fact that BDO acts as Patriot National's public auditor. Patriot National paid Del Pizzo & Associates $109,000 and $185,100 in 2014 and 2015, respectively. In 2016, the Company increased its payments to Del Pizzo & Associates significantly, agreeing to pay a total of $400,000 for seemingly the same services. Del Pizzo & Associates further received compensation from GIC on an hourly basis.

## CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action on behalf of all individuals and entities who purchased or otherwise acquired Patriot National securities in connection with Patriot National's IPO and/or on the public market during the Class Period, and were damaged, excluding the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

35.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Patriot National securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members

of the Class may be identified from records maintained by Patriot National or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon completion of the IPO, Patriot National had approximately 26,390,415 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

36.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

37.     Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.  whether the Securities Act was violated by Defendants' respective acts as alleged herein;

     b.  whether the Exchange Act was violated by Defendants' respective acts as alleged herein; and

     c.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

9

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

40.     In 2003, Mariano started a workers' compensation insurance business and acquired GIC through Patriot National Insurance Group, Inc. ("PNIG"), which was Patriot National's predecessor company.

41.     Because GIC is a Florida insurance company, it is regulated by the FOIR and is subject to annual capital requirements.  Each year, regulated insurance companies must file financial statements with the FOIR and the National Association of Insurance Commissioners by March 1, reporting their solvency and risk-based capital as of the end of the calendar just ended. An insurance company's financial information must satisfy certain criteria of the FOIR, such as certain ratios based on the company's amount of risk-based capital.  An insurer that does not satisfy the criteria may be put under regulatory supervision, which allows for the claw back of receivables and fees from agents of the insurers, the return of unearned premiums, and a prohibition on writing new business.

42.     In March of 2008, the FOIR retained an independent accounting firm "to conduct a target financial condition Examination (target examination) of [GIC.]" to "review the compliance by [GIC] with the findings in the Report on Examination as of December 31, 2006, which was dated August 10, 2007, and the directives in Consent Order #93640-07-CO, dated March 11, 2008, (Consent Order)."

43.     The FOIR's examination found numerous deficiencies in GIC's compliance with applicable laws and regulations, primarily with those concerning related party transactions, including:

a. GIC did not have sufficient "procedures to ensure that payments to affiliates are within the terms of the underlying contracts and that advances to affiliates are in accordance with Florida Administrative Code 69O-143.047 and Statement of Statutory Accounting Principle No. 25";

b. Mariano and GIC engaged in numerous improper practices related to GIC's payment of taxes on behalf of numerous affiliates and Mariano controlled holding companies, in violation of Florida Administrative Code 69O-143.047 and Statement of Statutory Accounting Principle No. 2;

c. The examination was unable to verify general ledger accounts and offsetting receivable/liability balances due between Mariano controlled affiliates, as a result of numerous service agreements between the affiliates, in violation of Florida Administrative Code 69O-143.047; and

d. Despite a request by FOIR, GIC was unable to "provide supporting detail for this account" for "documentation to support [the $2,021,301 liability for Policy Fees Pass-Through Payable it reported in its 2007 Annual Statement], explain [GIC's] method for billing and collecting of these fees, provide documentation granting [GIC] authority to pass these fees on to policyholders and demonstrate how and when these fees will be paid to the taxing authority".

44.     The examination concluded: "We are concerned with [GIC's] apparent inability to control and reconcile this account and recommends [GIC] establish or improve accounting controls over the collection of policy fees and the payment of these fees to taxing authorities."

45.     Similarly, in 2011, the FOIR conducted an independent examination of GIC for the period of January 1, 2007, through December 31, 2010.  After its examination, the FOIR found that GIC had again failed to comply with various requirements for affiliated party transactions. In particular, the FOIR found that GIC's services agreement with "with Patriot Recovery, Inc. was not in compliance with SSAP No. 96 [Settlement Requirements for Intercompany Transactions] in that it did not contain provisions for a timely settlement of accounts involved nor did it contain a specific due date for those amounts."  The FOIR also found that "[GIC] did not maintain written

11

agreements with certain affiliated persons, entities and/or related parties as required by paragraph 15 of Florida Consent Order 88129-06, filed December 29, 2006. The affiliated parties lacking written agreements consisted of: PNIG, Patriot General Agency, and Del Pizzo & Associates."

46.     As of the date of FOIR's 2011 report, Mariano owned PNIG, which in turn owned 100% of Patriot General Agency and GIC.  PNIG and Patriot General Agency provided insurance services to GIC, which wrote the underlying insurance policies.

47.     In November 2013, Mariano incorporated Old Guard Risk Services, Inc. in Delaware to consolidate and reorganize certain insurance services entities that he controlled.  This reorganization separated the insurance services business (which would become Patriot National) from the insurance risk-taking operations of GIC.  After the reorganization, Mariano owned substantially all of the outstanding equity of GIC and a majority of Patriot National's outstanding equity.

48.     By 2013 GIC's business was in trouble.  GIC had incurred annual operating losses since 2007.  In 2012 and 2013, GIC reported $22.3 million and $16.7 million in net underwriting losses, respectively. Similarly, in 2014, GIC had $17.43 million in underwriting losses and a total of net income loss of $26 million.

49.     Because of GIC's losses, Mariano was forced to cover the losses by pumping tens of millions of dollars into GIC each year in order to keep it solvent and in compliance with FOIR's capital requirements.  One of the ways Mariano raised the necessary capital to pump into GIC was to have Patriot National (and its predecessor entity and affiliates) take on debt, the proceeds of which he would then pump into GIC (as well as use to support his outlandishly lavish lifestyle).

50.     For example, on November 27, 2013, Mariano had Patriot National enter into a $42.0 million loan agreement with PennantPark Investment Corporation ("PennantPark") in order

to ensure that GIC met its year-end capital requirement. Mariano used the loan to repay a different $10 million loan and then put approximately $28.3 million into GIC.  As security for the PennantPark loan, Mariano pledged his shares in Patriot National to PennantPark.

51.   For 2014, Mariano followed a similar path to ensure that GIC would meet its year-end FOIR requirements.  On August 6, 2014, Mariano caused Patriot National to take out two additional loans, totaling over $87.8 million.  First, Mariano amended the 2013 loan taken out from PennantPark to borrow an additional $30.8 million, increasing the loan's principal balance to approximately $68.6 million. (the "Amended PP Loan").  Second, Mariano caused Patriot National to enter into an additional $57 million credit facility with UBS as lead arranger (the "UBS Loan," together with the Amended PP Loan, the "August 2014 Loans").  The UBS Loan was secured by the common stock of PCM Management, Inc. ("PCM"), a wholly owned subsidiary of Patriot National, and guaranteed by GIG and its wholly owned subsidiaries.  The Amended PP Loan continued to be secured by Mariano's Patriot National common stock.

52.   Mariano used the proceeds of the August 2014 Loans to provide cash to himself and GIC.  On August 6, 2014, Mariano caused Patriot National to enter into two transactions, one with [GIG] (the "GUI Acquisition.") and one with MCMC LLC ("MCMC") (the "PCM Acquisition").

53.   As part of the GUI Acquisition, Patriot National acquired certain contracts to provide marketing, underwriting and policyholder services to certain of its insurance carrier clients, as well as related assets and liabilities, from a subsidiary of GIG.  Patriot National also acquired a contract to provide a limited subset of its brokerage and policyholder services to GIC.  Immediately following the GUI Acquisition, Patriot National entered into a new agreement to

provide all of its brokerage and policyholder services to GIC. In total, Mariano transferred $55.1 million to GIC in connection with the GUI Acquisition.

54.     The PCM Acquisition was an example of Mariano using Patriot National's borrowed funds to buy his personal business.  The PCM Acquisition involved Patriot National purchasing a nurse case management and bill review services business for PCM from MCMC in exchange for 3,043,485 shares of Patriot National common stock to the holders of the MCMC preferred equity, which included Mariano and other Company insiders, including Del Pizzo and his wife, Shanfelter, Pesch and two other Patriot National executives.  In connection with the PCM Acquisition, Mariano and other Company insiders, including Patriot National executives, received 3,043,485 shares of Patriot National common stock (worth approximately $42.6 million at the time of the IPO).

55.     Patriot National recorded approximately $49.432 million in goodwill in connection with the GUI and PCM Acquisitions.

56.     In September 2014, Old Guard Risk Services, Inc. changed its name to Patriot National, Inc.

## II.     The IPO

57.     By the end of 2014, Mariano no longer had the ability to use money borrowed by Patriot National to keep GIC afloat.  This led Mariano to tap the public markets to cover his losses at GIC.

58.     Following a reorganization and spinning-off GIC, on December 16, 2014, Patriot National filed a Registration Statement with the SEC for its initial public offering of its common stock.

59.     On January 6, 2015, Patriot National filed an amended registration statement for its common stock with the SEC.

60.    On January 14, 2015, Patriot National filed a final registration statement for its common stock with the SEC (the "Registration Statement"), which was effective on January 15, 2015.  On January 20, 2015, Patriot National filed a Prospectus for its IPO with the SEC (the "Prospectus").  The Prospectus made the same representations and contained the same information as contained in the Registration Statement.

61.    The IPO was underwritten by UBS, BMO, SunTrust, JMP, and William Blair.

62.    In connection with the IPO, Mariano was required to retain an independent registered accounting firm to audit Patriot National and sign off on any financial statements to be included in the Registration Statement and Prospectus.  Accordingly, Mariano went with BDO, an auditor he has known for years and which consistently demonstrated its willingness to provide necessary audit opinions on Patriot National's and GIC's financial statements.

63.    BDO (and its predecessor entities) have worked with Mariano and GIC since at least 2007 and has willingly signed off on questionable financial statements for Mariano's benefit.  In fact, Mariano has worked with the same BDO office (Miami) and the same accountants since at least early 2014.  Despite the numerous accounting and control problems at GIC that were discovered by the FOIR during its examinations, BDO still provided clean audit opinions on GIC's financial statements.

64.    Accordingly, Mariano was able to rely on BDO to issue Patriot National a clean bill of health in connection with the IPO regardless of Patriot National's true financial situation.

65.    On November 12, 2014, BDO issued their audit opinion on Patriot National's December 31, 2013 financial statements, which BDO later consented to be included by reference in the Registration Statement. BDO's opinion stated, among other things, that BDO audited Patriot National in accordance with the standards of the Public Company Accounting Oversight Board

(United States) ("PCAOB") and "audited the accompanying combined balance sheets of Patriot National, Inc. as of December 31, 2013 and 2012 and the related combined statements of operations, stockholders' equity (deficit), and cash flows for each of the two years in the period ended December 31, 2013[.]"   Despite the FOIR's previous admonishments for its internal controls, BDO's report raised no issues with any of Mariano's accounting practices at Patriot National, concluding, "[i]n our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of Patriot National, Inc. at December 31, 2013 and 2012, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2013**,** in conformity with accounting principles generally accepted in the United States of America."

66.     In connection with the IPO, Mariano also entered into a customary lock-up agreement, which prohibited him from selling or pledging his Patriot National shares within 180 days of the IPO.

67.     On January 15, 2015, Patriot National went public, offering 7,350,000 shares of its common stock at $14 per share, raising $102.9 million.

68.     Prior to the IPO, Mariano owned 15,352,170 shares, representing 84.9% of Patriot National's voting power.  After the IPO, Mariano continued to own the same amount of shares, but his control dipped to approximately 60%.

### III.    After the IPO, Mariano used Patriot National's new funds to enrich himself and his associates

69.     Immediately following the IPO, Patriot National entered a new senior secured credit facility with BMO Harris Bank N.A., an affiliate of BMO Capital Markets Corp., as administrative agent (collectively, "BMO"), comprised of a $40.0 million revolving credit facility and a $40.0 million term loan facility (the "BMO Credit Agreement").  Between its IPO and 2016,

Patriot National obtained several amendments to the BMO Credit Agreement, including one amendment for an additional $50 million in term loans, and another for the ability to increase the add-on loan by $50 million.

70.     Patriot National used a portion of the money from the BMO Credit Agreement and the proceeds from the IPO to repay the August 2014 Loans. As a result of repaying the loan to PennantPark, Mariano's Patriot National shares were released from their pledge as security for that loan.

71.     Rather than use the remaining funds from the BMO Credit Agreement and IPO to support Patriot National, Mariano used the BMO Credit Agreement and IPO proceeds to further enrich himself and his associates by using money to purchase his and his associates' private businesses.

72.     On February 5, 2015, Patriot National purchased 98.8% of the membership interests in DecisionUR, LLC for $2.2 million in cash from Six Points Investment Partners, LLC, a Mariano-owned company operating out of Patriot National's offices.  Mariano received all of the proceeds from the sale.

73.     On February 12, 2015, the Board approved Patriot National's acquisition of Vikaran Solutions, LLC ("Vikaran"), a company in which Mariano held a 45% interest, for $8.5 million in cash.  Patriot National also agreed to purchase Mehta and Pazol Consulting Services Private Limited for approximately $1.5 million.   Mariano received $3.8 million from the acquisition of Vikaran and $749,850 from the acquisition of Mehta and Pazol Consulting Services Private Limited.

74.     In addition to having Patriot National acquire his companies, Mariano had Patriot National acquire the companies of his friends and associates.

17

75.     Patriot National acquired three companies from Snow, Mariano's longtime friend and business associate.  On April 2, 2015, Mariano caused Patriot National to acquire Hospitality Supportive Systems, LLC ("HSS") and Selective Risk Management ("Selective") for a maximum of $9.65 million and $3.846 million, respectively, from Snow.  The acquisition agreements for HSS and Selective provided for contingent earn-out payments of $4.045 million and $1.923 million as part of the maximum payouts, respectively, based on the companies achievement of specified EBITDA thresholds for the 12-month period following the acquisitions.  A month later, Patriot National accelerated the earn-out periods and paid Snow the maximum earn-out possible.  On May 14, 2015, Patriot National paid Snow a total of $6 million.  By accelerating the payments, Mariano ensured that those payments would not be subject to clawback should either company fail to achieve its EBITDA thresholds.

76.     Additionally, following Patriot National's acquisition of HSS, Mariano let Snow remain in control of its cash distributions, and Snow used this control to withhold payments to Patriot National's customers and partners, which ultimately resulted in considerable liabilities for Patriot National.

77.     On June 15, 2015, Patriot National entered into two transactions with Carman Corporation ("Carman"), another company owned by Snow, for a total of $4 million.  In addition, on October 29, 2015, Patriot National, through one of its subsidiaries, entered into an agreement with Carman, pursuant to which Carman would provide Patriot National with certain market-finding and consulting activities in exchange for an upfront payment of $2 million.

78.     Next, Patriot National acquired Global HR, a company owned by Shanfelter, a Patriot National director, on July 21, 2015, for $24 million in cash and $18 million in Patriot

National stock.  Patriot National had no need to purchase Global HR, and, in fact, had to create a new division to account for Global HR.

79.     Only one year after acquiring it, Mariano was already looking to sell Global HR, which he described as a "noncore" and "underperforming" asset.

80.     In 2017, Patriot National sold Global HR for a substantial loss.  In 2017, Patriot National wrote down $17.7 million related to Global HR's goodwill, and on April 24, 2017, Patriot National announced that it had sold Global HR for only $20 million with up to an additional $10 million in earnout and contingent payments.

81.     Related to Mariano's self-interested buying spree in 2015, he also generously awarded himself and his associates cash bonuses.  In 2015 alone, Mariano and the Board's Compensation Committee distributed approximately $1.7 million in M&A bonuses, with Mariano receiving $700,000, Shields receiving $338,983, and Pesch receiving $92,072.

82.     Unsurprisingly, Mariano dictated the terms of his bonus, telling Shanfelter via email on October 26, 2015, that: "I have decided to take a bonus for 2015…I will take it this week[.]  No stock is necessary[.]"  Shanfelter responded that Mariano's demand was "no problem" and suggested that they "should look at [his] year end bonus as well[, as] [t]his way we could approve this interim bonus tied to a larger year end one."  On October 28, 2015, the Compensation Committee approved a $700,000 bonus for Mariano – right after he sent another email stating "he rather just take 700 k bonus and the rest in stock[.]"

83.     Mariano did not limit the "M&A Bonuses" to Company management.  Despite not being an officer of Patriot National, Snow also received at least $65,000 in "M&A bonuses."

### IV.     Patriot National announces the Secondary Offering as pretext for Mariano to dump his shares and raise money for GIC

84.     In connection with the IPO, Mariano entered into a customary lock-up agreement, which prevented him from offering, selling, contracting to sell, pledging or otherwise disposing of, directly or indirectly, Patriot National common stock during the period ending 180 days after the IPO, or July 17, 2015.

85.     During the lock-up period, Mariano's cash needs (and desires) grew exponentially. On March 11, 2015, Mariano purchased a $37 million, 187 foot yacht.  Lacking the necessary liquidity to buy the yacht outright, Mariano took out a $32.3 million loan from Fifth Third Bank (the "Yacht Loan") and delivered a $5 million promissory note to the seller, Douglas Von Allmen (the "Von Allmen Note").  Douglas Von Allmen is Mariano's personal friend and is the second-largest Patriot National stockholder.

86.     Pursuant to the Yacht Loan, Mariano pledged, commencing July 31, 2015, $50 million in Patriot National common stock to Fifth Third as collateral seemingly in violation of the IPO lock-up agreement restrictions.  The Yacht Loan also required that GIC maintain Risk-Based Capital ratio of at least 200%.

87.     The Yacht Loan was scheduled to mature on March 11, 2020, and the Von Allmen Note was scheduled to mature on September 30, 2015 (*i.e.*, the expiration of the lock-up period).

88.     To help cover his immediate expenses, on August 12, 2015, Mariano took out a $12.5 million revolving note.  Under the terms of this note, Mariano was required to maintain at least $10 million worth of liquid assets or marketable securities as collateral against that note.  Any amount of Patriot National stock, however, held as collateral was discounted by 35% to 75%.

89.     To satisfy his growing cash needs and ensure that GIC would meet its annual capital requirements, Mariano caused the Board to approve a secondary offering into which he could sell his stock.  On October 5, 2015, Patriot National filed a Form S-1 registration statement with the

20

SEC for a secondary offering of Patriot National common stock, which included Mariano's sale of an undisclosed number of his shares (the "Secondary Offering").  The market's reaction was punishing.  On October 5, 2015, Patriot National's stock opened at $16.15 per share, and closed at $14.72.  The next day the stock closed at $13.61.

90.     As Mariano needed money, he ignored the market's reaction to the Secondary Offering and pushed forward.  On October 15, 2015, Patriot National amended the S-1 to disclose that the Secondary Offering would total $80 million, comprised of a $55 million stock sale by Patriot National and a $20 million stock sale by Mariano.  Patriot National's stock price continued to fall on the revised disclosures.

91.     On October 20, 2015, Patriot National announced that it was withdrawing the registration statement for the secondary offering citing "market conditions."

## V.     Mariano had Patriot National enter into a PIPE transaction to get money for GIC

92.     When the Secondary Offering failed, Mariano came up with two other plans to satisfy his liquidity needs.  In the short term, Mariano had a pressing need to secure millions of dollars by December 31, 2015 in order to meet GIC's FOIR capital requirements.  To this end, Mariano retained J.P. Morgan Chase ("JPM") to serve as a placement agent in a private investment in public equity placement ("PIPE") transaction that would close before the end of 2015.

93.     Mariano's second plan was longer term and focused on investigating alternative ways he could use Patriot National to obtain additional funds for himself and GIC.  To this end, Mariano instructed Patriot National's management to investigate ways to implement a strategic review process (the "Strategic Review") to provide himself with additional liquidity in the future.  Mariano hired Evercore as an advisor to run the Strategic Review.

94.     Mariano knew that he required the Board's approval of certain actions, so he made sure to tell the directors just enough information to entice their approval of both plans at the Board's November 13, 2015 meeting.

95.     In this regard, Mariano disclosed that "management was considering private investment in a public entity (PIPE) transaction facilitated by JP Morgan for $60M."  Pesch then made a presentation to encourage Board approval of the PIPE.  The Board meeting minutes show that Shanfelter readily supported Mariano's proposal, "not[ing] that he was familiar with these types of PIPE transactions and that he had reviewed the materials provided by JP Morgan and thought the proposed transaction was a good deal."  No outside advisors provided any opinions about how a PIPE transaction would affect Patriot National or why it was even favorable or necessary to pursue.

96.     Mariano also informed the Board that he and certain members of management had already begun the Strategic Review, which they referred to as "Project Vikaran."  As part of this project, they had discussions with Evercore "to explore all alternatives available to [Patriot National] to increase/optimize shareholder value."  The Board made no effort at the meeting to challenge or even account for any conflicts of interests related to Mariano a running a strategic review process.

97.     The Board did not meet again prior to approving the PIPE transaction.  Instead, Mariano kept certain members of the Board in the dark, waiting to coerce them into quickly signing a written consent to approve the PIPE without adequate information.  Specifically, on December 9, 2015, Pesch emailed the Board members to have a telephone conference about approving the PIPE Transaction the following day.  In response, Smith requested that any documents related to the deal be sent over for him to review.  Pesch did not respond or send the documents until

December 10, 2015 at 9:52 am.  Smith then privately vented to Shanfelter via email, "This last minute delivery of documents has got to stop."

98.    On December 13, 2015, the Board approved a PIPE transaction between Patriot National, Mariano, and three hedge funds, Hudson Bay Master Fund Ltd. ("Hudson Bay"), CVI Investments, Inc. ("CVI"), and Alto Opportunity Master Fund, SPC ("Alto") (collectively, the "PIPE Investors") (the "PIPE Transaction").

99.    Under the terms of the PIPE Transaction, the PIPE Investors paid Mariano approximately $30 million for 2.5 million shares of Company stock owned by him, and paid approximately $20 million to Patriot National for 666,666 shares of Patriot National's common stock and warrants that were exercisable for common stock.

100.    The common stock sold to the PIPE Investors was priced at $12 per share, a discount to the prevailing market price of approximately $13.

101.    Patriot National also entered into a "Back-to-Back Agreement" with Mariano, pursuant to which, upon the exercise of the warrants, Patriot National would purchase a number of shares of Patriot National's common stock owned by Mariano equal to 60% of the shares to be issued in connection with the exercise by the PIPE Investors of the warrants.

## VI.    The PIPE Transaction backfires and threatens Mariano's control of Patriot National

102.    The market reacted disastrously to the news of the PIPE Transaction, causing Patriot National's stock to plunge to $7.79 per share on Monday, December 14, 2015, from a price of $13.08 per share on Friday, December 11, 2015.  Unbelievably, on December 14, 2015, while Patriot National's stock price was cratering, Mariano sent an email to Smith and Shanfelter touting his successful "stewardship" of Patriot National and a "second capital raise [with]in 11 months"

asking them to "[p]lease think about sending some stock options [and] [r]estricted stock my way…Not a bad strike price right now."

103.    With Patriot National's stock price in free-fall, Mariano tried to rectify the harm caused by the PIPE Transaction, but still unwilling to return the $30 million he needed for GIC.

104.    Without holding any Board meeting and without a fairness opinion, the Board approved amendments to the PIPE Transaction via unanimous written consent on December 22, 2015.  Under the terms of the revised PIPE Transaction, Mariano kept all of his $30 million while Patriot National was forced to give back all $20 million it had received.  Patriot National, however, was still obligated to issue stock pursuant to the warrants.

105.    In this regard, the Back-to-Back Agreement was modified to require Patriot National to purchase from Mariano 100%, rather than 60%, of the shares to be issued in connection with the exercise of the warrants by the PIPE Investors.

106.    Mariano kept his $30 million because he needed those funds to provide additional capital to GIC.  Mariano pumped $17 million of the money he received from the PIPE Transaction directly into GIC in order for it to meet its capital requirements deadline of December 31, 2015. GIC, however, continued to owe Patriot National the millions of dollars for past due accounts payable, which as of December 31, 2015 totaled $27 million.

107.    Almost immediately following the deal, Mariano came to believe that certain of the PIPE Investors were short-selling Patriot National's stock.  This created a problem for Mariano, because any reduction in Patriot National's stock price would increase the number of shares the PIPE Investors would obtain from Mariano pursuant to a warrant exercise (the lower Patriot National's stock price was, the greater number of shares issued upon an exercise was), along with causing other personal problems for Mariano.

108.    At the time he entered into the PIPE Transaction and agreed to the Back-to-Back Agreement, Mariano accounted for Patriot National's stock price at $12 per share.  At that price and under the terms of the original Back-to-Back Agreement, Mariano would have seen his ownership stake decline by approximately 2.5 million shares but he still would have maintained control of Patriot National.  However, with Patriot National's stock price around $7 per share, Mariano was at risk of losing control of Patriot National as the number of shares he would need to surrender following an exercise of the warrants had increased substantially.

109.    Furthermore, at the time Mariano entered into the PIPE Transaction, he had pledged 7,932,080 of his Patriot National shares to UBS and Fifth Third in connection with his loans from the two banks.

110.    With respect to Fifth Third, Mariano was required to pledge to it $50 million worth of Patriot National stock.  On July 28, 2015, Mariano pledged 2.86 million shares to Fifth Third at a time when Patriot National's stock closed at $17.63.  However, as Patriot National's stock price began to fall, Mariano was required to post additional stock to maintain a $50 million balance.

111.    Accordingly, on September 29, 2015, Mariano pledged an additional 361,700 shares, when the stock closed at $15.52.

112.    A month later, on October 29, 2015, Fifth Third required Mariano to pledge an additional 1.255 million shares, at a price of $13.01 per share.

113.    Again, on December 8, 2015, when Patriot National's stock closed at $13.73, Mariano was required to pledge an additional 2.125 million shares.

### VII.    Mariano causes Patriot National to launch a repurchase program so that he can maintain control

114.    Mariano responded to Patriot National's declining stock price by manipulating Patriot National to take measures to increase its stock price in his favor, hoping to limit his

exposure as much as possible under the terms of the PIPE Transaction and his bank loans, for which Mariano's Patriot National stock served as collateral.

115.    Mariano caused Patriot National to launch a share repurchase program to help him achieve this goal.  A Company-funded stock repurchase program would increase Mariano's control of Patriot National for free and provide him with a means to drive out hedge funds as holders of Patriot National stock.

116.    In early 2016, Mariano told Shanfelter about his idea to implement a stock repurchase plan and began discussing it with Patriot National's outside counsel.

117.    In addition to his plan to drive the stock up with the repurchase program, Mariano sought to publicly announce that the Board was undergoing a strategic review in the hopes that the news would drive up the price.  Mariano had Evercore review precedent announcements, which found that "[a] company's stock went up, on average, 4.6% the day after the announcement[.]"

118.    On February 24, 2016, Patriot National's stock closed at $6.11 per share.  After the close of trading, Patriot National released its 2015 year-end earnings Form 8-K.  The following day, Patriot National's stock closed at $4.54 per share.  Patriot National's stock continued to drop each day from $4.37 per share, to $4.22 per share, to $3.92 per share.  Finally, on March 2, 2016, Patriot National's stock closed at only $3.65 per share.

119.    Shanfelter assisted Mariano to put the repurchase program into effect by proposing the idea to the Board.  On the morning of March 1, 2016, Shanfelter emailed the Board to propose it approve a repurchase program.

120.    In response to questions from the Board, Mariano justified the program by explaining, "[g]iven the impending offers we expect for the company[,] we also think this is a very

short term event[.]"   Explaining further, Mariano stated that his proposed buyback "[p]lan is confined to a direct stock repurchase only up to $6 a share[.]"

121.   On March 3, 2016, without the benefit of any opinion as to the impact of the stock repurchase plan, much less a discussion about whether Mariano had any conflicts of interests related to it, the Board authorized a stock repurchase program of $15 million (the "Repurchase Program").  The consent also required that any repurchase of stock must "represent a sound use of [Patriot National]'s funds," and could "not impair the capital of [Patriot National]."

122.   The Board initially appointed Pesch and Shields as administrators of the Repurchase Program.  The Board further decided that shares should not be repurchased if the stock went over $6 per share.

123.   Despite appointing Pesch and Shields as administrators of the Repurchase Program, Mariano controlled the Repurchase Program from the beginning, personally selecting the number of shares to repurchase, and having his personal wealth management team at UBS execute the stock repurchases on behalf of Patriot National.

124.   Patriot National announced the Repurchase Program after the market closed on March 3, 2016, with Mariano stating in the associated press release that the Repurchase Program was instated because "[w]e believe [Patriot National]'s common stock is significantly undervalued and does not reflect the value or the earnings power of our operating platform…" That press release further disclosed that the Repurchase Program was "effective immediately," and that it "gives management discretion in determining the market and business conditions under which shares may be purchased from time to time, in open market transactions or in negotiated off-market transactions."

125.    The press release concealed Mariano's true purposes for the Repurchase Program, which were unlawful and completely self-interested.  By the time of the March 3, 2016 press release, Mariano's goals to accomplish under the Repurchase Program included attempting to limit his exposure under the PIPE Transaction and his personal bank loans, while increasing his ownership percentage of Patriot National for free.

126.    On March 9, 2016, again without any deliberation, the Board modified its prior approval and expressly put Mariano in charge of the Repurchase Program to "make all necessary, appropriate or advisable day to day determinations regarding the purchase of shares of Common Stock in the Repurchase Program."

127.    Immediately after officially being put in charge, Mariano continued aggressively buying back Patriot National stock.

128.    Between March 3 and March 14, 2016, the last day before the blackout period started, Patriot National had bought 992,182 shares, costing Patriot National $5.7 million.

129.    Following the blackout period, Mariano continue repurchasing stock. In total, between March 3 and April 15, 2016, when the Repurchase Program was paused, Patriot National had repurchased 1,360,457 shares for $8,672,616.48 and Mariano had increased his ownership stake in Patriot National by approximately 2.5%.

**VIII.   The Board's improper rejection of the warrants**

130.    On April 5, 2016, Hudson Bay and CVI each submitted notice to Patriot National for the delivery of 1 million and 250,000 shares, respectively, under their warrants.  On April 8, 2016, Hudson Bay submitted a second notice pursuant to the same warrant for the delivery of 356,004 shares.

131.    Allowing Hudson and CVI to exercise their Warrants would have dropped Mariano's ownership stake below 50% to 48.4% due to the Back-to-Back Agreement.

28

Unsurprisingly, Mariano did not comply with their notices.  Mariano had Pesch immediately draft letters to these PIPE Investors denying their exercise notices, which the Board quickly approved.

132.    After being denied their shares pursuant to the warrants, on April 13, 2016, Hudson Bay sued Patriot National and Mariano (as well as a nominal defendant transfer agent) in the United States District Court for the Southern District of New York for breach of contract. This action was captioned: *Hudson Bay Master Fund LTD. v. Patriot National Inc., et al.*, Case No. 1:16-cv-02767 (S.D.N.Y. filed Apr. 13, 2016).

133.    In total under the warrants, CVI and Hudson Bay each held approximately 3,667,499 shares issuable upon the exercise of the warrants.  If they were to exercise all of these warrants, Mariano would be forced to transfer over 7 million shares of Patriot National stock to Patriot National's coffers.  Based on Patriot National's outstanding shares and Mariano's holdings as of March 14, 2016, this would have caused Mariano's control to fall from 53.8% to a mere 26.8%.

134.    Even if Mariano was not concerned with his loss of control, he could not have complied with the attempted exercise of the warrants because all his shares (and some he did not have) were pledged to UBS and Fifth Third pursuant to his loans with them.  By the time the PIPE Investors sought to exercise their warrants in April 2016, Mariano had pledged 12,107,158 of his 14,629,138 Patriot National shares for various loans, including 10,525,100 shares to Fifth Third, 1,330,380 shares to UBS, and 251,678 shares to Walsh pursuant to a loan he had taken from Walsh in 2016.  As such, he had no unencumbered shares to transfer to Patriot National pursuant to the Back-to-Back Agreement.

IX.    **Throughout 2016, Mariano had Patriot National undertake a Strategic Review to raise additional funds for himself and GIC**

135.   In 2016, Mariano began seriously pursuing taking Patriot National private again—barely a year after going public.

136.   From the start, Mariano ensured that he was personally running the Strategic Review, meeting prospective buyers and taking steps to exclude a special committee of directors that purportedly was in charge of the process (the "Special Committee").

137.   In particular, Mariano also controlled the financial figures being sent to perspective buyers.  Mariano was guarded over Patriot National's financials, because he used them to justify the specious financial projections used to shop Patriot National.  For example, on January 14, 2016, Evercore pushed back on Mariano and Wilson's margin projections from 2016-2019.

138.   However, by mid-April 2016, many of the potential transactions and other opportunities that Evercore had tried to arrange as part of the Strategic Review began fizzling out. By the end of April, Mariano was discouraged about whether Evercore's process would result in securing funds for his personal interests.  As such, on April 27, 2016, Mariano had Wilson schedule a call with Houlihan Lokey Capital, Inc. ("Houlihan") for May 3, 2016, to discuss alternative options.

139.   On May 3, 2016, Mariano and Wilson had a call with Houlihan.  After that call, Houlihan emailed Wilson stating, "As a follow up to our discussion last week, attached please find the qualifications for our Capital Markets Group as well as a preliminary look at financing ….We believe this deal will be attractive to debt investors and that it presents an attractive alternative." On May 12, 2016, Wilson had another call with Houlihan.

140.   Mariano and Wilson affirmatively took steps to hide their exploration of a potential transaction from everyone outside their circle of cohorts, including some of the Board members. For example, on May 20, 2016, Wilson emailed Mariano from his personal account:

"toddewilson@gmail.com," to Mariano's private business email address, SM@six-points.com, with the subject line, "Calculation" to discuss their schemes.

141.    Mariano's scheme to have Patriot National enter into a transaction for his personal benefit was disrupted when Ebix sent the Board an unsolicited offer to acquire Patriot National for $9.50 per share, representing an approximately 30% premium to Patriot National's stock price at the time.  On June 15, 2016, Ebix went public with its offer of $9.50 per shares, which represented a 37% premium to the closing price of Patriot National's stock the previous day.

142.    On August 1, 2016, Patriot National issued a press release, "Patriot National Receives Enhanced Offer from Ebix, Inc.; Commences Strategic Discussions."  The press release stated:

> FORT LAUDERDALE, Fla., Aug. 1, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced that the Special Committee of its Board of Directors (the "Special Committee") has agreed to consider an enhanced offer for a potential acquisition by Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, e-governance and healthcare industries.
>
> As previously reported by Ebix on June 15, 2016, the Special Committee received an unsolicited offer from Ebix to acquire 100% of the outstanding stock of Patriot National for $9.50 per share.  The Special Committee has now received a revised and enhanced offer from Ebix to acquire Patriot National for a total enterprise value of $475 million, which the Special Committee expects will yield a price per share that materially exceeds Ebix's initial offer, after payment of Patriot's related transaction expenses, all outstanding debt obligations, and certain accounts payable.
>
> Ebix has also signed a confidentiality agreement with Patriot National and has begun comprehensive due diligence with [Patriot National].  Patriot National does not expect to make any further announcements regarding this offer until the Special Committee has concluded its ongoing consideration of all value-enhancing strategic opportunities.

143.    Initially, Mariano was not opposed to a transaction with Ebix as long as the terms were satisfactory for his personal interests.  However, he took steps to ensure that if a deal was reached, it would be on his terms, even if they harmed the minority stockholders' interests.

144.    By the end of the summer of 2016, however, Mariano had soured on any transaction with Ebix.  Rather than breakoff negotiations with Ebix and inform the public of this fact, Mariano strung Ebix along and pretended that he and Patriot National were negotiating in good-faith with Ebix.

**X.    Mariano had Patriot National enter a Leveraged Recapitalization to get money for GIC and cements his power over the Board**

145.    As 2016 went on, it became clear to Mariano that no transaction would occur prior to the end of the year, and thus he started hunting for a new source of funds that he could pump into GIC to allow it to meet its year-end capital requirement.

146.    To that end, Mariano began exploring the possibility of doing a leveraged recapitalization (a "Leveraged Recap") in which Patriot National would take out a much larger loan to issue a massive dividend.  Mariano intended to use the money issued via dividend to pump into GIC to ensure that it stayed solvent and complied with its annual capital requirement.

147.    Mariano engaged Houlihan to find potential lenders willing to fund a massive dividend, which was designed to solve Mariano's short-term liquidity desires.  Because Mariano knew that this plan would be perceived as self-interested and harmful to Patriot National, he continued to keep it secret until he could gather sufficient momentum and then lobby for the Board's quick approval.  For example, on September 8, 2016, Mariano emailed Wilson stating, "we need to make sure we can handle debt at both high and low.  If so.  I will sign Houlihan this week."  Wilson replied, "Absolutely…we should also talk about what, if anything, to say about it internally.  I don't trust certain people's ability to keep their mouth closed."  Mariano then

responded, "Pesch.  Definitely.  Question is can Tom [Shields] and Dave [Quigley, Patriot National accounting executive,] keep quiet.  They need to be in on it."

148.    In addition to pursuing a Leveraged Recap, Mariano also engaged Aon Securities Inc. to help find other potential investors for Patriot National.  While Aon's engagement letter contemplated it working as a financial advisor for Patriot National to find potential acquirers, in reality, Aon worked with Mariano to help him arrange a going-private transaction, which was the type of transaction Mariano wanted as it would benefit him the most.  Aon represented Patriot National in finding potential acquirers at the same time it was working with Mariano to help him find investors for another of his companies, Ashmere.

149.    Ashmere is a workers' compensation insurance company that Mariano attempted to launch in 2016, although Mariano started exploring launching the company in 2015.  Mariano's plan for Ashmere to quickly ramp up its business by taking $100 million of GIC's book of business from GIC within the first year of operations.

150.    In the same vein, Mariano simply moved GIC's management and directors to Ashmere.  All of Ashmere's executives were previously members of GIC's executive team until October 2016, when they left GIC and joined National Fidelity and Ashmere.  Similarly, with one exception, each of the directors, is currently or previously served as a director, executive, or employee of GIC or PN.  The one exception is Defendant Walsh's son, Walsh, Jr. (he has since resigned from Ashmere's board).

151.    As of October 6, 2016, Mariano indirectly owned Ashmere, and controlled it.  In the fall of 2016, Mariano retained Aon to help him investors for Ashmere.  On November 28, 2017, Mariano sold Ashmere and its parent holding company.

152.    The Board had not authorized either Houlihan's or Aon's engagement.

33

153.    By September 25, 2016, Aon had set up meeting in New York City for Mariano and Wilson to meet with three potential investors.

154.    On September 27, 2016, Mariano emailed Wilson stating, "Most likely We will have to do the [H]oulihan deal[.]  It's the quickest deal to get cash[.]  Solves our vendor issue and allows for deleverage of clients[.]  So many different things going on I am getting dizzy.  Lol".

155.    On September 29, 2016, Aon emailed Mariano to recommend that Patriot National move forward with another potential acquirer.  In the email, Aon stated that during the sales process, they had "weeded-out three potential buyers as they did not have the ability to proceed on … our required time frame."  Aon's echoed this same sentiment in a September 30, 2016 email to Mariano, stating that "I have softly let-down [two potential acquirers], convincing them that the time frame is too fast for them."  There was no business reason for Patriot National to sell itself on an expedited basis other than Mariano's personal desire for liquidity.

156.    On the evening of October 4, 2016, Mariano emailed Del Pizzo, stating "Heading home from a week in Nyc[.]  Can we talk on dividend tomorrow with Todd [Wilson?]"  Mariano needed to start building Board support for his dividend plan, so he began by telling Del Pizzo, his most trusted director on the Board, more details about his plan.

157.    On October 11, 2016, Cerberus Business Finance LLC ("Cerberus") sent Houlihan and Mariano a revised, non-binding outline of proposed terms for a $280 million financing package "for the purposes of repaying existing indebtedness, funding a common stock buyback, paying a dividend to shareholders…"  The package consisted of a $250 term loan and $30 million revolving credit line.  While Houlihan had received other term sheets for loans in connection with the Leveraged Recap, it highlighted to Mariano that Cerberus was offering the highest amount of financing and could close within Mariano's preferred time frame.

158.    October 18, 2016, a potential acquirer (*i.e.*, "Party A") sent Mariano an unsigned letter of intent.  Its term sheet was similar to that of Ebix's offer with the total enterprise value being $475 million.  Where Party A's offer differed was with respect to how it treated Mariano.

159.    On October 19, 2016, Mariano forwarded Party A's unsigned letter of intent via email to Smith, Del Pizzo, Walsh, and Corey.  In the accompanying email, Mariano emphasized that Party A "ha[s n]o issue with us doing a dividend or buyback of stock ahead of deal given timing of potential closing."  In the same email, Mariano finally provided more details to the Board about his scheme to implement a Leveraged Recap, telling the directors that "Cerberus is [the] best proposal and that the Cerberus's loan's "[c]losing [was] set for November 10" pending Board approval.  Mariano further told the Board that an acquisition and a Leveraged Recap were "not mutually exclusive," *i.e.*, Patriot National could "do the refi and dividend in November and close the [Party A] deal late q1."

160.    Mariano also organized a Board call for October 21, 2016.  Prior to the meeting, Smith emailed Walsh and Corey, stating that "In my mind (unless there is something that I am totally missing), we are being asked to refi the company's debt at an interest rate that is 220% higher than the current interest rate and pay $11+ million in fees for the opportunity and then pay out $100 million.  Net, net we are being asked to approve borrowing money to payout money to shareholders (i.e. to solve Steve's personal financial problems).  This is lunacy!"

161.    At the meeting, Mariano and the Board discussed Party A's offer and the Leveraged Recap.

162.    After the Board meeting, at 4:38pm, Corey emailed Smith and Walsh, stating, "For the first time I think we are finally getting valuable information.  I really want to drill down on the use of capital for operating the company.  I think it is BS to say that we want to make sure our

shareholders love us and want to stay with us.  Nobody takes on this kind of debt for that purpose."

Smith quickly replied, "I agree..."  Smith then commented, "Frankly, I am pleasantly surprised

with this call.  That said, the proof will be in the pudding on this shareholder distribution notion.

My only disappointment is that Steve did not 'put his cards on the table' re: his GIC capitalization

challenge, which we will need to press him on next time we all talk.  I think Jack heard the threat

of losing us as board members and Steve has come to grips with the impact of that possibility (at

least for now).  Talk to you guys on Monday with Kilpatrick."

163.    In late October and early November 2016, Mariano convinced the Board to approve

the Cerberus loan and a leveraged recapitalization.  In convincing the Board, Mariano told its

members that he reaching a tentative agreement with a third-party to acquire Patriot National and

take Patriot National private, but that the deal could not close before the end of the 2016.  As such,

a leveraged recapitalization was necessary to provide GIC with enough funding to meet its year-

end capital requirements.

164.    On November 9, 2016, the Board approved entering into a $280 million credit

agreement with Cerberus, a dividend of $2.50 to all stockholders for an aggregate total of $67

million (the "Dividend"), and the expansion of Patriot National's stock repurchase program by

approximately $33.7 million (collectively, the "Leveraged Recap").

165.    On November 17, 2016, Patriot National filed a Form 8-K with the SEC, stating in

relevant part:

> **Item 5.02. Departure of Directors or Certain Officers; Election of Directors;
> Appointment of Certain Officers; Compensatory Arrangements of Certain
> Officers.**
>
> On November 17, 2016, Patriot National, Inc. (the "Company") issued a press
> release to announce that the Board of Directors (the "Board") of [Patriot National]
> appointed Mr. James E. O'Brien and Dr. Sean Michael Bidic as directors of [Patriot
> National], effective immediately, to fill two vacancies. Mr. O'Brien will serve as a

Class III director, and Dr. Bidic will serve as a Class I director. *The Board affirmatively determined that Mr. O'Brien and Dr. Bidic are independent under the guidelines for director independence set forth in [Patriot National]'s Corporate Governance Guidelines and under applicable New York Stock Exchange rules. The press release is furnished as Exhibit 99.1 and is hereby incorporated by reference into this item 5.02*
Mr. O'Brien was appointed to the Audit Committee. The Board has determined that Mr. O'Brien meets all applicable independence requirements to serve on such committee, including those set forth in [Patriot National]'s Corporate Governance Guidelines, under New York Stock Exchange rules and under the rules and regulations of the Securities and Exchange Act of 1934, as amended. Dr. Bidic has not yet been appointed to serve on any committees.

166.    Patriot National's press release, attached to the Form 8-K as Exhibit 99.1, states:

FORT LAUDERDALE, FL., November 17, 2016 – Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions to the insurance industry, today announced the appointment of James O'Brien and Sean Bidic, M.D. to the Board of Directors, effective today.

"We are delighted to welcome Mr. O'Brien and Dr. Bidic to the Board," said Steven M. Mariano, Chairman, President and CEO of Patriot National. "Mr. O'Brien is an accomplished investment banker whose expertise in capital markets strategy and transactions will add significant financial insight to the Board. Dr. Bidic is a distinguished healthcare professional and a successful business owner who will utilize his substantial medical and healthcare experience to accelerate our expansion in telemedicine."

Mr. O'Brien is currently a managing director in Robert W. Baird's Real Estate Investment Banking Group, where he has built a strong track record of structuring and executing successful equity, debt and M&A transactions for both public and private companies. Previously, he was a managing director at FBR Capital Markets, where he established and led the firm's Real Estate Private Equity and Advisory Group. Prior to FBR, Mr. O'Brien was a member of the Private Equity Placement Group with UBS Investment Bank. Mr. O'Brien received a BS in management from St. Joseph's University and an MBA from Duke University.

Dr. Bidic is the founding president of American Surgical Arts, PC, a New Jersey-based medical corporation. He is a board-certified specialist in microsurgery and reconstructive surgery with an added qualification in surgery of the hand. From 2005 to 2010, Dr. Bidic was an assistant professor of plastic surgery and program director of the Hand and Microsurgery Fellowship at the University of Texas

Southwestern Medical Center in Dallas, America's leading plastic surgery residency program. Dr. Bidic graduated cum laude from the University of Pennsylvania in Philadelphia with degrees from the Wharton School of Business. He completed his medical school training at the Columbia University College of Physicians and Surgeons in New York City.

167.    The above statements failed to disclose that Bidic is Mariano's cousin or that O'Brien had a longtime personal friendship with Mariano.  Their undisclosed personal relationship with Mariano are material information because, in determining the value of their Patriot National stock, shareholders relied on the proper functioning of an independent Board as a balance to prevent Mariano's self-interested looting of Patriot National.

XI.    **Plaintiff Wasik filed suit in Delaware challenging the Leveraged Recap and put Mariano and his various schemes at Patriot National under close scrutiny for the first time**

168.    On November 30, 2016, Wasik filed the Wasik Action challenging the Leveraged Recap.  On December 1, 2016, Wasik moved for a temporary restraining order in connection with the Repurchase Program and the Dividend.

169.    On December 7, 2016, the Court granted the motion, enjoining the Dividend and the Repurchase Program.

170.    On December 19, 2016, the Court modified its prior order, enjoining the Dividend and the expansion of the Repurchase Program approved by the Board on November 9, 2016.  On March 13, 2017, Wasik and Patriot National entered into a stipulation extending the effects of the Court's modified order through the end of that litigation.

XII.    **In early 2017, Mariano devised a new scheme for Patriot National to cover GIC's capital deficiencies**

171.    Despite the injunction preventing the Dividend, Mariano continued to scheme to extract funds out of Patriot National and avoid state receivership of GIC – material information that was concealed from Patriot National stockholders.

172.    On March 3, 2017, Patriot National filed a Form 8-K with the SEC disclosing that on February 27, 2017, Patriot National, GIG, and Mariano, in his personal capacity, executed a binding term sheet whereby GIG was provided the $30 million that Mariano first sought to give to his private company as part of the Dividend (*i.e.,* the "GIC Bail Out").  In exchange for the $30 million, GIG, *inter alia*, agreed that Patriot National would be GIC's exclusive service provider for 10 years and allow Patriot National access to GIC's books and records, as well as its board meetings.

173.    Almost immediately upon getting the cash, Mariano and GIG did not comply with the terms of the GIC Bailout by preventing: (1) Patriot National's access to GIC's books and records, and (2) attendance at a GIC board meeting.

## XIII.   The Wasik Action Sparks BDO Investigation

174.    The Wasik Action forced BDO and the Audit Committee to begin investigating certain Patriot National subsidiaries acquired by Mariano in 2015 even though both the Audit Committee members and BDO had been present when these transactions were initially entered and had been obligated to review them at the time pursuant to Patriot National's Related Party Transaction Policy and BDO's duties as auditor.  In particular, the Audit Committee and BDO started investigating Patriot National's finances, including transactions involving Snow-related companies and Mariano's expenses that he charged to Patriot National.

175.    With respect to the Snow related companies, the Audit Committee and BDO were investigating accounting matters related to Patriot National's acquisition of the three companies from Snow in 2015 (*i.e.,* HSS for $9.65 million on April 1, 2015, Selective for $3.846 million on April 1, 2015, and Carman for $2 million on June 15, 2015).

176.    Patriot National delayed filing its annual report on Form 10-K for 2016 as a result of the still ongoing BDO investigation.  Patriot National has yet to file its annual report on Form 10-K for 2016.

177.    On Thursday, July 13, 2017, after the market closed, Patriot National announced that Mariano had resigned from his officer and director positions.  There was no mention of any severance payment to Mariano in this press release.  In a Form 8-K filed the following day, Patriot National revealed that the Board approved a $10 million "Severance Payment" (the term used in the 8-K) to Mariano (the "July 14 8-K").  That Severance Payment consisted of $6 million that was paid immediately and four annual payments of $1 million apiece starting August 2018 ("Mariano's Severance").

178.    On August 8, 2017, GIC filed its 2016 audited financial statement with the FOIR.  The filing included BDO's Independent Auditor's Report, which was, for the first time, critical of GIC and Mariano.  Notably, BDO refused to "express an opinion on the 2016 statutory basis financial statements" because it would not obtain sufficient and appropriate audit evidence to provide an audit opinion.  It also concluded that GIC appeared to lack sufficient capital as of December 31, 2016, which risked action by Florida insurance regulators.

179.    With respect to the GIC Bailout, BDO noted that, as of August 4, 2017, GIG had already breached its terms, including:

a.      "The required provisions include Section II of the [GIC Bailout], which requires that GIC extend the renewal expiration date of all service agreements with Patriot National Inc. by ten years from the expiration date."; and

b.      "Additionally, GIC distributed $8.5 million to GIC in spite of the covenants in Section III of the [GIC Bailout], which prohibited the issuance of dividends or distributions, or any further advances to any shareholder or GIC.

180.    BDO also stated that, as of December 31, 2016, GIC had an admitted income tax recoverable balance of $16,948,000 due from GIG, and that BDO had "evaluated this matter and concluded that this recoverable should be non-admitted as of December 31, 2016." However, BDO noted that GIC "has not recorded this adjusted in the accompanying December 31, 2016 statutory financial statements[, and] [a]s a result, we believe that admitted assets and capital and surplus are each overstated by $16,948,000 as of December 31, 2016."

181.    In addition, BDO stated that GIC held approximately 1,936,000 shares of Patriot National stock as of December 31, 2016, with a fair value of approximately $9 million.  Unrealized losses on this investment in Patriot National stock amounted to approximately $10.9 million as of December 31, 2016.  GIC did not classify the loss as other-than-temporary impairment, but "was not able to provide sufficient audit evidence to support the conclusion that an other-than-temporary impairment of these securities has not occurred as of December 31, 2016."  If an other-than-temporary adjustment were recorded by GIC, the loss would have been recorded as a realized loss.

182.    BDO also discussed related-party transactions, stating that, as of December 31, 2016, GIC and Guarantee Underwriters Inc. ("GUI"), another subsidiary of GIG, exchanged certain liabilities, whereby GIC exchanged $8,022,643 in amounts payable to a related party, Patriot Underwriters, Inc., a wholly owned subsidiary of Patriot National, in exchange for $8,022,643 in "Funds Held on behalf of reinsurers by GUI."  This assignment of GIC's liability to Patriot National was done unilaterally and without the requisite consent of Patriot National.

183.    BDO further explained that it was not until July 27, 2017, that "an agreement was executed between GIC and [Patriot National], in which [Patriot National] agreed to the assignment of the receivable balance due from GIC to GUI as of December 31, 2016."  Under the terms of the assignment, GIC agreed to guarantee GUI's payment of the $8,022,643 to Patriot National.  While

the agreement was executed in July 2017, GIC paid Patriot National on behalf of GUI in April 2017, which resulted in a non-admitted receivable of $8,022,643 from GUI to GIC.

184.     Notably, GIC did not record any liability associated with a guaranty of the GUI obligation as of December 31, 2016, despite being required to do so.  Moreover, "[t]he guarantee and payment of the GUI obligation, resulting in a non-admitted asset is a form of advancing funds to a related party [and] requires advanced approval from the [FOIR]."  GIC did not get advanced approval.  Based on this, BDO concluded that, "we believe that capital and surplus are each overstated by $8,011,643 as of December 31, 2016."

185.     Based on BDO's conclusions, it is clear that Mariano and GIC simply transferred GIC's debt to GUI to get the debt off of GIC's books for the December 31, 2016 capital requirement and did not document or get approval of the transfer or have GIC guarantee the debt because doing so would have required that the debt to be kept on GIC's books.  It was only after Wasik filed suit and caused an investigation into Patriot National and GIC that Mariano and GIC attempted to paper the transfer after the fact and retroactively had GIC guarantee the debt.

186.     BDO also discussed certain transactions with Snow and Snow related entities, including that:

a.      Carman Corporation and Steel Corporation, both of which are owned by Snow, owe GIC a total of approximately $8.4 million as of December 31, 2016 ($5.4 million for Carman and $3 million for Steel);

b.      Snow also has a management position and an ownership interest in Progress Physical Therapy, which executed a consulting agreement for monthly fees of $225,000 per month with GIC in October 2016, incurring total fees of $675,000 in 2016;

c.      BDO was "unable to determine whether the transaction with [Snow] or companies owned or controlled by [Snow] have been appropriately accounted for and disclosed in [GIC's 2016 financial statement]"; and

d.      GIC had two notes receivable from Carman Corporation totaling a combined $5.5 million but did "not provide [BDO] with sufficient audit evidence to support the collectability of these notes or authoritative

statutory support for the admissibility of these notes as of December 31, 2016, [under Florida law]".

187.    BDO further stated that, on December 30, 2016, Quadra Capital Corporation LCC ("Quadra"), a company that is owned by current and former GIC officers, executed a promissory note to repay $1.2 million to GIC that GIC advanced them during 2016.  GIC included this note as an admitted asset for 2016, but BDO stated that it had evaluated the matter and "concluded that the note should be non-admitted as of December 31, 2016" under Florida law.

188.    Finally, BDO addressed whether GIC could continue as a going concern, concluding that GIC had "suffered losses from operations and reflects a capital surplus level of $28.8 million as of December 31, 2016 that raise substantial doubt about its ability to continue as a going concern."   However, BDO noted that GIC had not recorded adjustments to income tax recoverable of $16,948,000, $1,200,000 related to Quadra's promissory note, and $8,022,643 due to Patriot National as of December 31, 2016.  Taken together, these amounts total approximately $26.2 million, which, when subtracted from GIC's claimed surplus of $28.8 million results in $2.6 million, which is well below the company's required minimum capital requirement as of December 31, 2016, of $19.3 million.  BDO warned that "[t]his capital deficient could result in action by the [GIC's] regulators."

**XIV.   In August 2017, GIC fell under the Administrative Supervision of the FOIR.**

189.    On August 18, 2017, the FOIR filed the Consent Order for Administrative Supervision, *In the Matter of: Guarantee Insurance Company*, Case No. 208236-17-Co (Aug. 18, 2017) (the "Administrative Supervision Order").

190.    The Administrative Supervision Order provided that "[a]fter a complete review" of GIC's records, "[t]he [FOIR] has determined that grounds exist for [GIC] to be placed in administrative supervision for the purpose of protecting the assets of [GIC] and protecting the

interests of its insureds during the implementation of a proposed corrective action plan[,]" which "could result in both significant restructuring of [GIC's] business as well as the infusion of capital."

191.     The Order provided GIC until September 1, 2017 to submit a plan detailing, *inter alia*, how it will meet its capital requirements, projections that will provide sufficient reserves for it to pay all policyholder claims and other liabilities as they come due; a written summary of its corporate governance and internal control weaknesses; and re-audit its financial statements for 2016.

192.     Moreover, the Administrative Supervision Order provided that "[GIC] shall cease writing any new business, and shall provide notice to its appointed agents that no new business may be written."

193.     The Administrative Supervision Order also sought to further prevent Mariano's expropriation by prohibiting GIC from "wast[ing] assets or expend[ing] funds in excess of $10,000, other than in the ordinary course of business, without the proper written consent of the [FOIR]."

## XV.     GIC goes into state receivership and Patriot National announces that it will be filing for bankruptcy protection

194.     On November 13, 2017, FOIR put GIC into state receivership ("GIC's Receivership").  On that day, the FOIR sent a letter to Florida's Department of Financial Services (the "DFS") "petitioning for an order appointing the [DFS] as receiver and directing it to rehabilitate or liquidate the business of [GIC.]" (the "Receivership Letter").

195.     In the Receivership Letter, the FOIR states that "GIC has insufficient assets to pay all outstanding obligations and is insolvent" and that "GIC's insolvency renders its further transaction of insurance hazardous to its policyholders, subscribers, claimants, creditors, and the citizens of the state of Florida."

196.    The FOIR also found that "GIC knowingly filed a false financial statement with the [FOIR]" by "report[ing] collateral for Unauthorized Reinsurance as a liability for Funds Held by GIC[.]"  Specifically, the FOIR found that "GIC booked and availed itself of reinsurance credit at a time that it knew that it did not have sufficient cash and invested assets to cover this liability."

197.    Most importantly, the FOIR found that "GIC has systematically transferred funds, totaling $15,743,000 to Mr. Steve Mariano, the ultimate owner of GIC during the calendar year 2016 and through June 2017.  These transfers were made with no documented business purpose and no discernable benefit to GIC[.]"  The FOIR further concluded that "[w]hile Mr. Mariano benefitted individually from these transaction by receiving cash from GIC, this indebtedness diverted funds that otherwise could be used to increase the surplus of GIC and otherwise be available for the payment of policyholders."  Additionally, "the [FOIR] has identified other transactions involving parties with known association to Mr. Mariano that have been harmful to GIC."

198.    On November 22, 2017, Patriot National finally disclosed the severity of the issues at Patriot National and the ways in which it can affect Patriot National. On that date Patriot National filed a Form 8-K with the SEC, which stated in pertinent part:

> [Patriot National's] largest customer, [GIC] Company ("GIC"), which has historically accounted for approximately 60-70 percent of [Patriot National]'s business, consented to be placed into receivership on November 13, 2017. [Patriot National] has met with the Florida Office of Insurance Regulation (the "OIR") on various occasions, including most recently on November 20, 2017, seeking to obtain both payment for past services rendered to GIC and an agreement that would allow [Patriot National] to provide and receive payment for future services while GIC is in receivership.  However, based on the most recent meeting with the OIR and other authorities now engaged in respect of GIC, [Patriot National] does not believe these efforts will be successful. Accordingly, a major portion of [Patriot National]'s revenue and cash flow going forward will cease.

199.    Additionally, the Form 8-K informed stockholders that Patriot National could be put into bankruptcy as soon as December 3, 2017.  Patriot National also disclosed that on November 17, 2017, it obtained and entered into a Forbearance Agreement (the "Forbearance Agreement") with Cerberus related to Patriot National's credit agreement with Cerberus (the "Cerberus Credit Agreement").  The Forbearance Agreement was necessary because Patriot National was and continues to be in default of the Cerberus Credit Agreement due to its failure to deliver timely financial statements, its non-payment of interest due November 1, 2017 and its failure to comply with financial covenants.

200.    On November 28, 2017, Patriot National announced that it had reached an agreement in principle with its secured lenders to recapitalize Patriot National.  Under the terms of the agreement, Patriot National and its direct and indirect U.S.-based subsidiaries will file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

201.    Patriot National has not yet announced a specific date when it will be filing for relief under Chapter 11 of the United States Bankruptcy Code.

## MISREPRESENTATIONS AND OMISSIONS

### I.    The Registration Statement was Materially False and/or Misleading

202.    On January 15, 2015, Patriot National launched its IPO, offering 7,350,000 shares of common stock at $14 per share and raising a total of approximately $102.9 million. The shares were offered pursuant to the Registration Statement signed by Defendants Mariano, Shields, Del Pizzo, and Shanfelter.

203.    In connection with Patriot National's financial statements, the Registration Statement stated that "[t]he accompanying combined financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America

(GAAP)."   The Registration Statement further stated that Patriot National was "not currently subject to any material interest rate risk or credit risk."

204.    The Registration Statement also discussed Patriot National's "goodwill" assets, representing that, as of September 30, 2014, Patriot National had approximately $59.385 million of goodwill assets in its balance sheet.  Approximately $49.432 million was attributable to Patriot National's 2014 PCM and GUI Acquisitions.

205.    The Registration Statement claimed that "[i]n accordance with United States Financial Accounting Standards Board ('FASB') Accounting Standards Codification ("ASC") 350, Intangibles - Goodwill and Other, goodwill is not amortized but instead is tested for impairment at least annually (more frequently if certain indicators are present)…. There was no impairment as of December 31, 2013 or 2012 or for the years then ended."  The Registration Statement stated that Patriot National "assess[es] potential impairment on [its] goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired."

206.    The Registration Statement also stated that it had $2,137,140 million in accounts receivables owed by GIC as of December 31, 2013 and that "Management believes that the receivable balances from these largest customers [*viz.* GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience."  The Registration Statement explained that "Management assesses the collectability of [Fee Income Receivable from Related Parties, *viz.* GIC,] balances and adjusts the receivable to the amount expected to be collected through an allowance for doubtful accounts.  As of December 31, 2013, [Patriot National] maintained an allowance for doubtful accounts of approximately $2.5 million in

connection with fee income receivables from an unaffiliated insurance company customer" (*i.e.*, not GIC).

207.   The Registration Statement contained audited financial statements by Patriot National as of December 31, 2013 as well as unaudited financial statements as of September 30, 2014. As of December 31, 2013, the financial statements contained in the Registration Statement reflect Patriot National revenue from operations of $55.9 million, of which $9.4 million is attributable to GIC.  As of September 30, 2014, Patriot National's financial statements reflect revenue from operations of $62.5 million of which $24.6 million is attributable to GIC.

208.   With respect to GIC and other related parties, the Registration Statement identified the following "Risk Factors":

> **Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**
>
> ***
>
> Although we intend to expand our relationships with additional carrier partners and our service offerings to third-party clients in the future, we expect that in the near-term a significant portion of our revenues will continue to be derived through our relationships with [GIC], Zurich and Scottsdale.  As such, we will continue to be significantly impacted by the overall business levels of these carrier partners. *While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control.*  For example, the general effects of economic and labor market conditions on business levels, a variety of market or regulatory factors can impact our carrier partners' decisions regarding the markets they enter, the products they offer and the industries they target. *In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive*.  A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.

***Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.***

Immediately upon consummation of this offering, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, will beneficially own 59.5% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIC] Group, the parent company of [GIC].  As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not impact otherwise impact our actions in a manner that is adverse to us or our stockholders.  Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC]. …

Although Mr. Mariano is no longer a board member or officer of [GIC] Group or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIC] Group, Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders.

## CERTAIN RISK AND CHALLENGES

\*\*\*

***We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.***

\*\*\*

Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government sponsored programs such as Medicare and Medicaid. ***They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.*** Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients.  We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention.  ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us***.
(emphasis added)

209.    As required by Regulation S-K, the Registration Statement contained the following

"Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.

> *The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee*.

> In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

> · the nature of the related person's interest in the transaction;

> · the material terms of the transaction;

> · the importance of the transaction both to [Patriot National] and to the related person;

> · whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

> · whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

> · any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

> *The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*  The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

> Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

·   [Patriot National] was or is to be a participant;

·   the amount involved exceeds $120,000; and

·   any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

(emphasis added)

210.    The Registration Statement stated that the purpose for the IPO was to raise funds

to pay off existing debt.  The Registration Statement provided that the "use of proceeds" from the

IPO as follows:

> We estimate that we will receive net proceeds of approximately $92.7 million from this offering, after deducting underwriting discounts and commissions and estimated offering expenses payable by us (or if the underwriters exercise in full their over-allotment option, we estimate that we will receive net proceeds of approximately $107.0 million).  We will not receive any proceeds from the sale of the shares by the selling stockholders.

> We intend to use the net proceeds from this offering, together with borrowings under the senior secured credit facility or cash on hand, as follows: (1) $66.8 million to repay all outstanding amounts under the amended and restated first lien term loan agreement, dated as of August 6, 2014 (the "PennantPark Loan Agreement"), between, among others, us and certain of our subsidiaries, as borrowers, certain of our other subsidiaries and certain affiliated entities, as guarantors, and PennantPark Investment Corporation and certain of its affiliates, as lenders, comprising (i) an initial tranche (the "Initial Tranche") and (ii) an additional tranche (the "Additional Tranche"), and (2) $56.6 million to repay all outstanding amounts under the credit agreement, dated as of August 6, 2014 (the "UBS Credit Agreement"), between, among others, us and certain of our subsidiaries, the lenders party thereto and UBS Securities LLC, as lead arranger, bookmanager, documentation agent and syndication agent, in each case including accrued interest and applicable prepayment premiums

> As of September 30, 2014, we had approximately $66.5 million in outstanding borrowings under our PennantPark Loan Agreement and $56.6 million in outstanding borrowings under our UBS Credit Agreement.  The borrowings under the Initial Tranche of the PennantPark Loan Agreement were used primarily in connection with the Reorganization, as described elsewhere in this prospectus.  The borrowings under the Additional Tranche of the PennantPark Loan Agreement and the UBS Credit Agreement were used primarily in connection with the Acquisitions, as described elsewhere in this prospectus.  During the nine months ended September 30, 2014, on a pro forma basis giving effect to the Acquisitions, outstanding borrowings under our PennantPark Loan Agreement accrued interest at a weighted average rate of 12.5% and outstanding borrowing under our UBS

51

Credit Agreement accrued interest at a weighted average rate of 10.0%. Our PennantPark Loan Agreement requires quarterly amortizations with a final maturity on November 27, 2018. Amounts under our UBS Credit Agreement mature on August 6, 2019. UBS Securities LLC is a lender under our UBS Credit Agreement and will receive a portion of the proceeds of this offering. Accordingly, this offering is being made in compliance with FINRA Rule 5121. See "Underwriting (Conflicts of Interest)—Conflicts of Interest."

We plan to use the remaining net proceeds remaining after repayment of these borrowings for general corporate purposes, which, consistent with our growth strategy described elsewhere in this prospectus, may include possible acquisitions of, or investments in, businesses or other assets. While we routinely engage in discussions with third parties regarding potential acquisitions in the ordinary course of our business, we have no present understandings, commitments or agreements to enter into any acquisitions or investments. Our management will have broad discretion in the application of remaining net proceeds, and investors will be relying on the judgment of our management regarding the treatment of these proceeds.

211.   Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) the primary purposes for the IPO; (2) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (3) GIC's ability to repay the sizable accounts payable to Patriot National; (4) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and goodwill; (5) the risks to Patriot National caused by GIC's precarious financial position; (6) the credit risk that Patriot National was under at the time of the IPO related to GIC; (7) Mariano's compensation; and (8) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance.

212.   In the Registration Statement, the Defendants failed to disclose material information concerning the primary purposes for Patriot National going public—to allow Mariano to tap public funds to cover GIC's annual losses and allow it to meet its FOIR capital requirements, to obtain additional funds to acquire his personal companies, and to cover his extravagant lifestyle.

213.   GIC sustained over $43 million in total losses between 2007 and 2013. The only way in which GIC was able to remain in business, as well as meet its annual capital requirements

was due to Mariano pumping a total of $36 million into GIC.  Moreover, by the time Patriot

National went public, Mariano personally was no longer able to continue to pump money into GIC.

As such, had Mariano not taken Patriot National public and then illegally extracted funds from

Patriot National (that Patriot National acquired via the IPO) to give to GIC, GIC would have

collapsed.  Indeed, once Mariano was no longer able to illegally take funds from Patriot National

to give GIC, that is exactly what happened, and GIC is now under a state receivership and Patriot

National is preparing to file for bankruptcy.

214.    As such, at the time of the IPO, it was not possible for GIC to repay the $11,979,800

million in accounts payable to Patriot National at that time, or the $2,137,140 recorded as of

December 31, 2013, without the support from Mariano with funds provided indirectly by Patriot

National itself.   As GIC needed support from Patriot National to remain in business, the

collectability of the accounts receivable from GIC was not reasonably probable or assured and

should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts

in respect of the GIC accounts receivable made Patriot National's financial statements contained

in the Registration Statement materially false and misleading.

215.    Further, the Registration Statement falsely and misleadingly stated that Patriot

National did not face any "credit risk".  As revealed by the GIC Bailout, GIC's Receivership, and

Patriot National's imminent bankruptcy, GIC's precarious financial condition, which was present

at the time of the IPO, posed a significant "credit risk" to Patriot National.  As disclosed in Patriot

National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-

payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s

revenue and cash flow going forward will cease."

216.    GIC presented another "credit risk" to Patriot National that the Securities Act Defendants did not disclose.  Specifically, the fact that Mariano used Patriot National common stock to meet GIC's FOIR capital requirements.  By using Patriot National stock to satisfy GIC's capital requirement, it created risk an undisclosed risk to Patriot National because if Patriot National's stock went down, then GIC would no longer meet its capital requirement, creating a risk that GIC would enter into a state receivership and Patriot National would lose the majority of its revenues.

217.    Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue it as purportedly "earned", its revenue as of December 31, 2013 was overstated by at least $2,137,140, the amount of the receivable recorded as owing from GIC.  Patriot National's revenue for the nine months ended September 30, 2014 was overstated by at least $11,979,800, the amount of the receivable recorded as owing from GIC.  Accordingly, Patriot National's financial statements were materially false and misleading as well as not properly stated in accordance with GAAP.

218.    The Registration Statement was also false and misleading because Patriot National's financial statements did not conform to GAAP, and misrepresented the value of Patriot National's "goodwill" assets.  GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."   GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.  In the Registration Statement, Patriot National stated that it would

test any goodwill valuation annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

219.    The Registration Statement represented that, as of September 30, 2014, Patriot National had approximately $59.385 million of goodwill assets in its balance sheet, of which approximately $49.432 million was attributable to Patriot National's 2014 PCM and GUI Acquisitions.

220.    The goodwill attributed to the acquisitions of GUI and PCM represented approximately 36% of Patriot National's total assets.  However, both GUI and PCM derived a substantial part of their revenue from GIC.  GUI, as a subsidiary of GIC, generated GIC's revenue, prior to Patriot National's acquisition of GUI, by servicing and underwriting insurance policies for GIC, as well as performing brokerage and policyholder services to GIC pursuant to a producer agreement with GIC.  PCM also derived a large portion of its revenues from business with GIC. For example, from August 6, 2014 to December 31, 2014, PCM earned $6.1 million worth of claims administration services fee income from GIC.  Accordingly, the majority of the goodwill attributed to the acquisition of GUI and PCM represented goodwill that was derived from GIC's false revenue stream.

221.    At time of the IPO, GIC was a deteriorating and failing business.  By that point, the circumstances requiring Patriot National to test for the impairment of the value of Patriot National's goodwill to reflect the true worth of GUI's and PCM's businesses had long existed. Had Defendants actually performed this testing, Patriot National would not have reported such businesses to have approximately $50 million in combined goodwill.  However, Patriot National did not perform an impairment test for the goodwill, and thus, Defendants' statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

222.    In addition, the "Risk Factors" identified in the Registration Statement (*see* ¶ 208) were false and misleading because the Registration Statement failed to disclose that, at the time of the IPO: (1) GIC's business had been in decline for at least 7 years; (2) absent influxes of cash every year, GIC could not repay its debts to Patriot National and could not satisfy its annual capital requirements; (3) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (4) Mariano had taken millions out of GIC for his person benefit; (5) GIC, had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and impermissible related party transactions; and (6) the aforementioned regulatory issues at GIC were known to Defendants.

223.    In addition, the Registration Statement contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons.  Although the Registration Statement set forth Patriot National's policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it would apply the policy after the IPO was false.  Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for unidentified purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire numerous companies from Mariano and his close friends associates without due diligence or due care; (5) the Board's decisions to accelerate the earn-out payments to Mariano and Snow barely a month after entering into the acquisition agreements; and (6) Mariano's secret December 31, 2016

transfer of Patriot National's accounts receivable from GIC to GUI.  Thus, Patriot National had no

means or intention to apply the policy as disclosed in the Registration Statement after the IPO.

## II.     BDO's Opinion was Materially False and/or Misleading

224.    The Registration Statement included an opinion from BDO, Patriot National's

Independent Registered Public Accounting Firm:

### Report of Independent Registered Public Accounting Firm

To the Stockholders and Board of Directors of
Patriot National, Inc.
Fort Lauderdale, Florida

We have audited the accompanying combined balance sheets of Patriot National, Inc. as of December 31, 2013 and 2012 and the related combined statements of operations, stockholders' equity (deficit), and cash flows for each of the two years in the period ended December 31, 2013.  In connection with our audits of the financial statements, we have also audited the financial statement schedule listed in the accompanying index.  These financial statements and schedule are the responsibility of [Patriot National]'s management.  Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

*We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)*.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  [Patriot National] is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of [Patriot National]'s internal control over financial reporting.  Accordingly, we express no such opinion.  *An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements and schedule.  We believe that our audits provide a reasonable basis for our opinion.*

*In our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of Patriot National, Inc. at December 31, 2013 and 2012, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2013, in conformity with accounting principles generally accepted in the United States of America*.

*Also, in our opinion, the financial statement schedule, when considered in relation to the basic combined financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.*

/s/ BDO USA, LLP
Miami, Florida
November 21, 2014

225.    BDO's opinion included in the Registration Statement was false and misleading because BDO had not "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)" as represented in the Registration Statement.

226.    The PCAOB standards require an auditor to evaluate "whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial reporting framework [.]"  In doing so, "the auditor should take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."  AS No. 14.3. In addition, auditors, such as BDO, "exercise professional skepticism [which] is an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU sec. 230.07 (Due Professional Care in the Performance of Work).

227.    The PCAOB standards also provide that "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."  AU sec. 110.02 (Responsibilities and Functions of the Independent Auditor). "[R]easonable assurance is a high level of assurance" AU sec. 230.11.  While an auditor need not audit every single item of a company's data being audited and may engage in "selective testing," it must exercise "judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed."  AU sec. 230.11.

228.    To this end, public auditors are required to put in place procedures designed to "identify and appropriately assess the risks of material misstatement[,]" AS No. 12.5.  In order to

accomplish this, "[t]he auditor should obtain an understanding of the company and its environment

("understanding of the company") to understand the events, conditions, and company activities

that might reasonably be expected to have a significant effect on the risks of material misstatement.

Obtaining an understanding of the company includes understanding: a. Relevant industry,

regulatory, and other external factors; b. The nature of the company; c. The company's selection

and application of accounting principles, including related disclosures; d. The company's

objectives and strategies and those related business risks that might reasonably be expected to

result in risks of material misstatement; and e. The company's measurement and analysis of its

financial performance."  AS No. 12.7.  Of importance here, the PCAOB dictates that an auditor

understand "[t]he sources of the company's earnings, including the relative profitability of key

products and services; and Key supplier and customer relationships" in order to understand "the

nature of the company."  AS No. 12.10.

229.     PCAOB standards further provide that in order to properly evaluate "whether the

company's financial statements are presented fairly" the auditor must evaluate "[t]he way in which

revenue should be recognized can vary depending on, for example, the type of revenue and terms

of the contractual arrangement."  PCAOB Staff Audit Practice Alert No. 12, dated Sept. 9, 2014.

"To audit revenue effectively, auditors should understand, among other things, the company's key

products and services, and business processes that affect revenue.  The auditor also is required to

evaluate whether the company's selection and application of accounting principles are appropriate

for its business and consistent with the applicable financial reporting framework and accounting

principles used in the company's relevant industry. For example, if a company's accounting

principles for revenue recognition are more aggressive than those of its industry peers, that may

indicate a risk of material misstatement." *Id.*

230.    The PCAOB warns auditors that "Business conditions [] may create increased pressures to achieve certain financial results that could result in bias in management's estimates. Applying professional skepticism is of particular importance when evaluating estimates and assumptions in judgmental areas that are susceptible to management bias.  The auditor should evaluate whether the difference between estimates best supported by the audit evidence and estimates included in the financial statements, which are individually reasonable, indicate a possible bias on the part of the company's management."  PCAOB Staff Audit Practice Alert No. 9, dated Dec. 6, 2011.

231.    In warning of the risk of management bias in its estimates, the PCAOB specifically warns of goodwill impairments.  PCAOB Staff Audit Practice Alert No. 9, dated Dec. 6, 2011. Accordingly, the PCAOB demands that companies assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value as a basis for determining whether it is necessary to perform the two-step goodwill impairment test described in ASU Topic 350.  PCAOB Staff Audit Practice Alert No. 9, dated Dec. 6, 2011. Paragraph 350-20-35-3c of ASU Topic 350 provides a non-exhaustive list of events and circumstances to consider as a basis to determine whether the auditor should commence the two-step goodwill impairment test, which is described in paragraphs 350-20-35-4 to 350-20-35-19.

232.    Specifically, the PCAOB guides auditors to apply greater diligence and skepticism when companies are under a tightening economic environment.  Among the areas to which the PCAOB directs attention is the "heightened risk of non-collection of receivables."  PCAOB Staff Audit Practice Alert No. 3, dated Dec. 5, 2008.  The PCAOB warns that "[e]vidence of this risk might be noted in an increase in days sales outstanding, the aging of receivables, or the amount of delinquent receivables."  *Id*.  Indeed, proper diligence in auditing accounts receivable is of such

importance because "[t]hese situations can affect the risk of material misstatement in the valuation of a company's receivables and the auditor's evaluation of management's estimate of the allowance." *Id.*

233.    Additionally, "[t]he auditor has a responsibility to evaluate whether there is a substantial doubt about the company's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." PCAOB Staff Audit Practice Alert No. 3, dated Dec. 5, 2008.  In evaluating a company's abilities to continue as a going concern "[i]t may be necessary to obtain additional information about such conditions and events, as well as the appropriate evidential matter to support information that mitigates the auditor's doubt."  *Id.*  Furthermore, the PCAOB explicitly warns that a company's "substantial dependence on the success of a particular project" may affect its ability to operate as going concern.  *Id.*

234.    Despite its affirmative statements that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," BDO did not. BDO's audit and related opinion, failed to comply with PCAOB standards in the following manners:

    a.     Assessing the risks of material misstatements in connection with Mariano and Patriot National management's accounting for doubtful accounts, goodwill, and/or ability to operate as a going concern;

    b.     Obtaining an understanding of the nature of Patriot National and its sources of earnings, namely, its codependent relationship with GIC;

    c.     Evaluating "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole[;]" particularly accounts receivable, doubtful accounts, and/or goodwill;

    d.     Evaluating "whether there is a substantial doubt about the [C]ompany's ability to continue as a going concern" posed by GIC's operating losses, capital requirements, and risk of regulatory receivership; and

     e.    Assessing whether Patriot National's goodwill, which equated to 43% of its total assets and was primarily supported by revenue from GIC, should be impaired in light of GIC's operating failures, among other issues at GIC.

235.    BDO also audited GIC's financial statements for 2014 and 2013.  Therefore, GIC was not an opaque private customer into which BDO as Patriot National's auditor had no insight; rather BDO (and the very same auditing staff) also was the registered auditor of GIC.  Indeed, it demanded that it be allowed to audit both GIC and Patriot National, purportedly because it needed access to both companies' financial statements to perform it duties.  Therefore, BDO had full access to all material information regarding GIC, including its reliance on cash provided by Mariano to meet regulatory capital requirements as well as the precarious state of its business.

236.    Conducting an audit of Patriot National in accordance with PCAOB standards, as represented in the Registration Statement, required BDO to gain a meaningful understanding of Patriot National's relationship with and dependence upon GIC.  GIC accounted for approximately 70% of Patriot National's revenue.  Moreover, GIC and Patriot National were both owned and controlled by Mariano.  As BDO had access to all material information regarding GIC as a result of its position as auditor of GIC, it knew that the collectability of Patriot National's account receivable from GIC was not reasonably probable and that both accounts receivable and revenue and income were overstated and not properly presented in accordance with GAAP.

237.    BDO's opinion was also false and misleading because it was unqualified, i.e., it failed to contain a qualification expressing doubt about Patriot National's ability to continue as a going concern.  BDO's "opinion" was false and misleading because it did not provide any warning, as it should have: (1) of Patriot National's doubtful accounts, which did not provide for GIC's accounts payable at all, were insufficient and materially inaccurate; (2) that Patriot National's goodwill asset on its balance sheet was materially impaired and the impairment had not been accounted for; (3) that GIC sustained annual losses that substantially threatened its ability to

operate as a going concern and avoid regulatory receivership; and (4) Patriot National faced significant risk as a going concern as a result of GIC's risky position.

238.    Under PCAOB guidelines, BDO was required to evaluate GIC's ability to operate as going concern in order to in turn evaluate "whether there is a substantial doubt about [Patriot National's] ability to continue as a going concern[.]"  PCAOB Staff Audit Practice Alert No. 3, dated Dec. 5, 2008.  Due to the importance of GIC's revenue as a customer of Patriot National, any auditor exercising  "due profession care… in the planning and performance of the audit and the preparation of the report" would have scrutinized GIC prior to issuing its Report opining that Patriot National's financial statements were "in conformity with accounting principles generally accepted in the United States of America[,]" and the "financial statement schedule [which included doubtful accounts estimates and goodwill assets], when considered in relation to the basic combined financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein."

239.    The facts that led to BDO's 2017 determination that it was "substantially doubt[ful]," that GIC could continue as going concern were present at the time of the IPO.  GIC has struggled to be profitable since at least 2007, and would have collapsed had Mariano not pumped millions of dollars into it.  Moreover, BDO had already been specifically warned by the FOIR of Mariano's improper accounting practices at Patriot National and GIC (when they operated as a single business) in 2008 and 2010.

A.    *The 2014 Annual Report, dated March 31, 2015.*

240.    On March 31, 2015, Patriot National filed its annual report for the fiscal year ended December 31, 2014, on Form 10-K with the SEC (the "2014 Form 10-K"). The 2014 Form 10-K stated that "[t]he accompanying combined financial statements have been prepared in conformity

with accounting principles generally accepted in the United States of America (GAAP)." The 2014 Form 10-K further provided:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the year ended December 31, 2014 was $102.7 million compared to $55.9 million for the year ended December 31, 2013, an increase of $46.9 million or approximately 84%. The increase was primarily due to an increase in fee income from related party.
>
> For the year ended December 31, 2014, approximately 71% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 18% of our total fee income and fee income from related party was attributable to contracts with our second largest client.
>
> For the year ended December 31, 2013, approximately 44% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 38% and 12% of our total fee income and fee income from related party were attributable to our contracts with our second and third largest clients, respectively.
>
> ***
>
> **Concentration**
>
> ***
>
> As of December 31, 2014, approximately 86% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2013, approximately 62% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 23% and 11% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2012, approximately 28% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 51% and 19% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. Management believes that the receivable balances from these largest customers do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience.

241. Patriot National also reported in the 2014 Form 10-K that as of December 31, 2014, it had $11.988 million in fee income receivable from related party, a significant increase from the $2.79 million in fee income receivable from related party as of December 31, 2013.

242.     The 2014 Form 10-K further stated that, as of December 31, 2014, Patriot National was "not subject to any material interest rate risk or credit risk."  The 2014 Form 10-K also stated that Patriot National had $11,979,800 in accounts receivables owed by GIC as of December 31, 2014, and that "Management believes that the receivable balances from these largest customers [*viz.*, GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience."  The 2014 Form 10-K further stated that management "assess[es] the collectability of [Fee Income Receivable from Related Parties] balances and adjust[s] the receivable to the amount expected to be collected through an allowance for doubtful accounts.  As of December 31, 2014, we maintained an allowance for doubtful accounts of approximately $0.1 million." Additionally, the filing stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

243.     The 2014 Form 10-K also contained the following false and misleading statements and/or omissions in the "Risk Factors" detailed in the prospectus.

**Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**

\*\*\*

Although we intend to expand our relationships with additional carrier partners and our service offerings to third-party clients in the future, we expect that in the near-term a significant portion of our revenues will continue to be derived through our relationships with [GIC], Zurich and Scottsdale.  As such, we will continue to be significantly impacted by the overall business levels of these carrier partners. ***While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control.***  For example, the general effects of economic and labor market conditions on business levels, a variety of market or regulatory factors can impact our carrier partners' decisions regarding the markets they enter, the products they offer and the industries they target. ***In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that***

65

*independent retail agencies and policyholders consider attractive*.  A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.

***Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.***

Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owns 59.5% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIC] Group, the parent company of [GIC].  As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders.  Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC].  Our total fee income and fee income from related party pursuant to contracts with [GIC] and our fee income from related party constituted 71% and 46%, respectively, of our total fee income and fee income from related party for the year ended December 31, 2014.  Furthermore, on August 6, 2014, we acquired, through the Acquisitions, contracts to provide marketing, underwriting and policyholder services and our Patriot Care Management Business from entities controlled by Mr. Mariano; concurrently, we also entered into a new agreement with [GIC] to provide all such services that GUI had provided to [GIC], its parent, prior to the GUI Acquisition.

Although Mr. Mariano is no longer a board member or officer of [GIC] Group or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIC] Group, Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders.

***We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.***

Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government sponsored programs such as Medicare and Medicaid.  ***They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.***  Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable

laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients.  We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention.  ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us***.

244.    The 2014 Form 10-K stated that "[a]s of December 31, 2014, we had approximately $61.5 million of goodwill and approximately $33.0 million of net intangible assets (the latter, net of $1.8 million of accumulated amortization and generating a deferred tax liability of approximately $13.2 million) recorded, which represents, in the aggregate, 66% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI and PCM] Acquisitions."   Patriot National further stated that it "assess[es] potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired."   Additionally, the 2014 Form 10-K, disclosed that Patriot National reported $7.756 million in intangible assets related to "Customer & Carrier Relationships".

245.    Related to Regulation S-K, the 2014 Form 10-K contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.

67

In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

· the nature of the related person's interest in the transaction;

· the material terms of the transaction;

· the importance of the transaction both to [Patriot National] and to the related person;

· whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

· whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

· any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].***   The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

· [Patriot National] was or is to be a participant;

· the amount involved exceeds $120,000; and

· any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

246.    The 2014 Form 10-K stated that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the amount of approximately $109 thousand in the year ended December 31, 2014 for tax advisory services it performed in fiscal years 2014 and 2013 in respect of entities that are now our subsidiaries."  The 2014 Form 10-K further states that Mariano received no compensation for 2014 and $255,235 in total compensation for 2013.  Moreover, as disclosed in the 2014 Form 10-K:

The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

247.    Additionally, the 2014 Form 10-K also disclosed that "[o]n February 5, 2015, [Patriot National] purchased 98.8% of the membership interests of DecisionUR, LLC, a California limited liability company which provides web-based Utilization Review Software for the worker's compensation industry for $2.2 million in cash. The membership interests, previously held by Six Points Investment Partners, LLC, were transferred to [Patriot National] pursuant to an Assignment and Assumption Agreement. The transaction closed on February 5, 2015."

248.    Defendants Mariano, Shields, Del Pizzo, and Shanfelter signed or authorized the signing of Patriot National's 2014 Form 10-K filed with the SEC. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, stating:

In connection with the Annual Report on Form 10-K of Patriot National, Inc. (the "Company") for the fiscal year ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 31, 2015

249.    Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2014 of Patriot National, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2015

250.    Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts, goodwill, and "Customer & Carrier Relationships"; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under at the time of the IPO related to GIC; and (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance.

251.    Critically, the 2014 Form 10-K was false and materially misleading in that Patriot National and Mariano purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time—*viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his absurdly unaffordable lifestyle.

252.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public.  Due to the annual operating losses, Mariano was forced to pump a total of $36 million into GIC so that it could meet its year-end FOIR capital requirements.  Thus, Patriot National, Mariano, and Shields knew or were reckless in not knowing as of March 31, 2015 that GIC would be unable to repay the $11,979,800 recorded as an account receivable as of December 31, 2014.  Indeed, by March 31, 2015, the account receivable from GIC had continued to grow and now totaled $14.5 million.  Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed

to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

253.    As revealed by the GIC Bailout, the GIC Receivership, and Patriot National's imminent bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of March 31, 2015, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."  Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

254.    Significantly, the 2014 Form 10-K failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

255.    The 2014 Form 10-K was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the 2014 Form 10-K materially false and misleading.

256.    Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue as of December 31, 2014 was overstated by at least $11,979,800, the amount of the receivable recorded as owing from GIC.  Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

257.    In addition, the 2014 Form 10-K contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons.  Although the 2014 Form 10-K set forth Patriot National's purported policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it currently applied the policy was false.  Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for unidentified purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire

numerous companies from Mariano and his close friends associates without due diligence or due care; and (5) the Board's decisions to accelerate the earn-out payments to Mariano barely a month after entering into the acquisition agreements.  Thus, Patriot National's statement in the 2014 Form 10-K that it applied the disclosed Policy Regarding Transactions with Related Person was false.

258.    Patriot National's financial statements contained in the 2014 Form 10-K were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Registration Statement, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

259.    Approximately 84% of Patriot National's $61.5 million "goodwill" asset listed in the 2014 Form 10-K was tied to its acquisitions of GUI and PCM, and that figure represented 36% of total Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  By March 31, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts, assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill.  However, Patriot National

did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

260.    For the same reasons, Patriot National's accounting of approximately $7.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus false and omitted information necessary to make such misstatements not misleading.

261.    Additionally, the above detailed "Risk Factors" were false and misleading because the 2014 Form 10-K failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control", as Patriot National executives controlled GIC; (3) the primary factor for GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to Defendants.

262.    The 2014 Form 10-K was also false and misleading for stating in the "Statement of Policy Regarding Transactions with Related Persons" that, among other things, the Audit Committee and/or disinterested directors oversee and approve interested transactions.  This was false and misleading because Patriot National did not follow this policy in that each of the purportedly independent directors that would oversee the "Policy Regarding Transactions with Related Persons" was operating for the benefit of Mariano and/or themselves, as revealed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services which were never

provided; (2) GIC's business dealings with Patriot National; and (3) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without due care.

263.    Moreover, the 2014 Form 10-K was false and misleading because it did not disclose that: (1) Patriot National purchased DecisionUR directly from Mariano; and (2) Del Pizzo did not perform $109,000 worth of tax advisory services.

264.    The 2014 Form 10-K also included an opinion from BDO, Patriot National's Independent Registered Public Accounting Firm:

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Patriot National, Inc.
Fort Lauderdale, Florida

We have audited the accompanying combined balance sheets of Patriot National, Inc. as of December 31, 2014 and 2013 and the related combined statements of operations, stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2014.  These financial statements are the responsibility of [Patriot National]'s management.  Our responsibility is to express an opinion on these financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).***  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  [Patriot National] is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of [Patriot National]'s internal control over financial reporting.  Accordingly, we express no such opinion.  An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements.  We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of Patriot National, Inc. at December 31, 2014 and 2013, and the results of its operations and its cash flows***

*for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.*

/s/ BDO USA, LLP
Miami, Florida
March 31, 2015         Certified Public Accountants

265.     Despite its affirmative statements that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," BDO did not. In particular, BDO's audit and related report, failed to comply with PCAOB standards (as set forth above at ¶¶ 226-33) in the following manners:

    a.  Assessing the risks of material misstatements in connection with Mariano and Patriot National management's accounting for doubtful accounts, goodwill, and/or ability to operate as a going concern;

    b.  Obtaining an understanding of the nature of Patriot National and its sources of earnings, namely, its codependent relationship with GIC;

    c.  Evaluating "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole[;]" particularly accounts receivable, doubtful accounts, and/or goodwill;

    d.  Evaluating "whether there is a substantial doubt about the [C]ompany's ability to continue as a going concern" posed by GIC's operating losses, capital requirements, and risk of regulatory receivership; and

    e.  Assessing whether Patriot National's goodwill, which equated to 43% of its total assets and was primarily supported by revenue from GIC, should be impaired in light of GIC's operating failures, among other issues at GIC.

266.     BDO also audited GIC's financial statements for 2014 and 2013.  Therefore, GIC was not an opaque private customer into which BDO as Patriot National's auditor had no insight; rather BDO (and the very same auditing staff) also was the registered auditor of GIC.  Indeed, it demanded that it be allowed to audit both GIC and Patriot National, purportedly because it needed access to both companies' financial statements to perform it duties.  Therefore, BDO had full access to all material information regarding GIC, including its reliance on cash provided by Mariano to meet regulatory capital requirements as well as the precarious state of its business.

267.    Conducting an audit of Patriot National in accordance with PCAOB standards, as represented in its march 31, 2015 opinion, required BDO to gain a meaningful understanding of Patriot National's relationship with and dependence upon GIC.  GIC accounted for approximately 70% of Patriot National's revenue.  Moreover, GIC and Patriot National were both owned and controlled by Mariano.  As BDO had access to all material information regarding GIC as a result of its position as auditor of GIC, it knew that the collectability of Patriot National's account receivable from GIC was not reasonably probable and that both accounts receivable and revenue and income were overstated and not properly presented in accordance with GAAP.

268.    BDO's opinion was also false and misleading because it was unqualified, *i.e.*, it failed to contain a qualification expressing doubt about Patriot National's ability to continue as a going concern.  BDO's "opinion" was false and misleading because it did not provide any warning, as it should have: (1) of Patriot National's doubtful accounts, which did not provide for GIC's accounts payable at all, were insufficient and materially inaccurate; (2) that Patriot National's goodwill asset on its balance sheet was materially impaired and the impairment had not been accounted for; (4) GIC sustained annual losses that substantially threatened its ability to operate as a going concern and avoid regulatory receivership; and (5) Patriot National faced significant risk as a going concern as a result of GIC's risky position.

269.    Under PCAOB guidelines, BDO was required to evaluate GIC's ability to operate as going concern in order to in turn evaluate "whether there is a substantial doubt about [Patriot National's] ability to continue as a going concern[.]"  PCAOB Staff Audit Practice Alert No. 3, dated Dec. 5, 2008.  Due to the importance of GIC's revenue as a customer of Patriot National, any auditor exercising  "due profession care… in the planning and performance of the audit and the preparation of the report" would have scrutinized GIC prior to issuing its Report opining that

Patriot National's financial statements were "in conformity with accounting principles generally accepted in the United States of America[,]" and the "financial statement schedule [which included doubtful accounts estimates and goodwill assets], when considered in relation to the basic combined financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein."

270.    The facts that led to BDO's 2017 determination that it was "substantially doubt[ful]," that GIC could continue as going concern were present at the time of the IPO.  GIC has struggled to be profitable since at least 2007, and would have collapsed had Mariano not pumped millions of dollars into it.  Moreover, BDO had already been specifically warned by the FOIR of Mariano's improper accounting practices at Patriot National and GIC (when they operated as a single business) in 2008 and 2010.

**B.**    ***First Quarter 2015 Press Release and Quarterly Report.***

271.    On May 6, 2015, Patriot National's issued a press release announcing the results of the first quarter of 2015, later filed with the SEC on Form 8-K, attached as Exhibit 99.1.  In this press release, Patriot National stated:

**For the quarter ended March 31, 2015:**
- Reference premium written of $103.0 million
- Gross reference premium written of $119.5 million
- Total revenues and fee income of $43.0 million
- GAAP Net loss of $4.8 million, or $0.19 per share
- Adjusted earnings of $4.6 million, or $0.18 per diluted share
- Adjusted EBITDA of $10.8 million or 25.2% of fee income
- Operating Cash Flow of $8.2 million

272.    Additionally, the Patriot National Press Release stated:

"***I am pleased to report that our first quarter results continued to reflect strong execution of our strategy***.  Gross reference premium written increased to $119.5 million from $77.4 million in the December quarter and total fee income increased to $43 million, up from $40 million.  In addition, Adjusted EBITDA grew to $10.8 million from $9.8 million in the last quarter*,*" said Steven M. Mariano, Chief Executive Officer of Patriot National.

"***We also made significant progress in implementing our strategic growth plan. For the first four months of 2015, we completed eight strategic acquisitions. Taken together, these acquisitions significantly enhance our competitive position, bolster our capabilities, expand our carrier relationships and retail agent network, and enhance our robust technology platform.***  In aggregate we expect these acquisitions to add approximately $20 million in revenue in 2015 and approximately double that in 2016[.*"]*

"Year-to-date, we have also added numerous new carrier relationships, including, Chubb, Hartford, and Safety National, among others, and expanded our existing relationship with Falls Lake National Insurance, a subsidiary of James River Group Holdings.  We now have 64 carrier relationships versus 17 at the time of our IPO. We have also expanded our retail agent network to 1,600 agents from 1,100 at the beginning of the year[.*"]*

"We are well positioned for continued strong growth in the remainder of 2015.  We are excited about the growing demand we are seeing for our technology enabled solutions in the workers' comp sector and pleased that we are also starting to see opportunities to leverage our successful track record to deliver solutions to other select property and casualty lines."

273.    Defendant Pesch signed or authorized the signing of Patriot National's Form 8-K filed with the SEC on May 6, 2015.

274.    On May 14, 2015, Patriot National filed its quarterly report for the period ended March 31, 2015 (the "Q1 2015 Form 10-Q").  The Q1 2015 Form 10-Q stated that "[t]he accompanying unaudited combined financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

275.    The Q1 2015 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

*Total Revenue.* Total revenue for the three months ended March 31, 2015 was $43.0 million compared to $15.8 million for the three months ended March 31, 2014, an increase of $27.2 million or approximately 172.2%.  The increase in fee income during the first quarter of 2015 was primarily due to transactions that occurred in August of 2014, fee income we generated from new business produced with new carrier clients secured in 2014 and fee income from acquisitions completed in the first quarter of 2015.

For the three months ended March 31, 2015, approximately 83% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 10% of our total fee income and fee income from related party was attributable to contracts with our second largest client.

For the three months ended March 31, 2014, approximately 56% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 31% of our total fee income and fee income from related party were attributable to our contracts with our second largest client.

\*\*\*

*Fee Income from Related Party.* Fee income from related party for the three months ended March 31, 2015 was $24.6 million compared to $2.5 million for the three months ended March 31, 2014, an increase of $22.1 million.

\*\*\*

**Concentration**

For the three months ended March 31, 2015, approximately 83% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 10% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended March 31, 2014, approximately 56% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 31% and 7% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

As of March 31, 2015, approximately 84% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 5% and 3% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

276.     Patriot National also reported in the Q1 2015 Form 10-Q that as of March 31, 2015, it had $13.740 million in fee income receivable from related parties, an increase of $1.482 million in fee income receivable from related parties in the first quarter of 2015.  The Q1 2015 Form 10-Q further provided that Patriot National had $14.5 million in accounts receivables owed by GIC as of March 31, 2015, and "[a]s of March 31, 2015, we were not subject to any material interest rate risk or credit risk[.]"  Additionally, the filing stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

277.     Additionally, the Q1 2015 Form 10-Q reported an increase of approximately $6 million in goodwill, for a total of over $67 million as of March 31, 2015.  As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was worth over $7.7 million.  Concerning the valuation of its intangible assets, Patriot National stated that "In accordance with FASB ASC 350, *Intangibles—Goodwill and Other*, intangible assets, which are comprised solely of the estimated fair value of the service contracts acquired, are being amortized over the estimated life of the customer contracts, ranging from two to ten years, in a manner that, in management's opinion, reflects the pattern in which the intangible asset's future economic benefits are expected to be realized.  ***The intangible asset is tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the combined company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.***"

278.     The Q1 2015 Form 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks

and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2014. Other than as described below, there have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2014."

279.    The only additional "Risk Factor" listed in the Q1 2015 Form 10-Q was the following:

> ***We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.***
>
> We have recently acquired a number of insurance services firms in a short period of time.  We believe that similar acquisition activity will be important to maintaining comparable growth in the future.  Failure to successfully identify and complete acquisitions likely would likely result in slower growth.  Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions.  Our ability to finance and integrate acquisitions may also suffer if we expand the number or size of our acquisitions.
>
> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as ***violations of sanctions laws or anti-corruption laws, risks relating to ensuring compliance with licensing and regulatory requirements***, tax and accounting issues, distractions to  management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth.  Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

280.    The Q1 2015 Form 10-Q further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with

such regulation or adapt to new regulatory and legislative initiatives may adversely impact our

business."

281.    The Q1 2015 Form 10-Q also disclosed Patriot National's acquisitions in that

quarter.  Specifically, the Q1 2015 Form 10-Q stated:

On April 8, 2015, TriGen Insurance Solutions, Inc. ("TriGen"), our wholly owned subsidiary, entered into an asset purchase agreement with Hospitality Supportive Systems, LLC, a Pennsylvania limited liability company ("HSS"), and the sole shareholder of HSS effective April 1, 2015, pursuant to which we acquired substantially all of the assets of HSS for an estimated maximum of $9,650,000. Pursuant to the HSS purchase agreement, [Patriot National] paid HSS $5,605,000 in cash at closing.  HSS will also be entitled to an earn-out payment of up to $4,045,000 twelve months after closing, subject to reduction on a pro-rata basis if EBITDA within the first year does not meet certain targets. On May 14, 2015, due to ***strong post-acquisition performance***, the parties amended the HSS purchase agreement to cap the incentive earn-out at $5,000,000 and to accelerate the base earn-out to be paid as of the date of the amendment.

On April 8, 2015, TriGen also entered into an asset purchase agreement with Selective Risk Management LLC, a Pennsylvania limited liability company ("SRM"), and the shareholders of SRM effective April 1, 2015, pursuant to which we acquired substantially all of the assets of SRM for a maximum of $3,845,000. Pursuant to the SRM purchase agreement, we paid SRM $1,922,500 in cash at closing.  SRM will also be entitled to an earn-out payment of up to $1,922,500 twelve months after closing, subject to reduction on a pro-rata basis if EBITDA within the first year does not meet certain targets.  On May 14, 2015, due to ***strong post-acquisition performance***, the parties amended the SRM purchase agreement to accelerate the earn-out to be paid as of the date of the amendment.

On April 17, 2015, Vikaran Technology Solutions, Inc. ("VTS"), our wholly owned subsidiary, entered into an agreement and plan of merger with Vikaran Solutions, LLC, an Illinois limited liability company ("Vikaran"), and certain members of Vikaran, pursuant to which Vikaran was merged with and into VTS.  The merger closed on April 17, 2015 for a purchase price of $8,500,000 paid in cash at closing.

In connection with the Vikaran transaction, we also entered into a definitive agreement to purchase all of the outstanding stock of Mehta and Pazol Consulting Services Private Limited, an Indian private limited company ("MPCS").  MPCS is Vikaran's software development center located in Pune, India.  The purchase price for MPCS is expected to be approximately $1,500,000.

On April 24, 2015, Patriot Risk Services, Inc ("PRS"), our wholly owned subsidiary, entered into a stock purchase agreement with Corporate Claims Management, Inc. a Missouri corporation ("CCMI") and the shareholders of CCMI pursuant to which PRS acquired all of the outstanding equity of CCMI for

$8,000,000 in cash plus a performance-based earn-out of up to $1,000,000. Pursuant to the CCMI purchase agreement, the Sellers will be entitled to the earn-out in two tranches.  The first tranche will be up to $500,000 twelve months after closing, and the second tranche will be up to $500,000 fifteen months after closing, in each case subject to a reduction on a pro-rata basis if revenue during each earn-out period does not meet certain targets.  Neither [Patriot National] nor PRS assumed any material liabilities under the CCMI purchase agreement.   In connection with the transaction, which closed April 24, 2015, CCMI became a direct subsidiary of PRS.

On May 8, 2015, Contego Services Group, LLC ("Contego"), a 97% owned subsidiary of Patriot Services Inc., entered into an asset purchase agreement with Candid Investigation Services, LLC, a New Mexico limited liability company ("Candid"), to acquire substantially all of the assets of Candid for a maximum of $1,500,000.  Pursuant to the asset purchase agreement, [Patriot National] paid $900,000 in cash at closing.  Candid will be entitled to earn-out payments totaling $600,000 in quarterly payments over twelve months after closing, subject to reduction on a pro-rata basis if revenue during each earn-out period does not meet certain targets.

282.   Defendant Shields signed or authorized the signing of the Q1 2015 Form 10-Q filed with the SEC on May 14, 2015.  Mariano and Shields each certified the filing pursuant to Sarbanes-Oxley Act of 2002 as follows:

> In connection with the Quarterly Report on Form 10-Q of Patriot National, Inc. (the "Company") for the quarterly period ended March 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.
>
> Date: May 14, 2015

283.   Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that:

> 1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 of Patriot National, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

284.  Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to

Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for income, goodwill, account receivable, and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under as of May 14, 2015 related to GIC; and/or (6) the propriety of its recent acquisitions.

285.    The Q1 2015 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time— *viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

286.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public.  Due to the annual operating losses, Mariano was forced to pump a total of $36 million into GIC so that it could meet its year-end FOIR capital requirements.  Thus, Patriot National, Mariano, and Shields knew or were reckless in not knowing as of May 14, 2015 that GIC would be unable to repay the $14.5 million recorded as an account receivable as of March 31, 2015.  Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National. Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future. (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the

sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

287.    As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's imminent bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of May 14, 2015, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."  Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

288.    Significantly, Q1 2015 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

289.    The Q1 2015 Form 10-Q was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot

National's financial statements contained in the Q1 2015 Form 10-Q materially false and misleading.

290.    Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue as of March 31, 2015 was overstated by at least $2.5 million, the quarterly increase in the amount of the receivable recorded as owing from GIC.  Consequently, Patriot National's financial statements as set forth in the Q1 2015 Form 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

291.    Patriot National's financial statements contained in the Q1 2015 Form 10-Q were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Q1 2015 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

292.    Approximately 76.8% of Patriot National's $67.1 million "goodwill" asset listed in the Q1 2015 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 30% of total Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  As of May 14, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's

deteriorating business.  Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts, assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill. However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

293.    For the same reasons, Patriot National's accounting of approximately $7.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

294.    Additionally, the above detailed "Risk Factors" were false and misleading because the Q1 2015 Form 10-Q and the 2014 Form 10-K failed to disclose that, as of May 14, 2015: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control", as Patriot National executives controlled GIC; (3) the primary factor for GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano and Shields.

295.    With regards to the "Subsequent Events" detailing the numerous acquisitions by Patriot National in the first quarter of 2015, those too were false and materially misleading because they misrepresented or omitted that: (1) Snow was a long-time friend of Mariano; (2) the "strong post-acquisition performance" which it used to justify the accelerated earn-out payments were based upon fraud; (3) as a result of the fraudulent conduct engaged in at the newly acquired subsidiaries, Patriot National was facing significant risks; and (4) Snow was receiving "consulting" fees from Patriot National and GIC.  All of the above would slowly be revealed to the public and regulators, which resulted in Patriot National's inability to file its annual statement for 2016, GIC's Receivership, and ultimately, Patriot National's bankruptcy.

C.    *Quarterly Report dated August 14, 2015.*

296.    On August 14, 2015, Patriot National filed its quarterly report for the period ended March 31, 2015 (the "Q2 2015 Form 10-Q").  The Q2 2015 Form 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

297.    The Q2 2015 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

*Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended June 30, 2015 was $47.4 million compared to $15.5 million for the three months ended June 30, 2014, an increase of $31.9 million or approximately 206%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first two quarters of 2015.

Total fee income and fee income from related party for the six months ended June 30, 2015 was $90.4 million compared with $31.1 million for the same period in 2014, an increase of $59.3 million or 191%.  The increase in fee income and fee

income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first two quarters of 2015.

For the three and six months ended June 30, 2015, approximately 70% and 76%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 9% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and six months ended June 30, 2015.

For the three and six months ended June 30, 2014, approximately 58% and 57%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 36% and 34%, respectively, of our total fee income and fee income from related party were attributable to our contracts with our second largest client.

*Fee Income.* Fee income, which represents fee income from non-related parties, for the three months ended June 30, 2015 was $26.9 million compared to $9.2 million for the three months ended June 30, 2014, an increase of $17.7 million.  For the six months ended June 30, 2015, fee income was $45.3 million compared to $22.3 million for the six months ended June 30, 2014, an increase of $23.0 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the six-month period ended June 30, 2015 relative to the six-month period ended June 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

*Fee Income from Related Party*. Fee income from related party for the three months ended June 30, 2015 was $20.5 million compared to $6.3 million for the three months ended June 30, 2014, an increase of $14.2 million.  For the six months ended June 30, 2015, fee income from related party was $45.1 million compared to $8.8 million for the six months ended June 30, 2014, an increase of $36.3 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the six-month period ended June 30, 2015 relative to the six-month period ended June 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, *Related Party Transactions*.  Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC]. Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee

income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], as described in Note 13, *Concentration*, [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

***

**Concentration**

For the three months ended June 30, 2015, approximately 70% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 9% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended June 30, 2014, approximately 58% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 36% and 6% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

For the six months ended June 30, 2015, approximately 76% of total combined fee income and fee income from related party was attributable to contracts with [GIC] and approximately 9% was attributable to contracts with [Patriot National]'s second largest customer. For the six months ended June 30, 2014, approximately 57% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 34% and 6% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

As of June 30, 2015, approximately 67% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% and 1% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

298.    Patriot National also reported in the Q2 2015 Form 10-Q that as of June 30, 2015,

it had $16.6 million in fee income receivable from related parties, an increase of $2.1 million from

the previous quarter and $4.6 million (or 38.6%) since December 31, 2014.  The Q2 2015 Form

10-Q further that Patriot National had $16.6 million in accounts receivables owed by GIC as of

June 30, 2015, and "[a]s of June 30, 2015, we were not subject to any material interest rate risk or

credit risk[.]"  Additionally, the filing stated that "We believe that our cash flow from operations

and available cash and cash equivalents will be sufficient to meet our liquidity needs for the

foreseeable future."

299.    Additionally, the Q2 2015 Form 10-Q reported an increase of approximately $24.3

million in goodwill, for a total of over $85.7 million as of June 30, 2015. As of that date, Patriot

National also reported in the filing that its intangible asset of "Customer and carrier relationships"

was over $22 million.  Concerning the valuation of its intangible assets, Patriot National stated

that "In accordance with FASB ASC 350, *Intangibles—Goodwill and Other*, intangible assets,

which are comprised of the estimated fair value of the service contracts acquired, are being

amortized over the respective estimated life, ranging from two to ten years, in a manner that, in

management's opinion, reflects the pattern in which the intangible asset's future economic benefits

are expected to be realized. ***Intangible assets are tested for impairment at least annually (more***

***frequently if certain indicators are present). In the event that management determines that the***

***value of the intangible asset has become impaired, [Patriot National] will incur an accounting***

***charge for the amount of impairment during the fiscal quarter in which the determination is***

***made.***"

300.    The Q2 2015 Form 10-Q also contained false and misleading statements and/or

omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks

and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on

Form 10-K for the year ended December 31, 2014.  Other than as described below, there have been

no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year

ended December 31, 2014." The only additional "Risk Factor" listed in the Q2 2015 Form 10-Q

was the following:

> ***We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.***
>
> We have recently acquired a number of insurance services firms in a short period of time. We believe that similar acquisition activity will be important to maintaining comparable growth in the future. Failure to successfully identify and complete acquisitions likely would likely result in slower growth. Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions. Our ability to finance and integrate acquisitions may also suffer if we expand the number or size of our acquisitions.
>
> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as ***violations of sanctions laws or anti-corruption laws, risks relating to ensuring compliance with licensing and regulatory requirements***, tax and accounting issues, distractions to  management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

301.    The Q2 2015 Form 10-Q stated further stated the following "risks": (1) "Our

relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our

transactions with [GIC] will be conducted on the same terms as those available from unaffiliated

third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to

comply with such regulation or adapt to new regulatory and legislative initiatives may adversely

impact our business."

302.    The Q2 2015 Form 10-Q also disclosed Patriot National's acquisitions in that

quarter. Specifically, the Q2 2015 Form 10-Q stated:

On July 9, 2015, Patriot Risk Services, Inc. ("PRS"), a wholly owned subsidiary of Patriot National, entered into a stock purchase agreement with CWIBenefits, Inc., a Delaware corporation ("CWI"), and the shareholders of CWI, pursuant to which PRS acquired all of the outstanding equity of CWI for a maximum of $7.4 million. Pursuant to the purchase agreement, PRS paid CWI $2.8 million in cash at closing. CWI will also be entitled to an earn-out payment of up to $4.7 million approximately six months after closing, subject to reduction on a pro-rata basis if EBITDA does not meet certain targets.  Neither Patriot National nor [Patriot National] assumed any material liabilities under the Purchase Agreement.

On July 20, 2015 [Patriot National] entered into a membership interest purchase agreement with Global HR Research LLC, a Florida limited liability company ("Global HR"), In Touch Holdings LLC, a Florida limited liability company ("ITH"), the members of Global HR, and Brandon G. Phillips as the sellers' representative, pursuant to which, subject to the satisfaction or waiver of certain conditions, [Patriot National] will acquire all of the outstanding membership interests of Global HR.  The Global HR transaction is expected to close on the later of (i) three business days following the satisfaction of certain customary closing conditions and (ii) August 25, 2015.   One of [Patriot National]'s independent directors, Austin J. Shanfelter, indirectly controls Global HR.  Mr. Shanfelter owns 84% of the equity interests in ITH, which owns 75.5% of the equity interests of Global HR.  The purchase price for the transaction is (i) $24.0 million in cash and (ii) 1,062,574 shares of common stock of [Patriot National], subject to adjustment based on the estimated net working capital of Global HR on the closing date.  The number of shares of common stock of [Patriot National] to be issued was determined by dividing $18.0 million by the closing stock price of [Patriot National]'s common stock on July 20, 2015, the signing date.  If the revenues for Global HR for its fiscal year 2016 are less than $12.8 million, then ITH will forfeit and return 10% of its stock consideration to [Patriot National].

Bank of Montreal has informed [Patriot National] that it is in receipt of commitment letters to increase the term loan portion of [Patriot National]'s Senior Secured Credit Facility by $50.0 million.   The proceeds of this additional term loan financing would be available concurrent with the closing of the Global HR transaction.

303.     Defendant Shields signed or authorized the signing of the Q2 2015 Form 10-Q filed with the SEC on August 14, 2015.  Mariano and Shields also certified the filing pursuant to Sarbanes-Oxley Act of 2002, certifying that:

In connection with the Quarterly Report on Form 10-Q of Patriot National, Inc. (the "Company") for the quarterly period ended June 30, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

96

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 14, 2015

304.    Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 of Patriot National, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2015

305.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for income, goodwill, account receivable, and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under as of August 14, 2015 related to GIC; and/or (6) the propriety of its recent acquisitions.

306.    The Q2 2015 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time— *viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

307.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public.  Due to the annual operating losses, Mariano was forced to pump a total of $36 million into GIC so that it could meet its year-end FOIR capital requirements.  Thus, Patriot National and Mariano knew or were reckless in not knowing as of August 14, 2015 that GIC would be unable to repay the $14.5 million recorded as

an account receivable as of June 30, 2015.  Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

308.    As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of August 14, 2015, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."  Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

309.    Significantly, Q2 2015 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

310.    The Q2 2015 Form 10-Q was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the Q2 2015 Form 10-Q materially false and misleading.

311.    Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue for the three months ended June 30, 2015 was overstated by at least $2.1 million, the quarterly increase in the amount of the receivable recorded as owing from GIC.  Consequently, Patriot National's financial statements as set forth in the Q2 2015 Form 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

312.    Patriot National's financial statements contained in the Q2 2015 Form 10-Q were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Q2 2015 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

313.     Approximately 60% of Patriot National's $85.8 million "goodwill" asset listed in the Q2 2015 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 23% of all Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  As of August 14, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill.  However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

314.     For the same reasons, Patriot National's accounting of approximately $22 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

315.     Additionally, the above detailed "Risk Factors" were false and misleading because the Q2 2015 Form 10-Q and the 2014 Form 10-K failed to disclose that, as of August 14, 2015: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control", as Patriot National executives controlled GIC; (3) the primary factor for GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain

101

undue benefits for himself and GIC; (5) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

316.    Additionally, as explained above, Global HR was an utter disaster for Patriot National because it grossly overpaid for it.  In fact, once Shanfelter left Patriot National and competent individuals were placed in charge of the Audit Committee, they immediately wrote down the goodwill attributable to Global HR by $17.7 million, or greater than 42% of its purchase price.  Further, Patriot National sold Global HR for a loss of approximately $20 million, barely a year and a half after acquiring the subsidiary.  Accordingly, Patriot National's statements in support of the purported valuation of Global HR were false and misleading.

**D.    *Secondary S-1 was Materially False and/or Misleading.***

317.    On October 15, 2015, Patriot National filed its Secondary S-1 the SEC, in which it sought to sell $55 million in common stock, and Mariano would sell approximately $326.2 million worth of his stock.  The Secondary S-1 stated that Patriot National "intend[e]d to use a portion of the net proceeds from this offering to finance our growth strategy, which may include possible acquisitions of, or investments in, businesses or other assets, and to repay all outstanding amounts under the revolving credit facility of our senior secured credit facility, including accrued interest. We will use any remaining net proceeds of this offering for working capital and for general corporate purposes."

318.    Specifically, the Secondary S-1 further stated:

USE OF PROCEEDS

\*\*\*

We plan to use a portion of the net proceeds from this offering to finance our growth strategy which may include possible acquisitions of, or investments in, businesses or other assets.  While we routinely engage in discussions with third parties regarding potential acquisitions in the ordinary course of our business, we have no present understandings, commitments or agreements to enter into any acquisition or investment.

We also intend to use a portion the net proceeds from this offering to repay all outstanding amounts under the revolving credit facility of our senior secured credit facility, including accrued interest.  As of September 30, 2015, we had approximately $10.8 million in principal outstanding under such revolving credit facility.  These borrowings were used to finance certain of the acquisitions we made since our initial public offering, as described elsewhere in this prospectus.  During the six months ended June 30, 2015, outstanding borrowings under the revolving credit facility of our senior secured credit facility accrued interest at a weighted average rate of 3.75%.  Affiliates of BMO Capital Markets Corp. and Fifth Third Securities, Inc. are lenders under our senior secured credit facility and will receive more than 5% of the net proceeds of this offering due to the repayment of borrowings thereunder.  Accordingly, this offering is being made in compliance with FINRA Rule 5121, which requires, among other things, that a "qualified independent underwriter" participate in the preparation of, and exercise the usual standards of "due diligence" with respect to, the registration statement and this prospectus. J.P. Morgan Securities LLC has agreed to act as a qualified independent underwriter for this offering and to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act, specifically including those inherent in Section 11 thereof.  J.P. Morgan Securities LLC will not receive any additional fees for serving as a qualified independent underwriter in connection with this offering.  We have agreed to indemnify J.P. Morgan Securities LLC against liabilities incurred in connection with acting as a qualified independent underwriter, including liabilities under the Securities Act.  See "Underwriting (Conflicts of Interest)—Conflicts of Interest."

We intend to use any remaining proceeds for working capital and general corporate purposes.  Our management will have broad discretion in the application of the net proceeds, and investors will be relying on the judgment of our management regarding the use of these proceeds.

319.    The Secondary S-1 stated, among other things, that Patriot National is "not currently subject to any material interest rate risk or credit risk."  The Secondary S-1 further explained that Management "assess[es] the collectability of [Fee Income Receivable from Related Parties] balances and adjust[s] the receivable to the amount expected to be collected through an

103

allowance for doubtful accounts.  As of December 31, 2014, we maintained an allowance for doubtful accounts of approximately $0.1 million."  Additionally, the Secondary S-1 stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

320.    Additionally, the Secondary S-1 stated that "[a]s of June 30, 2015, we had approximately $85.8 million of goodwill and approximately $67.1 million of net intangible assets (the latter, net of $5.0 million of accumulated amortization and generating a deferred tax liability of approximately $12.3 million) recorded, which represents, in the aggregate, 68% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI and PCM] Acquisitions."  The prospectus further stated "We assess potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired."  Moreover, it stated that Patriot National "determined that there was no [goodwill] impairment as of December 31, 2014 or June 30, 2015."

321.    The Secondary S-1 also contained the following "Risk Factors":

**Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**

***

Although we intend to expand our relationships with additional carrier partners and our service offerings to third-party clients in the future, we expect that in the near-term a significant portion of our revenues will continue to be derived through our relationships with [GIC], Zurich and Scottsdale. ***As such, we will continue to be significantly impacted by the overall business levels of these carrier partners. While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control.***  For example, the general effects of economic and labor market conditions on business levels, a variety of market or regulatory factors can impact our carrier partners' decisions regarding the markets they enter, the products they offer and the industries they target. ***In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing,***

104

*product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive.*  A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.

\*\*\*

**Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.**

As of September 25, 2015, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owned 62.2% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIC] Group, the parent company of [GIC].  As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders.  Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC].  Our fee income and fee income from related party derived from our contracts and relationships with [GIC] and our fee income from related party constituted 76% and 50%, respectively, of our total fee income and fee income from related party for the six months ended June 30, 2015, and 71% and 46%, respectively, of our total fee income and fee income from related party for the year ended December 31, 2014.  Furthermore, on August 6, 2014, we acquired, through the Acquisitions, contracts to provide marketing, underwriting and policyholder services and our Patriot Care Management Business from entities controlled by Mr. Mariano; concurrently, we also entered into a new agreement with [GIC] to provide all such services that GUI had provided to [GIC], its parent, prior to the GUI Acquisition.

Although Mr. Mariano is no longer a board member or officer of [GIC] Group or [GIC], and we have implemented a related party transaction policy in connection with our initial public offering, because of his ownership position in [GIC] Group, Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders.  See "Certain Relationships and Related Party Transactions."

\*\*\*

**We have acquired 16 insurance and other services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.**

We have recently acquired 16 insurance and other services firms in a short period of time.  We believe that similar acquisition activity will be important to maintaining comparable growth in the future.  Failure to successfully identify and

complete acquisitions would likely result in slower growth. Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions. Our ability to finance and integrate acquisitions may also suffer if we expand the number or size of our acquisitions.

***Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, assumption of unexpected or unknown contingencies or liabilities, risks relating to ensuring compliance with licensing and regulatory requirements, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth.*** Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

***

***We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.***

Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government-sponsored programs such as Medicare and Medicaid. ***They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.*** Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients. We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention. ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us.***

322.    Related to Regulation S-K, the Secondary S-1 contained the following "Statement

of Policy Regarding Transactions with Related Persons":

Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC. This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.

*The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee.*

In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

·   the nature of the related person's interest in the transaction;

·   the material terms of the transaction;

·   the importance of the transaction both to [Patriot National] and to the related person;

·   whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

·   whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

·   any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

*The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*   The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

·   [Patriot National] was or is to be a participant;

·   the amount involved exceeds $120,000; and

·   any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

323.    The Secondary S-1 stated that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the

amounts of approximately $336,000 in the year ended December 31, 2013 and approximately $109,000 in the in the year ended December 31, 2014 for tax advisory services it performed in fiscal years 2011, 2012 and 2013 in respect of entities that are now our subsidiaries."

324.    The Secondary S-1 further states that Mariano received no compensation for 2014 and $255,235 in total compensation for 2013.  Moreover, the annual report states:

> The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

325.    Defendants Mariano, Shields, Del Pizzo, and Shanfelter signed or authorized the signing of Patriot National's Secondary S-1 filed with the SEC on October 15, 2015.

326.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts, goodwill, and "Customer & Carrier Relationships"; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under as of October 15, 2015 related to GIC; and (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance.

327.    The Secondary S-1 was false and misleading because it misrepresented and/or omitted the reason why the Secondary Offering was announced.  Mariano caused Patriot National to announce the Secondary Offering so that he could easily obtain liquidity he needed in order to

provide GIC capital to meet its 2015 FOIR capital requirements and pay off his debt to Von Allmen incurred in the purchase of his mega-yacht.  Patriot National's stated reason for the Secondary Offering (primarily, "finance [its] growth strategy") was pretext for Mariano to obtain the liquidity he needed, while raising money for Patriot National in the inevitable event that GIC could not repay its accounts payable to Patriot National.

328.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public.  Due to the annual operating losses, Mariano was forced to pump a total of $36 million into GIC so that it could meet its year-end FOIR capital requirements.  Thus, Patriot National, Mariano, and Shields knew or were reckless in not knowing as of October 15, 2015 that GIC would be unable to repay the $16.5 million recorded as an account receivable as of June 30, 2015.  Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National. Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future. (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

329.    As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of October 15, 2015, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC

falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease." Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

330.   Significantly, the Secondary S-1 failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

331.   The Secondary S-1 was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the Secondary S-1 materially false and misleading.

332.   Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue it as purportedly "earned," its revenue as of December 31, 2014 was overstated by at least $11,979,800, the amount of the receivable recorded as owing from GIC and its revenue for the six months ended June 30, 2015 was overstated by at least $4.6 million, the additional account receivable from GIC recorded by Patriot National during that period.

Consequently, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

333.    In addition, the Secondary S-1 contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons.  Although the Secondary S-1 set forth Patriot National's purported policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it currently applied the policy was false.  Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent, but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for unidentified purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire numerous companies from Mariano and his close friends associates without due diligence or due care; (5) the Board's decisions to accelerate the earn-out payments to Mariano and Snow barely a month after entering into the acquisition agreements; and (6) the Board's approval of the Secondary Offering for Mariano's personal benefit.  Thus, Patriot National's statement in the Secondary S-1 that it applied the disclosed Policy Regarding Transactions with Related Person was false.

334.    Patriot National's financial statements contained in the Secondary S-1 were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Secondary S-1, that goodwill be tested for impairment at

least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

335.    Approximately 60% of Patriot National's $85.8 million "goodwill" asset listed in the Secondary S-1 was tied to its acquisitions of GUI and PCM, and that figure represented 23% of all Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  By October 15, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill.  However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

336.    For the same reasons, Patriot National's accounting of approximately $22 million in intangible assets related to customer and carrier relationships (namely, GIC) was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

337.    Additionally, the above detailed "Risk Factors" were false and misleading because the Secondary S-1 failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary factor for GIC's decline was Mariano's looting; (4) Mariano had already exerted his

control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

338. The Secondary S-1 was also false and misleading for stating in the "Statement of Policy Regarding Transactions with Related Persons" that, among other things, the Audit Committee and/or disinterested directors oversee and approve interested transactions. This was false and misleading because Patriot National did not follow this policy in that each of the purportedly independent directors that would oversee the "Policy Regarding Transactions with Related Persons" was operating for the benefit of Mariano and/or themselves, as revealed by, among other things: (1) Del Pizzo's lucrative contract for unidentified purported tax services which were never provided; (2) GIC's business dealings with Patriot National; and (3) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without due care.

339. Moreover, the Secondary S-1 was false and misleading because it did not disclose that Del Pizzo did not perform $336,000 and $109,000 worth of tax advisory services in 2013 and 2014, respectively.

340. Additionally, the Secondary S-1 incorporated BDO's opinion contained in the 2014 Form 10-K. Specifically, attached as Exhibit 23.1 to the Secondary S-1 is the following letter from BDO:

<u>Consent of Independent Registered Public Accounting Firm</u>

Patriot National, Inc.
Fort Lauderdale, FL

We hereby consent to the incorporation by reference in the Prospectus constituting a part of this Registration Statement of our report dated March 31, 2015 relating to the combined financial statements of Patriot National, Inc. which is incorporated by reference in that Prospectus.

We also consent to the reference to us under the caption "Experts" in the Prospectus.

/s/ BDO USA, LLP
Certified Public Accountants

Miami, Florida
October 15, 2015

341. Despite its affirmative statements in its opinion dated March 31, 2015 that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," BDO did not. In particular, BDO's audit and related report, failed to comply with PCAOB standards (as set forth above at ¶¶ 226-33) in the following manners:

a. Assessing the risks of material misstatements in connection with Mariano and Patriot National management's accounting for doubtful accounts, goodwill, and/or ability to operate as a going concern;

b. Obtaining an understanding of the nature of Patriot National and its sources of earnings, namely, its codependent relationship with GIC;

c. Evaluating "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole[;]" particularly accounts receivable, doubtful accounts;, and/or goodwill;

d. Evaluating "whether there is a substantial doubt about the [C]ompany's ability to continue as a going concern" posed by GIC's operating losses, capital requirements, and risk of regulatory receivership; and

e. Assessing whether Patriot National's goodwill and intangible assets, which equated to 66% of its total assets and was primarily supported by revenue from GIC, should be impaired in light of GIC's operating failures, among other issues at GIC.

342. BDO also audited GIC's financial statements for 2014 and 2013. Therefore, GIC was not an opaque private customer into which BDO as Patriot National's auditor had no insight;

rather BDO (and the very same auditing staff) also was the registered auditor of GIC.  Indeed, it demanded that it be allowed to audit both GIC and Patriot National, purportedly because it needed access to both companies' financial statements to perform it duties.  Consequently, BDO had full access to all material information regarding GIC, including its reliance on cash provided by Mariano to meet regulatory capital requirements as well as the precarious state of its business.

343.    Conducting an audit of Patriot National in accordance with PCAOB standards, as represented in its March 31, 2015 opinion, required BDO to gain a meaningful understanding of Patriot National's relationship with and dependence upon GIC.  GIC accounted for approximately 70% of Patriot National's revenue.  Moreover, GIC and Patriot National were both owned and controlled by Mariano. As BDO had access to all material information regarding GIC as a result of its position as auditor of GIC, it knew that the collectability of Patriot National's account receivable from GIC was not reasonably probable and that both accounts receivable and revenue and income were overstated and not properly presented in accordance with GAAP.

344.    BDO's March 31, 2015 opinion was also false and misleading because it was unqualified, *i.e.*, it failed to contain a qualification expressing doubt about Patriot National's ability to continue as a going concern.  BDO's "opinion" was false and misleading because it did not provide any warning, as it should have: (1) of Patriot National's doubtful accounts, which did not provide for GIC's accounts payable at all, were insufficient and materially inaccurate; (2) that Patriot National's goodwill asset on its balance sheet was materially impaired and the impairment had not been accounted for; (3) GIC sustained annual losses that substantially threatened its ability to operate as a going concern and avoid regulatory receivership; and (4) Patriot National faced significant risk as a going concern as a result of GIC's risky position.

345.     Under PCAOB guidelines, BDO was required to evaluate GIC's ability to operate as going concern in order to in turn evaluate "whether there is a substantial doubt about [Patriot National's] ability to continue as a going concern[.]"  PCAOB Staff Audit Practice Alert No. 3, dated Dec. 5, 2008.  Due to the importance of GIC's revenue as a customer of Patriot National, any auditor exercising  "due profession care… in the planning and performance of the audit and the preparation of the report" would have scrutinized GIC prior to issuing its Report opining that Patriot National's financial statements were "in conformity with accounting principles generally accepted in the United States of America[,]" and the "financial statement schedule [which included doubtful accounts estimates and goodwill assets], when considered in relation to the basic combined financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein."

346.     The facts that led to BDO's 2017 determination that it was "substantially doubt[ful]," that GIC could continue as going concern were present at the time of the IPO.  GIC has struggled to be profitable since at least 2007, and would have collapsed had Mariano not pumped millions of dollars into it.  Moreover, BDO had already been specifically warned by the FOIR of Mariano's improper accounting practices at Patriot National and GIC (when they operated as a single business) in 2008 and 2010.

347.     On the announcement of the Secondary Offering, shares of Patriot National declined from $16.11 per share at close on October 2, 2015, to $14.72 per share on October 15, 2015 (the date that the number of shares to be sold was announced), an overall drop of 13.8% drop, on unusually heavy volume.

**E.     *Quarterly Report dated November 12, 2015.***

348.     On November 12, 2015, Patriot National filed its quarterly report for the period ended September 30, 2015 (the "Q3 2015 Form 10-Q"). The Q3 2015 Form 10-Q stated that "[t]he

accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

349.    The Q3 2015 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended September 30, 2015 was $58.5 million compared to $31.4 million for the three months ended September 30, 2014, an increase of $27.1 million or approximately 86%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first three quarters of 2015.
>
> Total fee income and fee income from related party for the nine months ended September 30, 2015 was $148.9 million compared with $62.5 million for the same period in 2014, an increase of $86.4 million or approximately 138%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first three quarters of 2015.
>
> For the three and nine months ended September 30, 2015, approximately 66% and 72%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% and 8% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and nine months ended September 30, 2015.
>
> For the three and nine months ended September 30, 2014, approximately 76% and 66%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 10% and 22%, respectively, of our total fee income and fee income from related party were attributable to our contracts with our second largest client.
>
> *Fee Income*. Fee income, which represents fee income from non-related parties, for the three months ended September 30, 2015 was $34.8 million compared to $15.6 million for the three months ended September 30, 2014, an increase of $19.2 million.  For the nine months ended September 30, 2015, fee income was $80.1 million compared to $37.9 million for the nine months ended September 30, 2014, an increase of $42.2 million.
>
> Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the nine-month period ended

September 30, 2015 relative to the nine-month period ended September 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

*Fee Income from Related Party*. Fee income from related party for the three months ended September 30, 2015 was $23.8 million compared to $15.8 million for the three months ended September 30, 2014, an increase of $8.0 million.  For the nine months ended September 30, 2015, fee income from related party was $68.9 million compared to $24.6 million for the nine months ended September 30, 2014, an increase of $44.3 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the nine-month period ended September 30, 2015 relative to the nine-month period ended September 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, Related Party Transactions. Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC].  Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], as described in Note 13, Concentration, [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party

*** 

 **Concentration**
For the three months ended September 30, 2015, approximately 66% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer.  For the three months ended September 30, 2014, approximately 76% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 10% and 7% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

For the nine months ended September 30, 2015, approximately 72% of total combined fee income and fee income from related party was attributable to

contracts with [GIC] and approximately 8% was attributable to contracts with [Patriot National]'s second largest customer.  For the nine months ended September 30, 2014, approximately 66% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 22% was attributable to contracts with [Patriot National]'s second largest customer.

As of September 30, 2015, approximately 62% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% and 1% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.  As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

350.    Patriot National also reported in the Q3 2015 Form 10-Q that as of September 30, 2015, it had $ 22.1 million in fee income receivable from related party, an increase of $6.6 million since the previous quarter and an increase of $10.2 million, or 85%, since December 31, 2014. The Q3 2015 Form 10-Q further stated that Patriot National had $22 million in accounts receivables owed by GIC as of September 30, 2015, and "[a]s of September  30, 2015, we were not subject to any material interest rate risk or credit risk[.]"

351.    Additionally, the Q3 2015 Form 10-Q reported a total of over $119.4 million as of September 30, 2015.  As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $29 million.  Concerning the valuation of its intangible assets, Patriot National stated that   "In accordance with FASB ASC 350, *Intangibles—Goodwill and Other*, intangible assets, which are comprised of the estimated fair value of the service contracts acquired, customer and carrier relationships, non-compete agreements, developed technology and trade names are being amortized over the respective

estimated life, ranging from two to ten years, in a manner that, in management's opinion, reflects the pattern in which the intangible asset's future economic benefits are expected to be realized.

***Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.***"

352.   The Q3 2015 Form 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2014.  Other than as described below, there have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2014."  The only additional "Risk Factor" listed in the Q3 2015 Form 10-Q was the following:

> ***We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.***
>
> We have recently acquired a number of insurance services firms in a short period of time.  We believe that similar acquisition activity will be important to maintaining comparable growth in the future.  Failure to successfully identify and complete acquisitions likely would likely result in slower growth.  Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions.  Our ability to finance and integrate acquisitions may also suffer if we expand the number or size of our acquisitions.
>
> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as violations of sanctions laws or anti-corruption laws, risks relating to ensuring compliance with licensing and regulatory requirements, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have

an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

353.     The Q3 2015 Form 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties;" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

354.     Additionally, Patriot National stated in the Q3 2015 Form 10-Q:

On October 29, 2015, TriGen Insurance Solutions, Inc. ("TriGen") entered into a Facilitation Agreement with The Carman Corporation, a Pennsylvania corporation ("Carman"), pursuant to which Carman will provide Trigen with certain market-finding and consulting activities for an upfront payment of $2.0 million.    In conjunction with the Facilitation Agreement, TriGen also entered into a Managing Producer Agreement with AmTrust International Underwriters Limited ("AmTrust") as of October 15, 2015 pursuant to which TriGen will provide a hospitality-focused insurance program for AmTrust.

355.     Defendant Shields signed or authorized the signing of Patriot National's Form 10-Q filed with the SEC on November 12, 2015.  Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, stating:

In connection with the Quarterly Report on Form 10-Q of Patriot National, Inc. (the "Company") for the quarterly period ended September 30, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 12, 2015

356.     Additionally, Mariano and Shields signed certifications as Chief Executive Officer
and Chief Financial Officer, respectively, certifying that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended
    September 30, 2015 of Patriot National, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a
    material fact or omit to state a material fact necessary to make the statements made, in
    light of the circumstances under which such statements were made, not misleading
    with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information
    included in this report, fairly present in all material respects the financial condition,
    results of operations and cash flows of the registrant as of, and for, the periods
    presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and
    maintaining disclosure controls and procedures (as defined in Exchange Act Rules
    13a-15(e) and 15d-15(e)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure
       controls and procedures to be designed under our supervision, to ensure that
       material information relating to the registrant, including its consolidated
       subsidiaries, is made known to us by others within those entities, particularly
       during the period in which this report is being prepared;

    b) Evaluated the effectiveness of the registrant's disclosure controls and
       procedures and presented in this report our conclusions about the effectiveness
       of the disclosure controls and procedures, as of the end of the period covered
       by this report based on such evaluation; and

    c) Disclosed in this report any change in the registrant's internal control over
       financial reporting that occurred during the registrant's most recent fiscal
       quarter (the registrant's fourth fiscal quarter in the case of an annual report)
       that has materially affected, or is reasonably likely to materially affect, the
       registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most
    recent evaluation of internal control over financial reporting, to the registrant's
    auditors and the audit committee of the registrant's board of directors (or persons
    performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation
       of internal control over financial reporting which are reasonably likely to
       adversely affect the registrant's ability to record, process, summarize and
       report financial information; and

      b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 12, 2015

357.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under as of November 12, 2015 related to GIC; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; and/or (7) Mariano and Snow's schemes concerning Trigen's Facilitation Agreement.

358.    The Q3 2015 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time— *viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

359.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public.  Due to the annual operating losses, Mariano was forced to pump a total of $36 million into GIC so that it could meet its year-end FOIR capital requirements.  Thus, Patriot National and Mariano knew or were reckless in not knowing as of November 12, 2015 that GIC would be unable to repay the $22.1 million recorded as an account receivable as of September 30, 2015.  Moreover, the amounts due from GIC grew

each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

360.    As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of November 12, 2015, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."  Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

361.    Significantly, Q3 2015 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

362.    The Q3 2015 Form 10-Q was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the Q3 2015 Form 10-Q materially false and misleading.

363.    Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue for the three months ended September 30, 2015 was overstated by at least $6.6 million, the quarterly increase in the amount of the receivable recorded as owing from GIC.  Consequently, Patriot National's financial statements as set forth in the Q3 2015 Form 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

364.    Patriot National's financial statements contained in the Q3 2015 Form 10-Q were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Q3 2015 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

365.     Approximately 43% of Patriot National's $119.4 million "goodwill" asset listed in the Q3 2015 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 18% of total Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  As of November 12, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill. However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

366.     For the same reasons, Patriot National's accounting of approximately $29.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

367.     Additionally, the above detailed "Risk Factors" were false and misleading because the Q3 2015 Form 10-Q and the 2014 Form 10-K failed to disclose that, as of November 12, 2015: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control", as Patriot National executives controlled GIC; (3) the primary factor for GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain

undue benefits for himself and GIC; (5) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

368.     In addition to the reasons detailed above, Patriot National's statement concerning Trigen's Facilitation Agreement with Carman which provided Snow with $2 million in upfront payment was false and misleading because Mariano and Snow never had the ability to obtain the requisite revenue thresholds and also had no intention of returning any unearned funds.

369.     On the filing of the Q3 2015 Form 10-Q, shares of Patriot National declined from $13.58 per share at close on November 12, 2015 to $13.31 per share at close the next day, a 2% drop, on unusually heavy volume.

**F.     *Initial PIPE Announcements were Materially False and/or Misleading.***

370.     On December 14, 2015, Patriot National filed a Form 8-K with the SEC, stating:

On December 13, 2015 (the "Signing Date"), Patriot National, Inc. (the "Company") and Steven M. Mariano, the President and Chief Executive Officer of [Patriot National], as the selling stockholder (the "Selling Stockholder"), entered into a Securities Purchase Agreement (the "Purchase Agreement") certain purchasers named therein (the "Purchasers"), pursuant to which, subject to the satisfaction or waiver of certain conditions, (i) [Patriot National] will issue and sell, and the Purchasers will purchase, an aggregate of 1,666,666 shares (the "Company Shares") of common stock of [Patriot National], par value $0.001 per share (the "Common Stock"), (in the form of 666,666 shares of common stock and a prepaid warrant for 1,000,000 shares of common stock) and warrants to purchase up to an aggregate of 2,083,333 shares of Common Stock (the "Warrant Shares"), subject to adjustments pursuant to which additional shares may be issued, to be issued by [Patriot National] (the "Warrants"), for an aggregate purchase price of approximately $20 million, and (ii) the Selling Stockholder will sell, and the Purchasers will purchase, an aggregate of 2,500,000 shares (together with [Patriot National] Shares, the "Firm Shares") of Common Stock, for an aggregate purchase price of approximately $30 million, in a private placement transaction (the "Transaction").     The Purchase Agreement contains certain customary representations and warranties accompanied by certain indemnification rights and

certain customary and other closing conditions.  The transaction is expected to close on December 16, 2015 (the date of such closing, the "Closing Date").

In addition, [Patriot National], the Selling Stockholders and the Purchasers, on the Closing Date, will enter into a registration rights agreement (the "Registration Rights Agreement"), pursuant to which [Patriot National] will provide the Purchasers with demand and piggyback registration rights to register the Firm Shares, the Warrants and the Warrant Shares, subject to penalties and other customary provisions.  [Patriot National] will agree to indemnify the Purchasers in connection any claims related to their sale of securities under a registration statement, subject to certain exceptions.

On the Signing Date, [Patriot National] and the Selling Stockholder entered into an agreement (the "Stock Back-to-Back Agreement"), pursuant to which [Patriot National] will repurchase a number of shares of Common Stock owned by the Selling Stockholder equal to 60% of the Warrant Shares to be issued in connection with the exercise by Purchasers of the Warrants.

The issuance and sale, as applicable, of the Firm Shares and the Warrants are intended to be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act").  [Patriot National] expects to rely upon Section 4(a)(2) of the Securities Act, as the issuance and sale of the Firm Shares and Warrants pursuant to the Purchase Agreement do not involve a public offering and further upon reliance on the representation by each Purchaser that it is acquiring the securities for its own account, for investment only, and not with a view to any resale or public distribution thereof.

The foregoing description of the Purchase Agreement, the Registration Rights Agreement, the Stock Back-to-Back Agreement and the Warrants, does not purport to be complete and is qualified in its entirety by reference to the Purchase Agreement, the form of Registration Rights Agreement, the Stock Back-to-Back Agreement and the form of Warrants, copies of which are included as Exhibits 10.1, 10.2, 10.3 and 4.1, respectively, to this Current Report on Form 8-K and incorporated herein by reference.

371.    Patriot National's press release, attached to the Form 8-K as Exhibit 99.1, states that "[Patriot National] expects to use the proceeds from this transaction for general corporate purposes."

372.    Defendant Pesch signed or authorized the signature of the Form 8-K.

373.    In another Patriot National press release, dated December 14, 2015, announcing the PIPE transaction, Patriot National stated:

Steven M. Mariano, President and CEO of Patriot National said, "We appreciate the support of the investors who participated in our offering and their confidence in

our plans for continued strong growth. ***We plan to maintain a strong balance sheet and to use the proceeds of this offering to finance future growth, including strategic acquisitions***. Since we completed our IPO, we have completed 16 acquisitions that have significantly expanded our carrier relationships, increased our distribution reach and diversified our business beyond workers' compensation. We have a robust pipeline of acquisition opportunities and with the proceeds of this offering, we are confident that we can continue to make strategic acquisitions that will enhance shareholder value. ***Furthermore, increasing our float through this transaction will create more liquidity, to the benefit of current and potential shareholders***.

374. Similarly, on December 16, 2015, Patriot National issued a Press-Release announcing Closing of PIPE transaction:

**Patriot National Announces Closing of Private Placement of Common Stock and Warrants; Reaffirms 2016 Guidance**

Company Release - 12/16/2015 5:29 PM ET

FORT LAUDERDALE, Fla., Dec. 16, 2015 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National), today announced that [Patriot National] and Steven M. Mariano, Founder and Chief Executive Officer of [Patriot National] (the "Selling Stockholder"), closed on the previously announced securities purchase agreement with certain institutional investors.

Mr. Mariano said, "We are pleased to have completed this capital raise so that we can continue to execute our balanced growth strategy, which includes a combination of organic growth and strategic acquisitions. With a strong balance sheet, we are well positioned to continue to invest in organic growth initiatives to expand our carrier and employer relationships by cross selling our broad suite of insurance services and to make selective, accretive acquisitions in our core insurance services business operations."

Mr. Mariano continued, "[Patriot National] has no plans to raise additional equity and I have no plans to sell any shares in 2016. After this one time sale I remain the majority stockholder of Patriot National, and as such my interests continue to be fully aligned with stockholders to grow our business and create stockholder value. We remain highly confident in the 2016 financial guidance reiterated in our most recent earnings release."

375. The above statements were false and misleading because they omitted and/or misrepresented the purpose for PIPE transaction—*viz.* providing Mariano with $30 million in liquidity to fund GIC's capital requirements by year end and pay off his mega-yacht. Moreover, the statements were false and misleading because they omitted and/or misrepresented Patriot

National's need for an additional capital raise less than one year after the IPO.  Finally, the statements misleadingly misrepresented the strength of Patriot National's balance sheet and growth of its business.

376.    On this news, shares of Patriot National declined from $13.08 per share at close on December 11, 2015 to $6.59 per share at close on December 15, 2015, a 49.6% drop, on unusually heavy volume.

### G.    Amended PIPE Form 8-K, dated December 23, 2015.

377.    On December 23, 2015, Patriot National filed a Form 8-K with the SEC, stating:

On December 23, 2015 (the "Signing Date"), Patriot National, Inc. (the "Company") entered into several agreements (collectively, the "Rescission and Exchange Agreement") with Steven M. Mariano, the President and Chief Executive Officer of [Patriot National] (the "Stockholder"), and certain investors named therein (the "Investors"), pursuant to which [Patriot National] has rescinded the purchase and sale of an aggregate of 1,666,666 shares (the "Shares") of common stock of [Patriot National], par value $0.001 per share (the "Common Stock") (in the form of 666,666 shares of common stock and a prepaid warrant for 1,000,000 shares of common stock) issued on December 16, 2015, for an aggregate purchase price of approximately $20 million, and [Patriot National] has exchanged the warrants previously issued by [Patriot National] to each of the Investors for new warrants (the "New Warrants") to purchase up to an aggregate of 3,250,000 shares of Common Stock (the "New Warrant Shares") (the "Transaction").    The Rescission and Exchange Agreement contains certain customary representations and warranties accompanied by certain indemnification rights and certain customary and other closing conditions.

***On the Signing Date, [Patriot National] and the Stockholder amended and restated a stock back-to-back agreement (the "Amended and Restated Stock Back-to-Back Agreement"), pursuant to which [Patriot National] will repurchase a number of shares of Common Stock owned by the Stockholder equal to 100% of the New Warrant Shares to be issued in connection with the exercise by Investors of the New Warrants, resulting in no dilution for existing shareholders***.

378.    Patriot National's press release, attached to the Form 8-K as Exhibit 99.1, further states:

Steven M. Mariano, Patriot National Chairman and Chief Executive Officer noted, "The decline in our stock price since the closing of the original transaction has had a meaningful impact to our stockholders.    Following many productive

conversations with our investors, [Patriot National] worked diligently with the private placement investors and mutually agreed to rescind [Patriot National] portion of the transaction. Patriot National has no plans to raise equity capital in 2016, and, as previously announced, I have no plans to sell any additional shares in the coming year."

Mariano added, "Our continued organic growth and strong free cash flow – as evidenced by our reiteration of 2016 guidance during the 3rd quarter earnings report – in combination with our present credit facility, will allow us to continue to execute our balanced growth strategy, which consists of investments in organic growth initiatives as well as selective strategic acquisitions in our core business lines."

379.    The above statements were false and misleading because they omitted and/or misrepresented the true purpose for PIPE transaction.  The purpose of the PIPE transaction was to provide Mariano with $30 million in liquidity to fund GIC's capital requirements by year end and pay off his mega-yacht.

380.    Moreover, the statements misleadingly misrepresented the strength of Patriot National's "organic growth and strong free cash flow".  The above statements were also false and misleading because they omitted and/or misrepresented Mariano's impetus to amend the PIPE transaction—*viz.* prevent greater than projected dilution of his control.  Lastly, the above statements were also false and misleading because Mariano had no intention of ever handing over his shares to Patriot National pursuant to the Back-to-Back Agreement, and always intended to use his control of Patriot National to prevent the exercise of the Warrants.

**H.    *Press Release, dated February 29, 2016.***

381.    On February 29, 2016, Patriot National issued a press release, "Patriot National Updates 2016 Strategic Initiatives for Value Creation".  The press release stated:

FORT LAUDERDALE, Fla., Feb. 29, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today updated its 2016 strategic initiatives for value creation.

Steven M. Mariano, Chairman and Chief Executive Officer of Patriot National, stated, "I am very proud of our 2015 financial performance and the solid execution of our growth strategy.  Over the past 14 months, we have built a powerful operating platform capable of delivering substantial value to our customers.  Today,

we have relationships with 139 carriers and 4,100 agencies, and we offer a broad menu of products and services, spanning workers' compensation and property and casualty insurance services, human resources management and stand-alone technology solutions that is unparalleled in the marketplace.   Our 2015 achievements reflect our efforts to build a world-class platform that gives us a significant competitive advantage.   ***More importantly, it positions Patriot National to increase revenue and profitability and deliver improved shareholder returns.***

"As we move forward into 2016, our near-term objectives include increasing organic growth through cross-selling and offering more choices to agencies and carriers, as well as enhancing our platform and technology capabilities with a few surgical acquisitions. ***Furthermore, with the integration of our 2015 acquisitions behind us***, we expect margins to expand as our Adjusted EBITDA grows faster than revenue.  We can achieve our 2016 plan without raising additional capital.

***"Patriot National is fortunate to have a Board of Directors committed to lending their experience and skills to help facilitate, as well as oversee, these strategic value creation initiatives.  Three of our outside directors have agreed to serve on a new committee expressly dedicated to this mission.  Our management team looks forward to working with the Board committee in our collective efforts to enhance shareholder value."***

Management and the Board committee will assess the potential merits of initiatives for alignment with [Patriot National]'s value creation strategy, will evaluate any unsolicited proposals, and may engage third party advisors, as appropriate.  [Patriot National] previously engaged a financial advisor to assist in exploring opportunities that may accelerate value creation, and that engagement will continue, if it proves to be useful, under the guidance of the Board committee.

382.    The above statements were false and materially misleading because they omitted and/or misrepresented, *inter alia*, (1) the independence of the Special Committee; (2) the functioning of the Special Committee and Mariano's personal dominance over the Strategic Review Process; (3) Mariano's undisclosed timeframe required to enter into a transaction; (4) Mariano's alternative motives for the Strategic Review Process, namely, to fight with the PIPE investors, bail out GIC, and fund Ashmere; (5) the improper and/or fraudulent activities occurring at Patriot National's subsidiaries; and (6) the success of Patriot National's 2015 acquisitions.

383. On this news, shares of Patriot National declined from $4.37 per share at close on February 26, 2016 to $3.92 per share at close on March 1, 2016, a 10.3% drop, on unusually heavy volume.

**I.** *Repurchase Program Form 8-K, dated March 7, 2016*

384. On March 7, 2016, Patriot National filed a Form 8-K with the SEC stating:

On March 3, 2016, the Board of Directors of Patriot National, Inc. (the "Company") approved a $15 million stock repurchase program (the "Repurchase Program"). Under the new Repurchase Program, [Patriot National] may repurchase up to $15 million of its common stock. The Repurchase Program may continue for up to eighteen (18) months. [ Patriot National] may repurchase its common stock from time to time, in amounts and at prices [Patriot National] deems appropriate, subject to market conditions and other considerations. [Patriot National's] repurchases may be executed using open market purchases or negotiated off-market transactions.

385. Patriot National's press release, attached to the Form 8-K as Exhibit 99.1, further states:

FORT LAUDERDALE, Fla., March 3, 2016—Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced that its Board of Directors approved a $15 million share repurchase program for [Patriot National]'s common stock.

*"We believe [Patriot National]'s common stock is significantly undervalued and does not reflect the value or the earnings power of our operating platform, which is unparalleled in the marketplace and positions Patriot National for long-term sustainable growth and profitability*, said Steven M. Mariano, Chief Executive Officer of Patriot National. *"Our management team and Board are focused on evaluating all opportunities to create value for our shareholders and we are pleased to announce this share repurchase program."*

The share repurchase program is effective immediately, and gives management discretion in determining the market and business conditions under which shares may be purchased from time to time, in open market transactions or in negotiated off-market transactions. The program may continue for up to eighteen months.

386. The above statements were false and misleading because they omitted and/or misrepresented the purpose for the Repurchase Program. As demonstrated above, Mariano's impetus for the Repurchase Program was to decrease his risk under the New Series B Warrants and entrench himself.

387.    Additionally, the above statements were false and misleading because they omitted and/or misrepresented Patriot National's ability to afford the Repurchase Program.  The statements fail to disclose that Mariano and the Board made matters worse at Patriot National by forcing it to amend the BMO Credit Facility so that Mariano could obtain funds and ability to repurchase Patriot National stock.  Lastly, the above statements were false and misleading because they omitted and/or misrepresented UBS's, Snow's, and Allied Standard Asset Management, LLC's ("Allied Standard") roles in the Repurchase Program.  Allied Standard is a secretive investment company owned by Mariano that was run out of Patriot National's headquarters.  Allied Standard made stock purchases on behalf of GIC and worked with Mariano to manipulated Patriot National's stock price.

**J.    *Annual Report dated March 21, 2016.***

388.    On March 21, 2016, Patriot National filed its annual report for the fiscal year ended December 31, 2015 on Form 10-K with the SEC (the "2015 Form 10-K").

389.    The 2015 Form 10-K stated that "[t]he accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

390.    The 2015 Form 10-K stated "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the year ended December 31, 2015 was $209.8 million compared to $102.7 million for the year ended December 31, 2014, an increase of $107.1 million or approximately 104%.  The increase was primarily due to increased overall revenue in organic growth, acquisition revenue and fee income from related party.

For the year ended December 31, 2015, approximately 69% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 7% of our total fee income and fee income from related party was attributable to contracts with our second largest client.

*Fee Income.* Fee income, which represents fee income from non-related parties, for the year ended December 31, 2015 was $122.9 million versus $55.8 million for the year ended December 31, 2014, an increase of $67.1 million or 120%.

This increase was attributable to non-related party fee income from businesses acquired during 2015 of $26.9 million, an increase in fee income earned by the Patriot Care Management Business from non-related parties of $24.7 million, which was acquired on August 6, 2014, and an increase in brokerage and policyholder services and claims administration services fee income earned from non-related parties of $15.4 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the year ended December 31, 2015 relative to the year ended December 31, 2014 and, accordingly, the net increase in fee income was related to changes in the volume of business we managed.

*Fee Income from Related Party.* Fee income from related party for the year ended December 31, 2015 was $86.9 million compared to $46.9 million for the year ended December 31, 2014, an increase of $40.0 million or approximately 85%.

***The increase was principally attributable to an increase of $41.3 million of brokerage and policyholders services fee income from [GIC].*** On August 6, 2014 we entered into a new agreement with [GIC] to provide all of our brokerage and policyholder services to [GIC], with no such contract existing previously during 2014.  The increase was partially offset by a decrease of $3.1 million of claims administration services fee income earned from [GIC] for the year ended December 31, 2015.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the year ended December 31, 2015 relative to the year ended December 31, 2014 and, accordingly, the net increase in fee income from related party was solely related to changes in the volume of business we managed.

***

## Concentration

For the year ended December 31, 2015, approximately 69% of total fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 7% was attributable to contracts with [Patriot National]'s second largest customer.  For the year ended December 31, 2014, approximately 71% of total fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 18% was

attributable to contracts with [Patriot National]'s second largest customer. For the year ended December 31, 2013, approximately 44% of total fee income and fee income from related revenues was attributable to contracts with [GIC] and approximately 38% and 12% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

As of December 31, 2015, approximately 77% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 3% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer.  As of December 31, 2014, approximately 86% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.  As of December 31, 2013, approximately 62% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 23% and 11% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.  Management believes that the receivable balances from these largest customers do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

391.   Patriot National also reported in the 2015 Form 10-K that as of December 31, 2015, it had $27.1 million in fee income receivable from related party, a dramatic increase of $15.2 million (or 127%) in fee income receivable from related party since December 31, 2014.

392.   The 2015 Form 10-K further stated that, as of December 31, 2015, Patriot National is "not currently subject to any material interest rate risk or credit risk."  The 2015 Form 10-K also stated that it had $27.1 million in accounts receivables owed by GIC and that "Management believes that the receivable balances from these largest customers [*viz.* GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience."  The 2015 Form 10-K further explained that Management "assess the collectability

of [Fee Income Receivable from Related Parties] balances and adjusts the receivable to the amount expected to be collected through an allowance for doubtful accounts.  As of December 31, 2015, we maintained an allowance for doubtful accounts of approximately $0.3 million."   Patriot National also stated that "***We expect a significant increase in brokerage and policyholder services fee income from [GIC] going forward.***"

393.    Additionally, Patriot National states in the 2015 Form 10-K that "[a]s of December 31, 2015, we had approximately $118.1 million of goodwill and approximately $75.7 million of net intangible assets (the latter, net of $11.5 million of accumulated amortization and generating a deferred tax liability of approximately $9.1 million) recorded, which represents, in the aggregate, 63% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI and PCM] Acquisitions. We assess potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired."  Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $31 million, as of December 31, 2015.  Patriot National then stated that it had "determined that there was no impairment as of December 31, 2015 and 2014."

394.    The 2015 Form 10-K also contained the following false and misleading statements and/or omissions in the "Risk Factors":

**Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**

Although we intend to expand our relationships with additional carrier partners and our service offerings to third-party clients, we expect we will continue to be significantly impacted by the overall business levels of [GIC], Zurich, AIG and Scottsdale.  While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control.  For example, the general effects of economic and labor market conditions on business levels, a variety of market or regulatory factors can

impact our carrier partners' decisions regarding the markets they enter, the products they offer and the industries they target.   In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive.   A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues. Further, if the premium rates assessed by our carrier partners decreased, we would experience a corresponding decrease in the revenues that we derive from these carrier partners because a significant portion of the fee revenue we receive from providing services to them is based on a percentage of reference premiums written for the policies that we produce and service.   We do not have any ability to control such rates, and in certain states premium rates are established by regulation. Further, our insurance carrier clients may in the future seek to reduce the service fees paid to us.

***

**Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.**

As of March 14, 2016, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owned 53.8% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIC] Group, the parent company of [GIC].   As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders.   Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC].   Our total fee income and fee income from related party pursuant to contracts with [GIC] and our fee income from related party constituted 69% and 41%, respectively, of our total fee income and fee income from related party for the year ended December 31, 2015. Furthermore, through the 2014 Acquisitions, we acquired contracts to provide marketing, underwriting and policyholder services and our Patriot Care Management Business from entities controlled by Mr. Mariano.   Concurrently, we also entered into a new agreement with [GIC] to provide all such services that GUI had provided to [GIC], its parent, prior to the GUI Acquisition.

Although Mr. Mariano is no longer a board member or officer of [GIC] Group or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIC] Group, Mr. Mariano's interests in our dealings with [GIC] may not align with our other

stockholders.   See "Certain Relationships and Related Party Transactions and Director Independence."

**We have acquired 17 insurance and other services firms in a short period of time and we have limited experience integrating the operations of companies or businesses that we have acquired and may incur substantial costs in connection therewith which could adversely affect our growth and results of operations.**

We have acquired 17 insurance and other services firms in a short period of time. We believe that similar acquisition activity will be important to maintaining comparable growth in the future.  Failure to successfully identify and complete acquisitions would likely result in slower growth.  Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions.  Our ability to finance and integrate acquisitions may also suffer if we expand the number or size of our acquisitions. Furthermore, in order to achieve the growth we seek, we may acquire numerous smaller market participants, which could require significant attention from management and increase risks, costs and uncertainties associated with integration.

The process of integrating the operations of an acquired company may create unforeseen operating difficulties and expenditures.  The key areas where we may face risks and uncertainties include:

- the need to implement or remediate controls, procedures and policies appropriate for a public company at companies that, prior to the acquisition, lacked these controls, procedures and policies;

- disruption of ongoing business, diversion of resources and of management time and focus from operating our business to acquisitions and integration challenges;

- our ability to achieve anticipated benefits of acquisitions by successfully marketing the service offerings of acquired businesses to our existing partners and clients, or by successfully marketing our existing service offerings to clients and partners of acquired businesses;

- the negative impact of acquisitions on our results of operations as a result of large one-time charges, substantial debt or liabilities acquired or incurred, amortization or write down of amounts related to deferred compensation, goodwill and other intangible assets, or adverse tax consequences, substantial depreciation or deferred compensation charges;

- the need to ensure that we comply with all regulatory requirements in connection with and following the completion of acquisitions;

- retaining employees and clients and otherwise preserving the value of the assets of the businesses we acquire; and

- the need to integrate each acquired business's accounting, information technology, human resource and other administrative systems to permit effective management.

***Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, assumption of unexpected or unknown contingencies or liabilities, risks relating to ensuring compliance with licensing and regulatory requirements, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth.*** Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

***

**We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.**

***

Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government-sponsored programs such as Medicare and Medicaid. They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions. Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients. We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention. In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us.

395.   Similarly, Patriot National states the following in the 2015 Form 10-K:

*1.   Regulation of Our Carrier Partners*

Our insurance carrier partners are subject to extensive regulation by the insurance regulators of the states in which they operate, as well as by the federal government for participation in government-sponsored programs such as Medicare and Medicaid. While we are not subject to these regulations, they could indirectly impact us if our carrier partners were forced to alter their businesses or the nature of their relationship with us as a result of regulation. The nature and extent of such

140

regulation varies by jurisdiction but typically includes the following: standards of solvency, including risk-based capital requirements; mandates that may affect wage replacement and medical care benefits paid; restrictions on the way rates are developed and premiums are determined; limitations on the manner in which general agents may be appointed; required methods of accounting; establishment of reserves for unearned premiums, losses and other purposes; and limitations on their ability to transact business with affiliates; potential assessments for the satisfaction of claims under insurance policies issued by impaired, insolvent or failed insurance companies.

Under the regulations applicable to [GIC], because of our affiliation through the common control of Mr. Mariano, all material transactions among us and [GIC] generally must be fair and reasonable and, if material or of a specified category, require prior notice and approval by the Florida Office of Insurance Regulation.

The premium rates that may be charged to insure employers for workers' compensation claims are set by state regulations.  For example, in Florida and New Jersey where a significant portion of the policies that we service are written, insurance regulators establish the premium rates charged by our carrier partners.  Although we do not set the premium pricing of the policies that we offer on behalf of our carrier partners, these types of regulations can impact us because we are compensated in part based on a percentage of the premiums associated with policies we offer and service on behalf of our carrier partners.  In addition, if regulated premium pricing causes our carrier partners to reduce their business levels or stop writing policies in certain states, it would reduce the services we provide for them.

396.    Related to Regulation S-K, the 2015 Form 10-K contained the following "Statement of Policy Regarding Transactions with Related Persons":

Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.

*The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee*.

In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

·   the nature of the related person's interest in the transaction;

- the material terms of the transaction;

-  the importance of the transaction both to [Patriot National] and to the related person;

- whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

- whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

- any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

*The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*  The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

- [Patriot National] was or is to be a participant;

- the amount involved exceeds $120,000; and

- any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

397.    The 2015 Form 10-K stated that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the amount of approximately $185,100 in the year ended December 31, 2015 for tax advisory services it performed in fiscal year 2015 in respect of entities that are now our subsidiaries.  Del Pizzo & Associates P.C. will continue providing similar services for fiscal year 2016."  The 2015 Form 10-K further states that Mariano received $700,001 in compensation for 2015 and no compensation for 2014.  Moreover, the annual report states:

The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods.  Mr. Mariano

receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis.  Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

398.    Patriot National stated the following in the 2015 Form 10-K in connection with the

PIPE transaction and the Back-to-Back Agreement.:

### Loan Arrangements and Receivable from Affiliates

Concurrent with the issuance of the New Warrants, the company entered into an amended Stock Back-To-Back Agreement with Steven M. Mariano.  Under the terms of the amended Stock Back-To-Back Agreement, Mr. Mariano will transfer Common Stock to [Patriot National] equal to 100% of the New Warrant Shares to be issued upon any exercise of the New Warrants by the PIPE Investors.  *Mr. Mariano also agrees to hold [Patriot National] harmless from and indemnify [Patriot National] for any expenses, obligations and liabilities that [Patriot National] incurs in connection with the issuance or performance of the New Warrants, including with respect to issuing additional shares of Common Stock*.

399.    Further, Patriot National stated the following in the 2015 Form 10-K in connection

with the Forward Purchase Asset backed by Mariano, pursuant to the Back-to-Back Agreement.:

The forward purchase asset is maintained at equal value to the Series A and B Warrants, as created by the Back-to-Back Agreement with the selling stockholder. There were no equity and fixed income security investments or forward purchase assets as of December 31, 2014.

The following is a reconciliation of the fair value of [Patriot National]'s financial assets that were measured using significant unobservable (Level 3) inputs:

| Year Ended December 31, 2015 (in thousands) | | Forward Purchase Asset |
|---|---|---|
| Fair value, January 1, 2015 | $ | — |
| Record fair value of forward purchase asset | | 27,300 |
| Record increase in fair value of forward purchase asset | | 820 |
| Fair Value, December 31, 2015 | $ | 28,120 |

143

400.     Defendants Mariano, Shields, Del Pizzo, and Shanfelter signed or authorized the signing of Patriot National's 2015 Form 10-K filed with the SEC.  Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, stating:

> In connection with the Annual Report on Form 10-K of Patriot National, Inc. (the "Company") for the fiscal year ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas Shields, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 18, 2016

401.     Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2015 of Patriot National, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 18, 2016

402.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for intangible assets and doubtful accounts; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under at the time of the IPO related to GIC; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (7) Mariano's intention and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; and/or (8) the value of the Forward Purchase Asset.

403.     The 2015 Form 10-K was false and materially misleading in that Patriot National and Mariano purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time—*viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his absurdly unaffordable lifestyle.

404.     As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public, and an additional net income loss of $16.9 million in the following two years.  Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE) into GIC so that it could meet its year-end FOIR capital requirements in 2015.  Thus, Patriot National, Mariano, and Shields knew or were reckless in not knowing as of March 21, 2016 that GIC would be unable to repay the $27.1 million recorded as an account receivable as of December 31, 2015.  Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

405.     As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of March 21, 2016, did in fact pose a significant "credit risk" to

Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease." Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

406.     Significantly, the 2015 Form 10-K failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

407.     The 2015 Form 10-K was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the 2015 Form 10-K materially false and misleading.

408.     Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received. Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue as of December 31, 2015 was overstated by at least $15.2 million, the twelve month increase in the amount of the receivable

recorded as owing from GIC.  Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

409.    In addition, the 2015 Form 10-K contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons.  Although the 2015 Form 10-K set forth Patriot National's purported policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it currently applied the policy was false.  Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for unidentified purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4 ) the Board's decisions to acquire numerous companies from Mariano and his close friends associates without due diligence or due care; (5) the Board's approval of the Secondary Offering for Mariano's personal benefit; and (6) the Board's actions in connection with approving and amending the PIPE transaction.  Thus, Patriot National's statement in the 2015 Form 10-K that it applied the disclosed Policy Regarding Transactions with Related Person was false.

410.    Patriot National's financial statements contained in the 2015 Form 10-K were also materially misstated with regard to goodwill. Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Registration Statement, that goodwill be tested for impairment at least

annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

411.    Approximately 43.6% of Patriot National's $118.1 million "goodwill" asset listed in the 2015 Form 10-K was tied to its acquisitions of GUI and PCM, and that figure represented 16.7% of total Patriot National assets.    As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.    Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.    By March 21, 2016, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.    Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.    Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill.    However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

412.    For the same reasons, Patriot National's accounting of approximately $29 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

413.    Additionally, the above detailed "Risk Factors" were false and misleading because the 2015 Form 10-K failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy"

was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National and Mariano.

414.    Moreover, the 2015 Form 10-K was false and misleading because it did not disclose that Del Pizzo did not perform $185,000 worth of tax advisory services.

415.    Additionally, the Forward Purchase Asset was required to be accounted for at its "fair value measurement," which demands that Patriot National account for, among other things, the risk of non-performance (or the risk that a liability will not be paid).  As detailed above, Patriot National, however, did not account for Mariano's inability and/or unwillingness to indemnify Patriot National at the full Warrant Redemption Liability.   Accordingly, Patriot National's accounting for the Forward Purchase Asset at a value equal to the Warrant Redemption Liability was false and/or misleading.

416.    The 2015 Form 10-K also included an opinion from BDO, Patriot National's Independent Registered Public Accounting Firm:

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders

Patriot National, Inc.

Fort Lauderdale, Florida

We have audited the accompanying consolidated balance sheets of Patriot National, Inc. as of December 31, 2015 and 2014 and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2015.   These financial statements are the responsibility of [Patriot National]'s management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  [Patriot National] is not required to

have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of [Patriot National]'s internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Patriot National, Inc. at December 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO USA, LLP

Miami, Florida

March 18, 2016        Certified Public Accountants

417.    Despite its affirmative statements that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)", BDO did not. In particular, BDO's audit and related Report, failed to comply with PCAOB standards in the following manners:

    a.    Assessing the risks of material misstatements in connection with Mariano and Patriot National management's accounting for doubtful accounts, goodwill, and/or ability to operate as a going concern;

    b.    Obtaining an understanding of the nature of Patriot National and its sources of earnings, namely, its codependent relationship with GIC;

    c.    Evaluating "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole[;]" particularly accounts receivable, doubtful accounts, and/or intangible assets.

    d.    Evaluating "whether there is a substantial doubt about the [C]ompany's ability to continue as a going concern" posed by GIC's operating losses, capital requirements, and risk of regulatory receivership; and

    e.    Assessing whether Patriot National's goodwill, which equated to 38% of its total assets and was primarily supported by revenue from GIC, should be impaired in light of GIC's operating failures, among other issues at GIC.

418.     Additionally, BDO's report was false for same and misleading because it improperly accounted: (1) for the goodwill attributable to Global HR (which was substantially overvalued, as revealed by its inevitable impairment and sale); and (2) the value of Patriot National's Forward Purchase Asset attributed to Mariano's indemnification of Patriot National the Back-to-Back Agreement.

419.     BDO also audited GIC's financial statements for 2014 and 2013.  Therefore, GIC was not an opaque private customer into which BDO as Patriot National's auditor had no insight; rather BDO (and the very same auditing staff) also was the registered auditor of GIC.  Indeed, it demanded that it be allowed to audit both GIC and Patriot National, purportedly because it needed access to both companies' financial statements to perform it duties.  As a result, BDO had full access to all material information regarding GIC, including its reliance on cash provided by Mariano to meet regulatory capital requirements as well as the precarious state of its business.

420.     Conducting an audit of Patriot National in accordance with PCAOB standards, as represented in its March 18, 2016 opinion, required BDO to gain a meaningful understanding of Patriot National's relationship with and dependence upon GIC.  GIC accounted for approximately 69% of Patriot National's revenue.  Moreover, GIC and Patriot National were both owned and controlled by Mariano.  As BDO had access to all material information regarding GIC as a result of its position as auditor of GIC, it knew that the collectability of Patriot National's account receivable from GIC was not reasonably probable and that both accounts receivable and revenue and income were overstated and not properly presented in accordance with GAAP.

421.     BDO's March 18, 2016 opinion was also false and misleading because it was unqualified, i.e., it failed to contain a qualification expressing doubt about Patriot National's ability to continue as a going concern.  BDO's "opinion" was false and misleading because it did not

provide any warning, as it should have: (1) of Patriot National's doubtful accounts, which did not

provide for GIC's accounts payable at all, were insufficient and materially inaccurate; (2) that

Patriot National's goodwill asset on its balance sheet was materially impaired and the impairment

had not been accounted for; (3) GIC sustained annual losses that substantially threatened its ability

to operate as a going concern and avoid regulatory receivership; and (4) Patriot National faced

significant risk as a going concern as a result of GIC's risky position.

422.    Under PCAOB guidelines, BDO was required to evaluate GIC's ability to operate

as going concern in order to in turn evaluate "whether there is a substantial doubt about [Patriot

National's] ability to continue as a going concern[.]"  PCAOB Staff Audit Practice Alert No. 3,

dated Dec. 5, 2008.  Due to the importance of GIC's revenue as a customer of Patriot National,

any auditor exercising  "due profession care… in the planning and performance of the audit and

the preparation of the report" would have scrutinized GIC prior to issuing its Report opining that

Patriot National's financial statements were "in conformity with accounting principles generally

accepted in the United States of America[,]" and the "financial statement schedule [which included

doubtful accounts estimates and goodwill assets], when considered in relation to the basic

combined financial statements taken as a whole, presents fairly, in all material respects, the

information set forth therein."

423.    The facts that led to BDO's 2017 determination that it was "substantially

doubt[ful]," that GIC could continue as going concern were present at the time of the IPO.  GIC

has struggled to be profitable since at least 2007, and would have collapsed had Mariano not

pumped millions of dollars into it.  Moreover, BDO had already been specifically warned by the

FOIR of Mariano's improper accounting practices at Patriot National and GIC (when they operated

as a single business) in 2008 and 2010.  Further, BDO's 2017 investigation into, among other

improper actions at Patriot National and companies owned by Snow, were present at the time BDO

provided its March 18, 2016 opinion.

**K.**     ***Press Release, dated April 7, 2016.***

424.     On April 7, 2016, Patriot National issued a press release, "Patriot National Updates

Strategic Value Creating Initiatives."  The press release stated:

> FORT LAUDERDALE, Fla., April 7, 2016 /PRNewswire/ -- As previously
> reported, the Board of Directors of Patriot National, Inc. (NYSE: Patriot National)
> ("Patriot National" or the "Company") formed a committee of independent
> directors ("Committee") to oversee strategic value creating initiatives. ***The
> Committee continues to explore strategic alternatives for [Patriot National] to
> maximize value for shareholders, including a possible sale of [Patriot
> National].  Neither the Committee nor the Board has made a decision to enter
> into any transaction or other alternative at this time***, and there are no assurances
> that the consideration of strategic alternatives will result in [Patriot National]
> entering into a transaction or other alternative.  The Committee has not has not set
> a timetable for completion of the evaluation process.  The exploration of strategic
> alternatives may be terminated at any time and without notice.  [Patriot National]
> does not expect to make any further public announcements regarding these matters
> unless and until the Committee makes a decision with respect to a specific action
> or otherwise concludes its review.

425.     The above statements, however, were false and materially  misleading because they

omitted and/or misrepresented, *inter alia*, (1) the independence of the Special Committee; (2) the

functioning of the Special Committee and Mariano's personal dominance over the Strategic

Review Process; (3) Mariano's undisclosed timeframe required to enter into a transaction; and (4)

Mariano's alternative motives for the Strategic Review Process, namely, to fight with the PIPE

investors, bail out GIC, and fund Ashmere.

426.     As detailed above, from the outset, Mariano dominated and controlled the Special

Committee in such a way that ensured that there would be no transaction unless he received

disproportionate, unique benefits for himself and GIC.

**L.**     *Press Release and Quarterly Report dated May 12 & 13, 2016.*

427.    On May 12, 2016, Patriot National released a press release, attached to the Form 8-

K filed with the SEC, as Exhibit 99.1, that states:

> FORT LAUDERDALE, FL., May 12, 2016 – Patriot National, Inc. ("Patriot National or "[Patriot National]") (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced its financial results for the quarter ended March 31, 2016.

**Highlights:**

**For the quarter ended March 31, 2016:**

(Comparisons to the corresponding prior-year period)

- Total Revenues increased 50% to $64.6 million

- Total Fee Income increased 51% to $64.9 million

- GAAP Net Income was $3.4 million, or $0.12 per diluted share

- Adjusted Earnings was $5.8 million, or $0.21 per diluted share

- Adjusted EBITDA of $15.7 million, up 45%

- Operating Cash Flow of $10.3 million, up 25%

- Q1 Operating efficiency initiatives result in $7 million of annualized savings; $400,000 realized during the first quarter

- Patriot Technology Solutions' Patriot National InsuranceExpert was awarded new contracts from an existing client valued at $3.2 million, with an additional $3.0 million expected from contracts in process

**Recent Developments:**

***

- On March 3, 2016, the Board approved a share repurchase program for [Patriot National]'s common stock of up to $15 million. To date, [Patriot National] has repurchased 1.4 million shares.

- On February 29, 2016, the Board formed a committee of independent directors to explore strategic alternatives to enhance shareholder value.

**Management Commentary**

*I am pleased to report that our first quarter 2016 fee income increased 51% to $64.9 million, up from $43.0 million in the first quarter of 2015,*" said Steven M.

Mariano, Chief Executive Officer of Patriot National. "Our first quarter results were ahead of our internal operating plan and we are reaffirming our full year 2016 outlook of total fee income of $270-$280 million and Adjusted EBITDA of $73-$78 million. Our guidance excludes contribution from any future acquisitions made in 2016.

"*We have built a comprehensive platform that we believe is a significant competitive advantage that positions us to increase revenue, margins, profitability and ultimately shareholder returns*. Today, we work with 139 insurance carriers and 4,100 insurance agencies and we offer a broad menu of products and services beyond workers' compensation.

"*Since our IPO, we have successfully integrated 18 acquisitions, and we have focused our efforts on driving operating efficiencies.* During the first quarter, our planned operating efficiency initiatives resulted in $7.3 million in total annualized expense savings, $400,000 of which we recognized in the first quarter. For the remainder of 2016, we will continue to seek additional expense savings through more efficient operations.

 "In the first quarter, we had several big technology wins for Patriot Technology Solutions' Patriot National InsuranceExpert, InsurePay, and Decision UR. Patriot National InsuranceExpert was awarded new contracts from an existing client valued at $3.2 million, with an additional $3.0 million expected from contracts in process. As of the end of the first quarter, InsurePay, our automated payroll solution, now has eight national carrier contracts up from one national carrier contact when we acquired them last June. The revenue from these contracts will accelerate throughout the year. We were also awarded a new national carrier contract for DecisionUR, which provides automated utilization review solutions for injured workers. Our technology team continues to develop new innovative solutions for the insurance industry, such as Patriot National ClaimsAlert, a mobile application that streamlines incident reporting for companies, and Patriot National BidExpert, a first of its kind interactive online marketplace to bring insurance carriers, underwriters and risk managers together with loss control engineers. We anticipate that our robust pipeline of standalone technology customers will continue to gain traction in 2016.

428.     Defendant Pesch signed or authorized the signature of the Form 8-K.

429.     On May 13, 2016, Patriot National filed its quarterly report for the period ended March 31, 2016 (the "Q1 2016 Form 10-Q"). The Q1 2015 Form 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

430.    The Q1 2016 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

*Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended March 31, 2016 was $64.9 million compared to $43.0 million for the three months ended March 31, 2015, an increase of $21.9 million or approximately 51%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed since January 2015.

For the three months ended March 31, 2016, approximately 62% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 5% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three months ended March 31, 2016.

For the three months ended March 31, 2015 approximately 83% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 10% of our total fee income and fee income from related party were attributable to our contracts with our second largest client.

*Fee Income.* Fee income, which represents fee income from non-related parties, for the three months ended March 31, 2016 was $40.4 million compared to $18.4 million for the three months ended March 31, 2015, an increase of $22.0 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three-month period ended March 31, 2016 relative to the three-month period ended March 31, 2015, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

*Fee Income from Related Party*. Fee income from related party for the three months ended March 31, 2016 was $24.5 million compared to $24.6 million for the three months ended March 31, 2015, a decrease of $0.1 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three-month period ended March 31, 2016 relative to the three-month period ended March 31, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

\*\*\*

**Concentration**

For the three months ended March 31, 2016, approximately 62% of total combined fee income and fee income from related party was attributable to contracts with

[GIC], [Patriot National]'s largest customer and a related party, and approximately 5% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended March 31, 2015, approximately 83% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 10% were attributable to contracts with [Patriot National]'s second largest customer.

As of March 31, 2016, approximately 68% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer.  As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

431.    Patriot National also reported in the Q1 2016 Form 10-Q that as of March 31, 2016, it had $20.6 million in fee income receivable from GIC and "[a]s of March 31, 2016, we were not subject to any material interest rate risk or credit risk[.]"  Further, the Q1 2016 Form 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

432.    Additionally, the Q1 2016 Form 10-Q reported an increase of approximately $4.9 million in goodwill, for a total of over $122 million as of March 31, 2016.  As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $37 million.  Concerning the valuation of its intangible assets, Patriot National stated that  "In accordance with FASB ASC 350, *Intangibles—Goodwill and Other*, intangible assets, which are comprised of the estimated fair value of the service contracts acquired, customer and carrier relationships, non-compete agreements, developed technology and trade names are being amortized over the respective estimated life, ranging from two to ten years, in a manner that, in

management's opinion, reflects the pattern in which the intangible asset's future economic benefits are expected to be realized.  ***Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present).  In the event that management determines that the value of the intangible asset has become impaired, [Patriot National] will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.***"  Patriot National also stated that it had "determined that there was no impairment as of March 31, 2016."

433.    The Q1 2016 Form 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2015.  There have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015."

434.    The Q1 2016 Form 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties;" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

435.    The Q1 2016 Form 10-Q also stated the following "Subsequent Events":

On March 3, 2016, the Board of Directors approved a $15 million stock repurchase program. Under the new Repurchase Program, [Patriot National] may repurchase up to a maximum of $15 million of its common stock. Pursuant to the Fourth Amendment to the BMO Credit Facility, [Patriot National] may purchase no more than 1,000,000 shares in any calendar month.  For the three months ended March 31, 2016, [Patriot National] purchased 992,182 shares for a purchase price of $5.7 million in the open market.  Total purchases under the plan as of May 11, 2016 were 1,360,457 shares for a purchase price of $8.7 million in the open market.

As of May 11, 2016, 1,360,457 of the repurchased shares have been retired and none remain as treasury shares.

On April 13, 2016, Hudson Bay Master Fund Ltd. ("Hudson Bay") filed suit in the US District Court for the Southern District of New York against [Patriot National], Steven M. Mariano, our Chairman and Chief Executive Officer, and American Stock Transfer Company, LLC as a nominal Defendant.  Hudson Bay alleges that [Patriot National] and Mr. Mariano are in breach of various contracts regarding delivery of price adjustment warrants, and that Mr. Mariano interfered with those same contracts between [Patriot National] and Hudson Bay.  Hudson Bay seeks specific performance of the contracts, monetary damages, and attorney's fees.  On April 14, 2016, CVI Investments Inc. ("CVI"), also filed suit against [Patriot National] in the same court.  The CVI suit makes similar allegations of breach of contract regarding the price adjustment warrants.  The CVI suit similarly seeks specific performance of the contracts, monetary damages, and attorney's fees, as well as injunctive relief.

[Patriot National] has filed answers in both actions denying the allegations and asserting defenses.  [Patriot National] has been indemnified for any losses related to the warrant agreements by Mr. Mariano.

436.    Related to Regulation S-K, the Registration Statement contained the following

"Statement of Policy Regarding Transactions with Related Persons":

Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.

*The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee*.

In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

· the nature of the related person's interest in the transaction;

· the material terms of the transaction;

·  the importance of the transaction both to [Patriot National] and to the related person;

· whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

· whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

· any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

· [Patriot National] was or is to be a participant;

· the amount involved exceeds $120,000; and

· any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

437.    Patriot National stated the following in the Q1 2016 Form 10-Q in connection with the PIPE transaction and the Back-to-Back Agreement:

### Loan Arrangements and Receivable from Affiliates

In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

438.    Further, Patriot National stated the following in the Q1 2016 Form 10-Q in connection with Mariano's indemnification of Patriot National, pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $48.8 million as of March 31, 2016.  In particular, the Q1 2016 Form 10-Q states:

*Decrease (Increase) in Fair Value of Warrant Redemption Liability*. There was a $20.7 million increase in the fair value of warrant redemption liability for the three months ending March 31, 2016, which was fully offset by a corresponding $20.7 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement.  These instruments are fully described in Note 12 Related Party and Note 15 Warrant Redemption Liability.  For the three months ended March 31, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015.  There was no remaining warrant redemption liability as of March 31, 2015 and no future fair value adjustments are required.

439.    On May 13, 2016, Patriot National held a conference call for its Q1 2016 results, in which Mariano iterated the purpose of the Repurchase Program, stating in relevant part:

> In February, our Board formed a special committee of independent directors to evaluate strategic value creation initiatives and in March, our Board approved a $15 million share buyback program. To-date, we have repurchased 1.4 million shares under the program. The special committee has not set a timetable for the completion of their evaluation of strategic alternative and do not plan to make any public announcements unless they decide to pursue a certain specific action will conclude their review.

440.    Defendants Shields signed or authorized the signing of Patriot National's Form 10-Q filed with the SEC.  Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002 , stating:

> In connection with the Quarterly Report on Form 10-Q of Patriot National, Inc. (the "Company") for the quarterly period ended March 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 13, 2016

441.    Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016 of Patriot National, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 13, 2016

442.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under as May 13, 2016 related to GIC; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (7) that Patriot National's acquisitions posed a significant threat to Patriot National at the time of filing; (8) the purpose of the Repurchase Program; (9) Mariano's willingness and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; and/or (10) the value of the Forward Purchase Asset;

443.    The Q1 2016 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time— *viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

444.    As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public, and an additional net income loss of $16.9 million in the following two years.  Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE) into GIC so that it could meet its year-end FOIR capital requirements in 2015.  Thus, Patriot National and Mariano knew or were reckless in not knowing as of May 13, 2016 that GIC would be unable to repay the $20.6 million

recorded as an account receivable as of March 31, 2016. Moreover, the amounts due from GIC had grown rapidly since December 31, 2013 and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end. Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National. Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future. (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

445. As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of May 13, 2016, did in fact pose a significant "credit risk" to Patriot National. In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease." Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

446. Significantly, Q3 2015 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC. The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price. A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

447. Patriot National's financial statements contained in the Q1 2016 Form 10-Q were also materially misstated with regard to goodwill. Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires, and Patriot National acknowledged in the Q1 2016 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

448. Approximately 42% of Patriot National's $122.5 million "goodwill" asset listed in the Q1 2015 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 15.3% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. As of November 12, 2015, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business. Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC. Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill. However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

449.    For the same reasons, Patriot National's accounting of approximately $37.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

450.    Additionally, the above detailed "Risk Factors" were false and misleading because the Q1 2016 Form 10-Q and the 2015 Form 10-K failed to disclose that, as of May 13, 2016: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

**M.    *Press Release and Quarterly Report dated August 15, 2016.***

451.    On August 15, 2016, Patriot National released a press release, attached to the Form 8-K filed with the SEC on August 15, 2016, as Exhibit 99.1, that states:

> FORT LAUDERDALE, FL., August 15, 2016 – Patriot National, Inc. (NYSE: Patriot National), … a leading provider of technology and outsourcing solutions, today announced its financial results for the quarter ended June 30, 2016, and ***confirmed that the special committee of its Board of Directors (the "Special Committee") is in the final stages of its consideration of possible strategic opportunities***.

> **Strategic Opportunities Consideration**

> The Special Committee, which is comprised of independent directors, is working collaboratively with Ebix, Inc. to explore the possible combination of the two businesses, while continuing to explore other available strategic opportunities for Patriot National to maximize value for shareholders. Ebix is expected to complete its due diligence by August 31, 2016, as the Special Committee nears the conclusion of its evaluation of the prospects it has received and expects to make a

recommendation to the Board of Directors soon on whether [Patriot National] should enter into any transaction or pursue another alternative. As announced August 1, 2016, Ebix made an improved offer to acquire 100% of the outstanding stock of [Patriot National].

**Financial Highlights:**

**For the quarter ended June 30, 2016:**

(Comparisons to the corresponding prior-year period)

- Total Revenues increased 19% to $56.5 million

- Total Fee Income increased 19% to $56.5 million

- GAAP Net Income was $14.2 million, or $0.45 per diluted share

- Adjusted Earnings[1] of $2.8 million, or $0.11 per diluted share

- Adjusted EBITDA[1] of $10.7 million, down 6%

- Operating Cash Flow[1] of $8.5 million, down 7%

- Launched operating efficiency initiatives that will generate an additional $5.3 million annualized savings

    [1] See Reconciliation of GAAP net income to Adjusted EBITDA, Adjusted Earnings and Operating Cash Flow in the accompanying financial tables.

**Management Commentary**

"During the second quarter, we continued to execute on our strategy of becoming the leading end-to-end technology-enabled services provider to the insurance industry. While the second quarter is always a seasonally low quarter for our company, *we continue to be extremely optimistic about our ability to drive significant organic revenue and EBITDA growth through the second half of 2016, as well as full year 2017*," said Steven M. Mariano, Chief Executive Officer of Patriot National. "*Our sales pipeline remains strong* and we are focused on driving top-line growth and profitability by expediting new carrier agreements and technology wins as well as significantly reducing our cost structure."

"*We have built a powerful operating platform to support our long-term growth*, with comprehensive technology and outsourcing solutions that are highly valued by our customers. Our roadmap for the future focuses on leveraging our deep customer relationships and broad product portfolio to serve a greater share of our customers' needs. We are also focused on continuing to deliver innovative technology solutions such as our InsurePay automated payroll solution and our Insurance Expert software platform."

452.    On August 15, 2016, Patriot National filed with the SEC its quarterly report for the period ended June 30, 2016 (the "Q2 2016 Form 10-Q"). The Q2 2016 Form 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

453.    The Q2 2016 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

*Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended June 30, 2016 was $56.5 million compared to $47.4 million for the three months ended June 30, 2015, an increase of $9.1 million or approximately 19%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.

Total fee income and fee income from related party for the six months ended June 30, 2016 was $121.3 million compared to $90.4 million for the three months ended June 30, 2015, an increase of $30.9 million or approximately 34%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.

For the three and six months ended June 30, 2016, approximately 55% and 59% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and six months ended June 30, 2016.

For the three and six months ended June 30, 2015 approximately 70% and 76% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 9% of our total fee income and fee income from related party were attributable to our contracts with our second largest client for both the three and six months ended June 30, 2015.

*Fee Income.* Fee income, which represents fee income from non-related parties, for the three months ended June 30, 2016 was $40.5 million compared to $26.9 million for the three months ended June 30, 2015, an increase of $13.6 million or 50%.  For the six months ended June 30, 2016 and June 30, 2015, fee income was $80.9 million versus $45.3 million, an increase of $35.6 million or 79%.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the six-month period ended June 30, 2016 relative to the six-month period ended June 30, 2015, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

*Fee Income from Related Party*. Fee income from related party for the three months ended June 30, 2016 was $16.0 million compared to $20.5 million for the three months ended June 30, 2015, a decrease of $4.5 million.  For the six months ended June 30, 2016 and June 30, 2015 fee income from related party was $40.4 million versus $45.1 million, a decrease of $4.6 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three and six-month period ended June 30, 2016 relative to the three and six-month period ended June 30, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, *Related Party Transactions*.  Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC].  Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], as described in Note 13, *Concentration*, [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

***

## Concentration

For the six months ended June 30, 2016, approximately 59% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer.  For the six months ended June 30, 2015, approximately 76% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and

approximately 9% were attributable to contracts with [Patriot National]'s second largest customer.

As of June 30, 2016, approximately 76% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer.  As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

454.    Patriot National also reported in the Q2 2016 Form 10-Q that as of June 30, 2016, it had $27.24 million in fee income receivable from GIC and stated that "[a]s of March 31, 2016, [sic] we were not subject to any material interest rate risk or credit risk[.]" Further, the Q2 2016 Form 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

455.    Additionally, the Q2 2016 Form 10-Q reported a total of approximately $121.7 million in goodwill as of June 30, 2016. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $36 million.  Concerning the valuation of its intangible assets, Patriot National stated that "In accordance with FASB ASC 350, Intangibles—Goodwill and Other, intangible assets, which are comprised of the estimated fair value of the service contracts acquired, customer and carrier relationships, non-compete agreements, developed technology and trade names are being amortized over the respective estimated life, ranging from two to ten years, in a manner that, in management's opinion, reflects the pattern in which the intangible asset's future economic benefits are expected to be realized. ***Intangible assets are tested for impairment at least annually (more frequently if certain***

*indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the Company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.*" Patriot National also stated that it "review[s] all of our intangible assets for impairment periodically (at least annually) and whenever events or changes in business circumstances indicate that the carrying value of the assets may not be recoverable…. [And] [b]ased on the results of impairment reviews during the six-month periods ended June 30, 2016 and 2015, no impairments were required."

456.   The Q2 2016 Form 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2015.  There have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015."

457.   The Q2 2016 Form 10-Q stated further stated the following "risks": (1)"Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

458.   The Q2 2016 Form 10-Q also stated:

On August1, 2016, the Issuer stated that a special committee of independent directors (the "Special Committee") of the Board received and is considering an offer from Ebix, Inc. ("Ebix") to acquire 100% of the outstanding stock of the Issuer.  The Special Committee is continuing to explore other strategic alternatives for the Issuer to maximize value for shareholders, including a possible sale of the Issuer.  *Neither the Board nor the Special Committee has made a decision to enter into any transaction or other alternative.*

459.     Related to Regulation S-K, the Registration Statement contained the following

"Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.

> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.

> In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

> · the nature of the related person's interest in the transaction;

> · the material terms of the transaction;

> · the importance of the transaction both to [Patriot National] and to the related person;

> · whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

> · whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

> · any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].***  The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

> Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

· [Patriot National] was or is to be a participant;

· the amount involved exceeds $120,000; and

· any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

460.    Patriot National stated the following in the Q2 2016 Form 10-Q in connection with the PIPE transaction and the Back-to-Back Agreement:

**Loan Arrangements and Receivable from Affiliates**

In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

461.    Further, Patriot National stated the following in the Q2 2016 Form 10-Q in connection with Mariano's indemnification of Patriot National, pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $51.9 million as of June 30, 2016.  In particular, the Q2 2016 Form 10-Q states:

*Decrease (Increase) in Fair Value of Warrant Redemption Liability.*

There was a $3.1 million increase in the fair value of warrant redemption liability for the three months ending June 30, 2016, which was fully offset by a corresponding $3.1 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement.  There was a $23.8 million increase in the fair value of warrant redemption liability for the six months ending June 30, 2016, which was fully offset by a corresponding $23.8 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. These instruments are fully described in *Note 12 Related Party* and *Note 15 Warrant Redemption Liability.*  For the six months ended June 30, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015.  There was no remaining warrant redemption liability as of June 30, 2015 and no subsequent fair value adjustments were required.

462.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting

its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that Patriot National was under at the time of the IPO related to GIC; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (7) that Patriot National's acquisitions posed a significant threat to Patriot National at the time of filing; (8) Mariano's willingness and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; (9) the value of the Forward Purchase Asset; (10) the functioning of the Special Committee; (11) Mariano's personal dominance over the Strategic Review Process; and/or (12) Mariano's complete disfavor for Ebix and his attempts to tank any potential deal with Ebix.

463.   The Q2 2016 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time— *viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

464.   As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public, and an additional net income loss of $16.9 million in the following two years.  Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE) into GIC so that it could meet its year-end FOIR capital requirements in 2015.  Thus, Patriot National and Mariano knew or were reckless in not knowing as of August 15, 2016 that GIC would be unable to repay the $27.1 million

recorded as an account receivable as of June 30, 2016. Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

465.  As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of August 15, 2016, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease." Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

466.  Significantly, the Q2 2016 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

467.   The Q2 2016 Form 10-Q was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the Q2 2016 Form 10-Q materially false and misleading.

468.   Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue for the three months ended June 30, 2016 was overstated by at least $6.5 million, the quarterly increase in the amount of the receivable recorded as owing from GIC.  Consequently, Patriot National's financial statements as set forth in the Q2 2016 Form 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

469.   Patriot National's financial statements contained in the Q2 2016 Form 10-Q were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Q2 2016 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

470.     Approximately 42.3% of Patriot National's $121.7 million "goodwill" asset listed in the Q2 2016 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 15% of total Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  As of August 15, 2016, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill. However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

471.     For the same reasons, Patriot National's accounting of approximately $36.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

472.     Additionally, the above detailed "Risk Factors" were false and misleading because the Q2 2016 Form 10-Q and the 2015 Form 10-K failed to disclose that, as of August 15, 2016: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board

had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

473.    As detailed above, Mariano was unwilling to allow Patriot National and/or the Board to approve a transaction with Ebix because it would require him ceding control of Patriot National and threatened to expose the fraud and other improprieties he was engaged in at Patriot National and its subsidiaries.  Thus, Mariano engaged in a secret process with Houlihan to obtain funds for GIC without dealing with Ebix.

474.    Following release of the Q2 2016 Form 10-Q, shares of Patriot National declined from $9.62 on August 15, 2016 to $9.18 per share at close on August 16, 2016, a 4.6% drop, on unusually heavy volume.

**N.    *October 17, 2016 Press Release (Ashmere I).***

475.    On October 17, 2016, Patriot National issued a press release entitled "Patriot National Awarded Turnkey BPO Services Contract from Ashmere Insurance Company",  which stated:

> FORT LAUDERDALE, Fla., Oct. 17, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced the award of a long-term end-to-end business process outsourcing ("BPO") service contract with Ashmere Insurance Company ("Ashmere").
>
> As part of the long-term turnkey BPO service contract, Patriot National will write and serve as program administrator for Ashmere's specialty property and casualty insurance policies with defined underwriting, claims settlement, loss control and premium audit authority for accounts in 36 states.
>
> "We are excited about our long-term contract with Ashmere to provide Patriot's full suite of end-to-end services.  Over the next 36 months, we expect the contract to generate over $100 million in written premium to be serviced by Patriot. Continued adoption of our innovative solutions is a clear indication of the value we

are delivering to our carrier partners," said Steve M. Mariano, Chief Executive Officer of Patriot National.

476.    The only additional statements in the press release concerning Ashmere was that "Ashmere Insurance Company was recently acquired by National Fidelity Holdings, Inc. Ashmere is licensed to offer all lines of property and casualty insurance products in 36 states through a network of 4,200 independent agents.  For more information, please visit www.ashmereins.com."

477.    The above statements were materially false and/or misleading because they misrepresented and/or omitted that: (1) Mariano was the controlling stockholder of Ashmere; (2) Ashmere was not going to generate over $100 million in written premiums over the following 36 months; (3) Ashmere's business was not "new" to Patriot National, but was merely the same revenue as it was previously receiving from GIC.  Significantly, the above statements were designed to give stockholders the false impression that Patriot National had generated $100 million in new, diversified revenue.  That was not the case, however, and Ashmere was merely Mariano's newest scheme to inflate Patriot National and dump GIC's debt.

O.    **October 26, 2016 Press Release (Ashmere II).**

478.    On October 26, 2016, Patriot National issued a press release, which stated:

**Patriot Technology Solutions Selected by Ashmere Insurance Company to Deploy Patriot National InsuranceExpert™**

Company Release - 10/26/2016 6:45 AM ET

FORT LAUDERDALE, Fla., Oct. 26, 2016 /PRNewswire/ -- Patriot Technology Solutions, Inc. ("PatTech"), a subsidiary of Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced that Ashmere Insurance Company ("Ashmere") has selected PatTech's flagship platform, Patriot National InsuranceExpert™ as their technology system.

Patriot National InsuranceExpert is an insurance value-chain software platform that includes core policy administration, billing, claims management, a rating/underwriting engine, business rules and workflow engines, document management, agency portal, policyholder/customer portal, claimant portal, business partner portal, reinsurance and business intelligence modules.

Additionally, the platform integrates with PatTech's InsurePay Pay-As-You-Go and DecisionUR Utilization Review products.

"We are pleased that Ashmere has selected Patriot National InsuranceExpert, which is our flagship software platform known for its high level of efficiency, productivity and collaboration for users," said Steven M. Mariano, Chief Executive Officer of Patriot National.  "Technology is the cornerstone of our business that enables us to create exceptional value for our customers.  This award exemplifies how our powerful operating platform and technology leadership will continue to drive organic growth and returns to our shareholders."

479.    The above statements were materially false and/or misleading because they misrepresented and/or omitted that: (1) Mariano was the controlling stockholder of Ashmere; and (2) Patriot National's ability to diversify its revenue and obtain new, unaffiliated customers.

**P.**      ***Press Release and Quarterly Report dated November 14, 2016.***

480.    On November 14, 2016, Patriot National released a press release, attached to the Form 8-K filed with the SEC on November 14, 2016, as Exhibit 99.1, that states:

FORT LAUDERDALE, FL., November 14, 2016 – Patriot National, Inc. (NYSE: Patriot National), … a leading provider of technology and outsourcing solutions to the insurance industry, today announced that it has closed a new credit facility with Cerberus Business Finance, LLC to recapitalize [Patriot National].  [Patriot National] also announced a significant capital distribution to shareholders, and an expansion of its share repurchase program.

**Highlights**

- [Patriot National] closes new $250 million term loan and $30 million revolving credit line with Cerberus Business Finance, an affiliate of Cerberus Capital Management, L.P.

- Board of Directors approves a special dividend of $2.50 per share of common stock

- Board of Directors increases existing share repurchase program to $40 million from $15 million

- Company plans to focus on enhancing shareholder value by leveraging robust platform of insurance services and technology solutions and reducing expenses to generate profitable growth

- Board of Directors continues to explore all strategic value creation opportunities

**Management Commentary**

"In February, our Board of Directors formed a Special Committee to explore all avenues for shareholder value creation including a potential sale of [Patriot National], divesting non-core assets, and other ways to return capital to shareholders," said Steven M. Mariano, President and Chief Executive Officer of Patriot National. "***Throughout this process, our shareholders have been very patient, and we are pleased to provide an immediate return of capital through a significant special dividend and to expand our stock repurchase program***.

"The Board of Directors will continue to evaluate all options for value creation and, at the same time, we are taking decisive action to enhance the value of [Patriot National] by driving organic growth in our core insurance services and technology businesses. ***Our new credit facility with Cerberus significantly enhances our financial flexibility to execute on our plans for enhanced growth and returns in 2017.***"

**Update on Organic Growth Plan**

Patriot National has built a powerful operating platform capable of delivering substantial value to its customers to support long-term growth. [Patriot National] currently has relationships with 139 carriers and more than 4,100 agencies and offers a broad menu of products and services that is unparalleled in the marketplace and spans from workers' compensation and specialty property and casualty insurance services to technology solutions.

***Over the past month, Patriot National has secured three significant new client engagements that include the expansion of a turnkey partnership with a leading national insurance carrier and the launch of a BPO relationship with two carriers that have a growing presence in the U.S. workers' compensation insurance market***. Looking ahead, Patriot National intends to leverage its core insurance platform and suite of technology solutions to strengthen existing and new client relationships and to expand its sales channels and commercialize its technology. [Patriot National] also plans to drive profitable growth by achieving cost savings of approximately $8 million in 2017.

**Return of Capital to Shareholders**

Today, Patriot National's Board of Directors declared a special cash dividend (the "Dividend") of $2.50 per share on all issued and outstanding shares of Common Stock of [Patriot National]. The Dividend is considered an ordinary dividend for tax purposes, and will be paid on December 9, 2016 to stockholders of record as of the close of business on November 28, 2016.

The Board has also approved an expansion of the existing share repurchase program to $40 million from $15 million, effective immediately. The program continues to give management discretion in determining the market and business conditions under which shares may be repurchased from time to time, in open market transactions or in negotiated off-market transactions.

**Recapitalization**

On November 10, 2016, Patriot National entered into an agreement with Cerberus Business Finance for a new $280 million five-year senior secured credit facility. The credit facility consists of a $30 million revolving line of credit and $250 million term loan.

[Patriot National] fully repaid all outstanding obligations on the former senior secured credit facility upon closing.  As of November 14, 2016, [Patriot National] has $106 million in cash, restricted cash and investments and approximately $250 million of debt outstanding including capital lease obligations and deferred financing charges.

481.    Defendant Pesch signed or authorized the signing of the Form 8-K filed with the SEC.

482.    On November 14, 2016, Patriot National filed with the SEC its Form 10-Q for the period ended September 30, 2016 (the "Q3 2016 Form 10-Q").  The Q3 2016 Form 2016 stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

483.    The Q3 2016 Form 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients."  It further stated the following:

*Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended September 30, 2016 was $60.2 million compared to $58.5 million for the three months ended September 30, 2015, an increase of $1.7 million or approximately 3%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.

Total fee income and fee income from related party for the nine months ended September 30, 2016 was $181.6 million compared to $148.9 million for the nine months ended September 30, 2015, an increase of $32.7 million or approximately 22%.  The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.

For the three and nine months ended September 30, 2016, approximately 61% and 59% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% and 6% of our total

fee income and fee income from related party was attributable to contracts with our second largest client for both the three and nine months ended September 30, 2016.

For the three and nine months ended September 30, 2015 approximately 66% and 72% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 6% and 8% of our total fee income and fee income from related party were attributable to our contracts with our second largest client for both the three and nine months ended September 30, 2015.

*Fee Income.* Fee income, which represents fee income from non-related parties, for the three months ended September 30, 2016 was $38.0 million compared to $34.8 million for the three months ended September 30, 2015, an increase of $3.2 million or 9%.  For the nine months ended September 30, 2016 and September 30, 2015, fee income was $118.9 million versus $80.1 million, an increase of $38.8 million or 48%.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the nine-month period ended September 30, 2016 relative to the nine-month period ended September 30, 2015, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

*Fee Income from Related Party*. Fee income from related party for the three months ended September 30, 2016 was $22.3 million compared to $23.8 million for the three months ended September 30, 2015, a decrease of $1.5 million or 6%.  For the nine months ended September 30, 2016 and September 30, 2015 fee income from related party was $62.7 million versus $68.9 million, a decrease of $6.2 million or 9%.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three and nine-month period ended September 30, 2016 relative to the three and nine-month period ended September 30, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

\*\*\*

**Concentration**

For the nine months ended September 30, 2016, approximately 59% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer.  For the nine months ended September 30, 2015, approximately 72% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 8% were attributable to contracts with [Patriot National]'s second largest customer.

As of September 30, 2016, approximately 79% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 1% of combined fee income receivable and fee income

receivable from related party were attributable to contracts with [Patriot National]'s second largest customer. As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

484.    Patriot National also reported in the Q3 2016 Form 10-Q that as of September 30, 2016, it had $35.3 million in fee income receivable from related party, an increase of $8.3 million since the previous quarter.  The Q3 2016 Form 10-Q further stated that Patriot National had $30 million in accounts receivables owed by GIC and "[a]s of September 30, 2016, we were not subject to any material interest rate risk or credit risk[.]" Further, the Q3 2016 Form 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

485.    Additionally, the Q3 2016 Form 10-Q reported a total of approximately $121.7 million in goodwill as of September 30, 2016.  As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $35.3 million. Concerning the valuation of its intangible assets, Patriot National stated that "In accordance with FASB ASC 350, Intangibles—Goodwill and Other, intangible assets, which are comprised of the estimated fair value of the service contracts acquired, customer and carrier relationships, non-compete agreements, developed technology and trade names are being amortized over the respective estimated life, ranging from two to ten years, in a manner that, in management's opinion, reflects the pattern in which the intangible asset's future economic benefits are expected to be realized.  ***Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present).  In the event that management determines that the value of the***

185

*intangible asset has become impaired, [Patriot National] will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.*" Patriot National also stated that it had "determined that there was no impairment as of September 30, 2016."

486.   The Q3 2016 Form 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS", which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2015.  There have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015."

487.   The Q3 2016 Form 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

488.   Related to Regulation S-K, the Q3 2016 Form 10-Q contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.  This Related Person Transaction Policy supplements our other policies that may apply to transactions with related persons, such as the Corporate Governance Guidelines of our board of directors and our Code of Business Conduct and Ethics.
>
> *The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee.*

In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:

· the nature of the related person's interest in the transaction;

· the material terms of the transaction;

· the importance of the transaction both to [Patriot National] and to the related person;

· whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

· whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and

· any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.

***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:

· [Patriot National] was or is to be a participant;

· the amount involved exceeds $120,000; and

· any related person (i.e., a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

489.    Patriot National stated the following in the Q3 2016 Form 10-Q in connection with

the PIPE transaction and the Back-to-Back Agreement:

**Loan Arrangements and Receivable from Affiliates**

In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

490.    Further, Patriot National stated the following in the Q3 2016 Form 10-Q in connection with Mariano's indemnification of Patriot National, pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $57.1 million as of September 30, 2016.  In particular, the Q3 2016 Form 10-Q states:

> *Decrease in Fair Value of Warrant Redemption Liability*. There was a $5.6 million increase in the fair value of warrant redemption liability for the three months ending September 30, 2016, which was fully offset by a corresponding $5.6 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement.  There was a $29.4 million increase in the fair value of warrant redemption liability for the nine months ending September 30, 2016, which was fully offset by a corresponding $29.4 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. These instruments are fully described in *Note 12 Related Party* and *Note 15 Warrant Redemption Liability*.  For the nine months ended September 30, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015.  There was no remaining warrant redemption liability as of September 30, 2015 and no subsequent fair value adjustments were required.

491.    The Q3 2016 Form 10-Q also stated the following "Subsequent Events":

On November 8, 2016 we announced that the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal.  The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation.

On November 9, 2016, Patriot National, Inc. (the "Company") entered into the Financing Agreement (the "Credit Agreement"), by and among [Patriot National], Cerberus Business Finance, LLC, as collateral agent and as administrative agent ("Agent"), and the other lenders party thereto, which provides for a $30.0 million revolving credit facility and a $250.0 million term loan facility (the "senior secured credit facility").  The senior secured credit facility has a maturity of five years, and borrowings thereunder bear interest, at [Patriot National]'s option, at LIBOR plus a margin ranging from 700 basis points to 725 basis points or at a base rate plus a margin ranging from 525 basis points to 550 basis points.  The minimum LIBOR rate before applicable margin is 1.00%, while the minimum base rate before applicable margin is 3.00%.  Effective with the closing of the Financing Agreement on November 9, 2016, the existing BMO credit facility was repaid in full and any remaining commitments terminated thereunder.

In addition to paying interest on outstanding principal under the senior secured credit facility, [Patriot National] is required to pay a commitment fee to the administrative agent for the ratable benefit of the lenders under the revolving credit facility in respect of the unutilized commitments thereunder of 50 basis points. In addition, [Patriot National] is required to pay Agent a loan servicing fee of $5,000 per month. [Patriot National] paid Agent, for the account of the lenders, a closing fee equal to $5,600,000.

The term loan facility amortizes quarterly beginning on December 31, 2016 with quarterly payments of $1,250,000 in the first year, quarterly payments of $2,000,000 in the second year and quarterly payments of $2,500,000 thereafter, with the remainder due at maturity. Principal amounts outstanding under the revolving credit facility are due and payable in full at maturity. In the event of any sale or other disposition by [Patriot National] or its subsidiaries guaranteeing the senior secured credit facility of any assets or their incurrence of additional indebtedness, [Patriot National] is required to prepay the net proceeds received from such a sale towards the remaining scheduled payments of the term loan facility, subject to certain exceptions.

All obligations under the senior secured credit facility are guaranteed by all of [Patriot National]'s existing and future subsidiaries, other than foreign subsidiaries, and secured by a first-priority perfected security interest in substantially all of [Patriot National]'s and such guaranteeing subsidiaries' tangible and intangible assets, whether now owned or hereafter acquired, including a pledge of 100% of the stock of each guarantor.

The senior secured credit facility contains certain covenants that, among other things and subject to significant exceptions, limit [Patriot National]'s ability and the ability of [Patriot National]'s restricted subsidiaries to engage in certain business and financing activities and that require [Patriot National] to maintain certain financial covenants, including requirements to maintain (i) a maximum total leverage ratio of total outstanding debt to adjusted EBITDA for the most recently-ended four fiscal quarters of no more than 5.25:1.00 and (ii) a minimum fixed charge coverage ratio of (a)(1) adjusted EBITDA less (2) unfinanced capital expenditures, to (b) the sum of (1) scheduled principal payments of debt (which amount has been agreed upon for the three, six and nine month periods ending March 31, 2016, June 30, 2016 and September 30, 2016), (2) cash interest expense (which amount has been agreed upon for the three, six and nine month periods ending March 31, 2016, June 30, 2016 and September 30, 2016), (3) income tax expense (which amount has been agreed upon for the three, six and nine month periods ending March 31, 2016, June 30, 2016 and September 30, 2016) and (4) dividends, share repurchases and other restricted payments for the same period of a least 1.25:1.00 for the most recently-ended four quarters. The senior secured credit facility contains other restrictive covenants, including those regarding indebtedness (including capital leases) and guarantees; liens; investments and acquisitions; loans and advances; mergers, consolidations and other fundamental changes; sales of assets; transactions with affiliates; no material changes in nature of business; dividends and distributions, stock repurchases, and other restricted

payments; change in name, jurisdiction of organization or fiscal year and other agreements prohibiting liens.  The senior secured credit facility has events of default that may result in acceleration of the borrowings thereunder, including (i) nonpayment of principal, interest, fees or other amounts (subject to customary grace periods for items other than principal); (ii) failure to perform or observe covenants set forth in the loan documentation (subject to customary grace periods for certain affirmative covenants); (iii) any representation or warranty proving to have been incorrect in any material respect when made; (iv) cross-default to other indebtedness and contingent obligations in an aggregate amount in excess of an agreed upon amount; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in excess of an agreed upon amount; (viii) ERISA defaults; (ix) change of control; (x) actual invalidity or unenforceability of any loan document as a result of an act or omission of [Patriot National] or its subsidiaries or actual  invalidity or unenforceability of any security interest on any collateral; (xi) [Patriot National] or its subsidiaries asserts that any loan document, including any guaranty, is invalid or unenforceable; and (xii) material unpaid, final judgments that have not been vacated, discharged, stayed or bonded pending appeal within a specified number of days after the entry thereof.

Special Dividend

On November 9, 2016, the Board of Directors (the "Board") approved a special dividend of $2.50 per share of Company common stock, payable December 9, 2016, to shareholders of record at the close of business on November 28, 2016.

Stock Repurchase Program

On November 9, 2016, the Board also authorized up to $40 million of stock repurchases through November 9, 2018 under [Patriot National]'s previously announced $15 million stock repurchase program (the "Repurchase Program"). This authorization represents an increase of $34 million for stock repurchases in addition to the approximately $6 million remaining under the previously authorized program.  Pursuant to the terms of the Repurchase Program, [Patriot National] may purchase no more than 1,000,000 shares in any calendar month. [Patriot National] may otherwise repurchase its common stock from time to time, in amounts and at prices [Patriot National] deems appropriate, subject to market conditions and other considerations.  [Patriot National's] repurchases may be executed using open market purchases or negotiated off-market transactions.

492.    Defendant Shields signed or authorized the signing of Patriot National's Q3 2016 Form 10-QQ filed with the SEC on November 11, 2016.  Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, stating:

In connection with the Quarterly Report on Form 10-Q of Patriot National, Inc. (the "Company") for the quarterly period ended September 30, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I,

190

Steven M. Mariano, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 14, 2016

493. Additionally, Mariano and Shields signed certifications as Chief Executive Officer

and Chief Financial Officer, respectively, certifying that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016 of Patriot National, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2016

494.    That same day, during the conference call held for the Q3 2016 results, the

company's executives stated in relevant part:

**Steve Mariano:**

Since our IPO, we've built up a powerful operating platform that has considerable leverage to deliver growth and profitability.  In combination with our new credit facility which Tom will discuss shortly, ***we now have the financial flexibility to execute on this mission***.

***

In a moment, Tom will review third quarter results, which reflect a slower than expected ramp in client activity and awards.  As a result, we have recalibrated our expectations for this year and ***we're committing resources to accelerate growth and improve our operating efficiencies***.

***

Tom Shields:

As Steve mentioned earlier, we announced that we entered into an agreement with Cerberus Business Finance to provide a new $280 million five-year senior-secured credit facility.  The credit facility consists of a $30 million revolving line of credit and $250 million term loan.  We have not drawn on the revolver.

The net proceeds from the new credit facility was $101.8 million after the full repayment of all outstanding obligations on a former senior-secured credit facility and the payment of closing fees related to the new loan transaction.

***

**Steven Mariano**

192

Thanks, Tom.   In closing, I believe we have made the right investments to strategically position Patriot National for organic growth and enhanced profitability.   We're committed to our strategic plan and to deliver best-in-class solutions to the insurance industry.   We have considerable runway ahead for sustainable long-term growth.   And are well positioned to deliver attractive returns to our shareholders as an independent Company.   That said, our Board will continue to review all alternatives to enhance shareholder value.   Nothing is off the table.

## Q&A Sessions

### Matt Carletti

Okay.   And then I guess just playing a little devil's advocate here, can you talk about the special dividend?   I mean, I understand the wanting to reward shareholders.   But I could take the other flip side of it and say that, if I'm doing the math right, it's about $80 million.   ***And you're taking on net increased borrowings of a little over $100 million at 8.25% to pay out a special dividend***.   ***Can you talk a little about why you may think that makes sense now, alongside needing to recapitalize the Business?***

### Steven Mariano

Well, the dividend's about $67 million, if I've got the shares right.   So we feel that the special dividend is good to give all shareholders something.   ***I mean, it's been a long time since the IPO. We think that [Patriot National] is tremendously undervalued based on where its share price is today, primarily because of the concentration issue that's being worked on as we speak***.   And we believe that the shareholders, all shareholders, should be rewarded at the same time.   I think where we are and what we're saying, Matt, is we have a great organic growth engine that generates huge cash flows during the year.   As Tom mentioned, you had an 8%, 8.25% interest rate, but our tax load is almost 40%.   So on a net tax basis, the number's closer to 6%.

So when you look at the cash coming into the Business from organic growth, and the BPO clients we have and the free cash that we have, ***we think the money's better off in the shareholders' hands.***   There's no reason to give a dividend to the shareholders.   ***They've been waiting two years and haven't seen it.   Investors have been asking for something***.   And we believe that this shows, number one, the cash flow initiatives that we have, the ability for us to believe in organic growth for the Business, while we continue to look at potential offers that are obviously a lot higher than the current stock price.   We think those are all positive things.

*** *** ***

### Brian Meredith

Okay.   And then I just want to follow up just a little bit on Matt's question about the special dividend, Steve.   I'm still trying to understand this.   If you think your stock is undervalued, why would you be doing a special dividend, and instead just doing an accelerated share repurchase or something like that in your stock?   I think

193

from a shareholder's perspective, that would deliver a lot more value, rather than levering up for a special dividend, or investing it in acquisitions or organic growth or something like that.  I'm just still a little confused.

Steven Mariano

Well, first of all, we are very much motivated by our organic growth in our pipeline. It is, even though the numbers look light for Q3 and were light, the number of submissions, the core Company, the business growth is moving very, very fast in the right direction from an organic growth perspective.  From our standpoint, we see that.  Number two, as you saw, it wasn't just a stock dividend, it is a big company repurchase.  We've gone from a $50 million Company repurchased back six months ago to an enhanced repurchase up to $40 million.  So when you see [Patriot National], where its stock price is – we're doing both things.  We're giving our shareholders a dividend, but we're also buying back shares in [Patriot National].

And so we feel that's two big major enhancements to shareholder value that are happening simultaneously, along with us just focusing on our core business and our organic growth in our core businesses, which should be substantial in 2017.

495.   Also, during the November 14, 2016 conference call, while asked by an analyst,

Mariano discussed the reasons for killing the Ebix offer.  He stated that the offer was rejected

because there was a better offer on the table, in relevant part:

**Matt Carletti**

Hey, thanks.  Good morning, just had a few questions.  I guess first just on the update on the strategic alternatives.   Obviously, you had the press release out, I think it was last week, just saying that Ebix wasn't going forward.  But it seems, maybe this is just me reading it, but it seems like there was a slight difference in tone then versus now, that then it was still kind of a focus on other strategic alternatives.  And it seems like today more of the focus is back to organic growth. Am I interpreting that right? I know that you will always look at what's out there. But it seems like the plan A today as we go forward is organic growth of [Patriot National].  Am I reading that right?

**Steven Mariano**

Matt, this is Steve.  ***Well, the Ebix transaction was rejected because it wasn't the best offer on the table.***  And so, with that, I really can't say anything further, other than there is still a process going.  And the special committee is continuing to look at offers.  ***The rejection of the Ebix deal was plain and simple because we had a better offer from someone else***.  But while we continue to look at that, and look at those potential offers, we need to understand a couple of things that are going on that are very positive for [Patriot National].

**Matt Carletti**

194

Absolutely. I want to make sure I heard you right. You said that there was a better offer on the table than the Ebix one, and that it's still currently being evaluated? And obviously I know you can't say any more than that. Is that correct?

**Steven Mariano**

That is correct.

496. Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern and meet its year-end FOIR capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National without obtaining at least $30 million from Mariano; (3) that Patriot National improperly accounted for doubtful accounts; (4) the risks, including credit risk, to Patriot National caused by GIC's precarious financial position; (5) the purpose of Leverage Recapitalization; (6) that Ebix "rejected" the offer, not the Special Committee; (7) Patriot National's ability to grow organically; (8) Ashmere is described as "new" business; (9) Mariano is a controlling stockholder of the "significant new client engagements"; (10) Mariano's intention and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; (11) the value of the Forward Purchase Asset; and/or (12) Patriot National's adherence to its Policy Regarding Transactions with Related Persons.

497. The Q3 2016 Form 10-Q was false and materially misleading in that Patriot National, Mariano, and Shields purposefully and/or recklessly failed to disclose material information concerning the primary purposes for Patriot National going public for the first time—*viz.* allowing for Mariano to tap public funds to cover GIC's annual losses and meet FOIR capital requirements, obtaining additional funds to acquire his personal companies, and cover his extravagant lifestyle.

498. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, preceding Mariano's decision to take Patriot National public, and an additional net income

loss of $16.9 million in the following two years.  Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE) into GIC so that it could meet its year-end FOIR capital requirements in 2015.   And most importantly, Defendants secretly approved the Leveraged Recapitalization because they assert that they needed to do so in order for Mariano to provide GIC with capital by year-end.  Thus, Patriot National and Mariano knew or were reckless in not knowing as of November 14, 2016 that GIC would be unable to repay the $30 million recorded as an account receivable as of September 30, 2016. Moreover, the amounts due from GIC grew each quarter and GIC was only able to pay off the balance it owed to Patriot National upon Mariano injecting it with additional capital at year-end.  Had Mariano not tapped the public markets in Patriot National's IPO, GIC would not be able to repay its debts to Patriot National.  Moreover, there were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future.  (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review Process, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

499.    As revealed by the GIC Bailout, GIC Receivership, and Patriot National Bankruptcy, GIC's precarious financial condition, which was manifest and known by Patriot National, Mariano, and Shields as of November 14, 2016, did in fact pose a significant "credit risk" to Patriot National.  In fact, as disclosed in Patriot National's November 22, 2017 Form 8-K, GIC falling into receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."  Moreover, as a result of the above (undisclosed) failures, Patriot National was forced to

approve the Leveraged Recap and is being forced to commence Chapter 11 bankruptcy proceedings itself.

500.   Significantly, the Q3 2016 Form 10-Q failed to disclose that Mariano had used Patriot National common stock to meet FOIR capital requirements for GIC.  The materiality of this omission cannot be understated, as it essentially leverages-up Patriot National, creating an undisclosed risk of Patriot National failing as a result of its stock price.  A company's stock price should reflect financial health and profitability, and is not typically a factor in and of itself that should impacts a company's ability to operate as a going-concern.

501.   The Q3 2016 Form 10-Q was also false and misleading because Patriot National's financial statements were not in conformity with GAAP.  As GIC needed support from Patriot National to remain in business, the collectability of the accounts receivable from GIC was not reasonably probable or assured and should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made Patriot National's financial statements contained in the Q3 2016 Form 10-Q materially false and misleading.

502.   Similarly, because collectability of payments from GIC was not reasonably probable or assured, it was improper for Patriot National to recognize revenue from GIC until payment was actually received.  Accordingly, as Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned", its revenue for the three months ended September 30, 2016 was overstated by at least $2.9 million, the quarterly increase in the amount of the receivable recorded as owing from GIC.  Consequently, Patriot National's financial statements as set forth in the Q3 2016 Form 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

503.     Patriot National's financial statements contained in the Q3 2016 Form 10-Q were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase."  GAAP also requires, and Patriot National acknowledged in the Q3 2016 Form 10-Q, that goodwill be tested for impairment at least annually, or even more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

504.     Approximately 42.3% of Patriot National's $121.7 million "goodwill" asset listed in the Q1 2015 Form 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 14% of total Company assets.  As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC.  Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream.  As of November 14, 2016, Patriot National, Mariano, and Shields knew, or were recklessly uninformed, of GIC's deteriorating business.  Accordingly, Patriot National, Mariano, and Shields were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC.  Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill.  However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

505.    For the same reasons, Patriot National's accounting of approximately $35.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

506.    Additionally, the above detailed "Risk Factors" were false and misleading because the Q3 2016 Form 10-Q and the 2015 Form 10-K failed to disclose that, as of November 14, 2016: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National, Mariano, and Shields.

507.    As detailed above, Mariano desperately needed $30 million for GIC by year end to meet FOIR capital requirements, so he did what he has always done, abuse his control of Patriot National to obtain the funds.  Rather than rewarding stockholders for their "patients", Mariano caused Patriot National to enter into a massive Leveraged Recap for the undisclosed purpose of bailing out GIC.  There was no other purpose for the transaction.  Mariano's statement that the Cerberus Credit Agreement "significantly enhances our financial flexibility to execute on our plans for enhanced growth and returns in 2017" has sufficiently been proven to be false and/misleading by the fact that Patriot National entered into bankruptcy due to not being able to pay its interests payments for a single year out of the five year duration of the loan.

508.    Additionally, Mariano's statement to stockholders that there was a "better offer" out there was clearly untrue.

## THE FINAL STAGES OF PATRIOT NATIONAL AND GIC

509.    On October 21, 2016, Patriot National filed a Form 8-K, which stated that:

On October 17, 2016, Austin J. Shanfelter, a director of Patriot National, Inc. (the "Company"), notified [Patriot National] that he would resign from [Patriot National]'s Board of Directors effective immediately. Mr. Shanfelter's decision to resign is solely for personal reasons and did not involve any disagreement with [Patriot National], [Patriot National]'s management or the Board of Directors.

510.    The Form 8-K also attached as an exhibit Shanfelter's resignation letter sent via email to Mariano, dated October 17, 2016, which stated: "I have come to the decision to submit my resignation from the Patriot National Board of Directors. As you are aware, I experienced some health related setbacks this year. During conversations with my doctors and family I have made the decision to fully focus on them and my health. I hope my time on the board has been both helpful and productive. Thank you for the opportunity to serve. "

511.    The stated reason for resigning from the Board was materially false and misleading because his "health" and "personal reasons" were not the true reason for his resignation. Rather, Shanfelter resigned because he was concerned over the legality and prudence of Mariano's actions at Patriot National. As stated above, Shanfelter suffered a heart attack May 2016, and he continued his duties at Patriot National and other companies of which he was part. What changed was that by October 2016, Shanfelter saw the writing on the wall that Mariano was attempting to seize control of Patriot National to push through an improper transaction. In an attempt to get out before things got too bad, Shanfelter used his heart attack from months prior as pretext to resign. Notably, Shanfelter's LinkedIn pages reflects that he continues to serves on the boards of Sabre Industries, Inc., and Orion Group Holdings, Inc. He also continues to work his "regular job" as a special consultant to MasTec, Inc. Thus, the above statement that "Shanfelter's decision to resign is solely

for personal reasons and did not involve any disagreement with [Patriot National], [Patriot National]'s management or the Board of Directors" is false and/or misleading.

512.    On this news, shares of Patriot National declined from $7.96 per share at close on October 21, 2016, to $6.78 per share at close on October 24, 2016, a 14.8% drop, on unusually heavy volume.

513.    On November 8, 2016, Patriot National issued a press release, entitled "Patriot National Rejects $475 Million Offer from Ebix, Inc.[:] Special Committee Continues to Explore and Evaluate More Attractive Offers and all Opportunities for Value Creation".  The press release stated:

> Company Release - 11/8/2016 1:46 PM ET
>
> FORT LAUDERDALE, Fla., Nov. 8, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National), a leading provider of technology and outsourcing solutions, today announced that *the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal.  The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation*.
>
> Patriot National, Inc. is a leading provider of technology and outsourced services to the insurance industry.  The company was founded by Fort Lauderdale based entrepreneur Steven Michael Mariano.
>
> *Neither the Special Committee nor the Board of Directors has made a decision to enter into any transaction or other opportunity at this time*, and there are no assurances that the consideration of strategic opportunities will result in [Patriot National] entering into a transaction or other opportunity.  The exploration of strategic opportunities may be terminated at any time and without notice.
>
> Patriot National will provide a more complete update on its strategic value creation initiatives on the third quarter earnings conference call on Monday, November 14, 2016.

514.    Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) that the Special Committee recommended against the Ebix offer because it was not in the best interest of Patriot National, and not Mariano alone; (2) the

Special Committee was still an independent committee evaluating "all opportunities for value creation"; and/or (3) Mariano and the Board had already determined to enter into the Leveraged Recap at the time of the press release.

515.    As detailed above, the Special Committee never voted or recommended against the Ebix transaction.  Moreover, it was Ebix that "rejected" the offer, and not Patriot National.  In fact, as detailed above, when Ebix's CEO learned of Patriot National's press release asserting this much, he emailed a colleague, "[Mariano] is a complete liar - we disengaged not him and our offer was not $475 million - we reduced along the way.  It defies any ethics.  He did the release to create a negative event into a fake positive event."  In fact, the only reason why Ebix's CEO never publically responded to Patriot National's press release because it was "limited by a tight NDA (that [Mariano] forced [Ebix] to sign as a precondition to talking to [it] many months back)." Indeed, Corey, a member of the Special Committee was also shocked to learn of the false and/or misleading statement that the Special Committee rejected Ebix's offer, texting Smith on that same day: "[the press release] shows we (SC) voted on rejecting the Ebix offer, which is not true…Is that a problem[?]".

516.    To Ebix's CEO's point, the above statements where materially false and misleading because they were made with the intention of persuading stockholders that Patriot National was worth in *excess* of $475 million.

517.    On this news, shares of Patriot National declined from $6.90 per share at close on November 8, 2016, to $6.35 per share at close the following day, an 8% drop, on unusually heavy volume.

**Q.    *March 3, 2017 Form 8-K (GIC Bailout).***

518.    On March 3, 2017, Patriot National filed a Form 8-K with the SEC disclosing the GIC Bailout, stating:

**Item 1.01                    Entry into a Material Definitive Agreement.**

On February 27, 2017, Patriot National, Inc. (the "Company") entered into an agreement with [GIG] and Steve Mariano, the Chairman, Chief Executive Officer and majority owner of [Patriot National] and the majority owner of GIG, regarding the service agreements between [Patriot National] and GIG's wholly-owned subsidiary [GIC]. GIC is [Patriot National]'s principal customer, with contracts and relationships from GIC generating $107.8 million, or 59% of [Patriot National]'s Total Fee Income and Fee Income from Related Party (the line item that reflects aggregate fee income) for the nine-months ended September 30, 2016 and $144.1 million, or 69%, for the year ended December 31, 2015.

Pursuant to the agreement, GIG agreed to, among other things, cause GIC to, subject to regulatory approval, amend each of the existing service agreements such that (1) the expiration date of each service agreement, as amended, shall be extended by not less than 10 years, (2) each such amended agreement shall provide that all of the services that GIC requires to be performed within the scope of such agreement shall be performed solely and exclusively by [Patriot National], (3) GIC will have the right to terminate each such amended agreement only in the event that [Patriot National] substantially fails to meet its obligations under the agreement or [Patriot National] commits gross negligence in the performance of its obligations under the agreement, (4) none of the rights and obligations of GIC and [Patriot National] under the amended agreements shall be assigned to any other party without the prior approval of a majority of the independent directors of [Patriot National], and (5) [Patriot National] and GIC will act in good faith to ensure that for the duration of the extended service agreements the amount of revenue to [Patriot National] from business with GIC does not decrease. In consideration of, among other things, the expansion of exclusivity and the extension of the term of such agreements and agreement as to certain corporate governance and financial covenants with respect to GIG, GIC (subject to regulatory approval) and [Patriot National], [Patriot National] paid GIG $30 million which was required to be immediately contributed into GIC as surplus and thereby included in GIC's calculation of total adjusted capital and its risk-based capital levels as of the end of the calendar year just ended in compliance with Florida Statute Section 624.4085.

As further material inducements for [Patriot National]'s payment, GIG and Mr. Mariano agreed to a series of corporate governance and financial covenants. These corporate governance covenants include the following: (1) at least one independent member of the Board of Directors of [Patriot National] shall have the right to attend and observe all meetings of the Board of Directors of GIC, (2) [Patriot National] will appoint an independent Lead Director, (3) [Patriot National]'s Audit Committee will have authority to approve payments of expenses for Board-related matters, (4) [Patriot National]'s Board of Directors will at all times be comprised of a majority of independent directors and nominations of new directors and nominations of directors seeking reelection must be approved by a majority of the independent directors, (5) [Patriot National] will not enter into any transaction with

203

an affiliate of Mr. Mariano without the prior approval of a majority of independent directors and (6) prior approval of a majority of [Patriot National]'s independent directors will be required before [Patriot National] carries out certain extraordinary transactions.

Pursuant to the financial covenants, GIG agreed to cause GIC to (1) not issue any dividends or distributions to (other than dividends or distributions permitted by the Florida Office of Insurance Regulation), or make any further advances to, any of its or GIG's shareholder(s), (2) adopt certain policies relating to operations including GIC expenses and (3) comply with certain other customary negative covenants including restrictions on indebtedness, investments, liens, affiliated party transactions and purchases and sales of assets, other than in the ordinary course of business. GIG further agreed that if it transfers or sells any of its shares in GIC, then GIG will pay to [Patriot National] the first $13.0 million in proceeds from such sale.

The transaction was approved by an independent special committee of [Patriot National]'s Board of Directors and by the independent directors of the Board. The special committee engaged separate independent legal counsel and financial advisors in connection with the agreement.

519.     The above statements were partially revealing of the extent of GIC's precarious financial condition and threat of regulatory supervision.  The above statements, however, were also false and purposefully misleading because they omitted and/or misrepresented: (1) the impetus for GIC's necessity of $30 million, namely, Mariano looting the company (as revealed in the GIC Receivership letter); and/or (2) Mariano's intention to adhere to covenants provided for the Binding Term Sheet.

520.     On this news, shares of Patriot National declined from $4.60 per share at close on March 2, 2017, to $3.67 per share at close on March 6, 2017, a 20% drop, on unusually heavy volume.

### R.     *Q4 2016 Form 8-K, dated March 14, 2017*

521.     On March 14, 2017, Patriot National issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, disclosing its financial results for the quarter and year ended December 31 2016 and providing guidance for 2017.  The press release stated in pertinent part:

**Financial Summary:**

**For the Quarter Ended December 31, 2016:**

(Comparisons correspond to the prior-year period)

- Total Revenues decreased 15.3% to $51.5 million

- Total Fee Income decreased 15.4% to $51.5 million

- GAAP Net Loss of $20.3 million, or $0.65 per diluted share

- Adjusted Loss[1] of $1.4 million, or $0.05 per diluted share

- Adjusted EBITDA[1] of $6.3 million, down 57.0%

- Operating Cash Flow[1] of $1.3 million, down 76.3%

**For the Year Ended December 31, 2016:**

(Comparisons to the corresponding prior-year period)

- Total Revenues of $232.8 million and Fee Income of $233.0 million, up 11.0% and 11.1%, respectively

- GAAP Net Loss of $0.8 million, or $0.03 per share

- Adjusted Earnings[1] of $10.3 million, or $0.38 per diluted share, down 48.6% and 49.3%, respectively

- Adjusted EBITDA[1] of $44.1 million, down 14.4%

- Operating Cash Flow[1] of $31.7 million, down 14.6%

> [1] References to non-GAAP financial measures as defined in Regulation G of SEC rules, including Adjusted EBITDA, Adjusted Earnings and Operating Cash Flow, are included in this press release. A reconciliation of this supplemental non-GAAP financial information to [Patriot National]'s GAAP information is contained in the accompanying financial tables. We present such non-GAAP supplemental financial information, as we believe such information is of interest to the investment community because it provides additional meaningful methods of evaluating certain aspects of [Patriot National]'s operating performance from period to period on a basis that may not be otherwise apparent on a GAAP basis. This supplemental financial information should be considered in addition to, not in lieu of, [Patriot National]'s consolidated financial statements.

**Recent Developments:**

- ***On December 1, 2016, Patriot National expanded its relationship with one of its major, non-related party carrier clients and now provides them with a wide variety of services***.

- On December 13, 2016, Patriot National launched a regional program with QBE Insurance Group to write workers' compensation and employers' liability

insurance policies for hospitality, healthcare, property management and manufacturing accounts in 12 states.

- On February 27, 2017, Patriot National announced that an independent special committee of its Board of Directors entered into an agreement with [GIC] Group ("GIG") and Steven Mariano, Chairman, Chief Executive Officer and majority owner of GIG, and its wholly-owned subsidiary [GIC] Company ("GIC"). This agreement expands the exclusivity and extends the term by not less than ten years of our existing service agreements with GIC and includes an agreement as to certain corporate governance and financial covenants with respect to GIG, GIC (subject to regulatory approval) and [Patriot National] in exchange for $30 million. The transaction was approved by the independent special committee of [Patriot National]'s Board of Directors and by the independent directors of the Board.  The special committee engaged separate independent legal counsel and financial advisors in connection with the agreement.

- Four new independent directors were appointed to Patriot National's Board of Directors including James O'Brien and Sean Bidic on November 17, 2016, and Michael Purcell and Jeffrey Rohr on January 5, 2017.

**Management Commentary:**

"Our results for the fourth quarter and the year were disappointing and, frankly, we did not execute as well as we hoped." said Steven M. Mariano, Chief Executive Officer of Patriot National.  "***In 2017, we have dedicated all of our resources to delivering profitable organic growth from our core businesses – workers' compensation insurance services and technology.  We believe a focused approach combined with improved execution and expense management across [Patriot National] is the most realistic way to improve our financial performance.  We are optimistic about 2017.  We have a solid plan and a very strong platform to build upon.***"

522.    Additionally, since Patriot National did not issue its annual report, it included the

following operating results for 2016 in the press release:

**Operating Results**

**Three Months Ended December 31, 2016**

Total fee income was $51.5 million for the fourth quarter of 2016, a decrease of 15.4% compared with $60.9 million in the fourth quarter of 2015.  The decrease in fee income during the fourth quarter of 2016 reflects weaker than expected results across [Patriot National]'s businesses.  Organic fee income was $50.3 million for the fourth quarter of 2016, a decrease of 17.3% compared with $60.9 million in the fourth quarter of 2015.  "Organic fee income" is defined as fee income earned after the first four quarters of fee income generated by each acquisition.

Total expenses for the fourth quarter of 2016 were $84.6 million, compared with $59.6 million in the fourth quarter of 2015. ***The increase was largely attributable to a $17.7 million goodwill impairment charge relating to the 2015 acquisition of Global HR Research*** and a write down of $3.7 million of other assets, primarily related to amounts owed to [Patriot National] under a third-party settlement agreement. In addition, fourth quarter 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, and $2.0 million in costs related to extinguishment of debt.

Fourth quarter 2016 GAAP net loss was $20.3 million, or $0.65 per diluted share, compared to a net loss of $5.4 million, or $0.19 per diluted share in the fourth quarter of 2015. Weighted average diluted shares were 31.3 million on a GAAP basis, which includes 4.9 million shares relating to the warrants associated with the PIPE financing as discussed in [Patriot National]'s previous 10-Q (the "Warrants"); and 26.4 million shares excluding the Warrants on a non-GAAP basis respectively. It is important to note that pursuant to the Back-to-Back Agreement between [Patriot National] and Mr. Mariano, Mr. Mariano has agreed to tender any shares back to [Patriot National] for any shares delivered by [Patriot National] pursuant to the Warrant Agreement.

Adjusted Loss for the fourth quarter of 2016 was $1.4 million, or $0.05 per diluted share, compared with Adjusted Earnings of $5.5 million, or $0.19 per diluted share, in the fourth quarter of 2015. In calculating the weighted average diluted shares, the Warrants previously mentioned have been excluded. Patriot National defines Adjusted Earnings and Adjusted Earnings Per Share as net income (loss) adjusted for cost for debt payoff, non-cash stock compensation costs, net realized gains (losses) on investments, increase (decrease) in fair value of warrant redemption liability, acquisition costs, claims settlements cost, litigation fees, severance expense, public offering costs, costs for strategic alternatives, goodwill impairment, write-down of other assets, and the income tax effect related to reconciling items.

Adjusted EBITDA for the fourth quarter of 2016 was $6.3 million, compared to Adjusted EBITDA of $14.6 million for the fourth quarter of 2015. Patriot National defines Adjusted EBITDA as net income (loss) adjusted for income tax, interest, depreciation and amortization, net realized gains (losses) on investments, increase (decrease) in fair value of warrant redemption liability, costs for debt payoff, non-cash stock compensation costs, acquisition costs, claims settlement cost, litigation fees, severance expense and public offering costs, and costs for strategic alternatives, goodwill impairment, and write-down of other assets.

Operating Cash Flow for the fourth quarter of 2016 was $1.3 million, compared to $5.6 million for the fourth quarter of 2015. Patriot National defines Operating Cash Flow as Adjusted EBITDA less income tax expense, interest expense and capital expenditures.

As of December 31, 2016, [Patriot National] had $91.9 million in cash and approximately $238.5 million of debt outstanding, net of deferred loan fees.

207

**Full Year Ended December 31, 2016**

Total revenues were $232.8 million for the twelve months ended December 31, 2016, compared with $209.7 million in the same period a year ago. Total fee income was $233.0 million for the twelve months ended December 31, 2016, an increase of 11.1% compared to $209.8 million for the corresponding prior-year period. The increase in fee income during the twelve months ended 2016 was primarily due to acquisitions closed during the twelve months ended December 31, 2016 and 2015. Organic fee income of $204.1 million declined 2.7% year-over-year. "Organic fee income" is defined as fee income earned after the first four quarters of fee income generated by each acquisition.

Total expenses for the twelve months ended December 31, 2016 were $252.3 million, compared with $210.1 million in the corresponding prior-year period. The increase was largely attributable to a $17.7 million goodwill impairment charge relating to our 2015 acquisition of Global HR Research and write down of $3.7 million of other assets, primarily related to amounts owed to us under a third-party settlement agreement. In addition, 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, $2.0 million in costs related to extinguishment of debt and expenses attributable to acquisitions closed during the twelve months ended December 31, 2016 and 2015.

For the twelve months ended December 31, 2016, GAAP net loss was $0.8 million or $0.03 per share, compared with GAAP net loss of $5.4 million, or $0.20 per share, for the twelve months ended December 31, 2015. Adjusted Earnings for the twelve months ended December 31, 2016 were $10.3 million, or $0.38 per diluted share, compared with Adjusted Earnings of $20.1 million, or $0.75 per diluted share, in the prior-year period.

For the twelve months ended December 31, 2016, Adjusted EBITDA decreased to $44.1 million, down from $51.5 million for the twelve months ended December 31, 2015. Operating Cash Flow for the twelve months ended December 31, 2016 was $31.7 million, compared to Operating Cash Flow of $37.1 million for the same period a year ago.

523. In Patriot National's consolidated balance sheet attached to the filing, it reported

approximately $105.3 million in goodwill, as of December 31, 2016.

524. Likewise, since Patriot National did not issue its annual report, it included the 2017

guidance in the press release:

**Outlook**

Patriot National is providing its full year 2017 Outlook for anticipated results. The Outlook provided is based on a number of assumptions that it believes are

reasonable at the time of this press release.  Information regarding potential risks that could cause the actual results to differ from these forward-looking statements is set forth below and in Patriot National's filings with the Securities and Exchange Commission.

For the full year ending December 31, 2017, Patriot National currently expects the following financial results.

| In millions: | 2017 Guidance |
| --- | --- |
| Total Fee Income | $224 - $236 |
| GAAP Net Income | $1 - $5 |
| Adjusted Earnings | $3 - $7 |
| Adjusted EBITDA | $45 - $52 |
| Operating Cash Flows | $21 - $25 |

525.   Each of these statements were false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for goodwill; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (6) Mariano's intention and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; (7) the value of the Forward Purchase Asset; (8) Patriot National's relationship with Ashmere; (9) the GIC Bailout and Mariano's intentions to adhere to its covenants; and/or (10) Patriot National's 2017 outlook and ability to continue as a viable going concern.

526.   Further, Patriot National's failure to account for the risk of GIC's ability to continue as a going concern in, *inter alia*, its doubtful accounts and 2017 guidance is particularly egregious

in the months following the Leveraged Recap and the GIC Bailout. Moreover, based on information and belief, at that time GIC and Patriot National were in discussions with the FOIR concerning GIC falling into receivership, which they knew would eventually foreclose any payment on GIC's debts and cessation of future revenue.

527. On this news, shares of Patriot National declined from $3.41 per share at close on March 13, 2017, to $2.83 per share at close on March 14, 2017, a 17% drop, on unusually heavy volume.

### S.    *Form NT 10-K was Materially False and/or Misleading.*

528. On March 17, 2017, Patriot National filed a Form NT 10-K with the SEC, stating:

Patriot National, Inc. (the "Company") has determined that it is unable to file its annual report on Form 10-K for the fiscal year ended December 31, 2016 within the prescribed time because [Patriot National] is still finalizing the Form 10-K and continues to prepare analyses and provide documentation requested by its auditors. In accordance with Rule 12b-25 under the Securities Exchange Act of 1934, as amended, [Patriot National] expects to file the Form 10-K within the permitted 15-day extension of the prescribed due date of March 16, 2017.

529. Exhibit A to the filing provided:

As reported in [Patriot National]'s earnings release for the quarter and year ended December 31, 2016, [Patriot National] had total revenues of $232.8 million for the twelve months ended December 31, 2016, compared with $209.7 million in the same period a year ago. Total fee income was $233.0 million for the twelve months ended December 31, 2016, an increase of 11.1% compared to $209.8 million for the corresponding prior-year period. The increase in fee income during the twelve months ended 2016 was primarily due to acquisitions closed during the twelve months ended December 31, 2016 and 2015.

Total expenses for the twelve months ended December 31, 2016 were $252.3 million, compared with $210.1 million in the corresponding prior-year period. The increase was largely attributable to a $17.7 million goodwill impairment charge relating to our 2015 acquisition of Global HR Research and write down of $3.7 million of other assets, primarily related to amounts owed to us under a third-party settlement agreement. In addition, 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, $2.0 million in costs related to extinguishment of debt and expenses

attributable to acquisitions closed during the twelve months ended December 31, 2016 and 2015.

For the twelve months ended December 31, 2016, GAAP net loss was $0.8 million or $0.03 per share, compared with GAAP net loss of $5.4 million, or $0.20 per share, for the twelve months ended December 31, 2015.

530.    The above statements were materially false and/or misleading because they misrepresented and/or omitted, among other things: (1) the reason why Patriot National was unable to timely file its annual meeting; (2) Patriot National's ability to file its annual statement within 15-days of March 16, 2017; (3) that the increase in total revenue and fee income was based on GIC accounts payable to Patriot National which they knew or should have known would not get paid due to GIC's inevitable receivership; and (4) Patriot National's intangible assets related to GIC, which was no impaired (even after GIC Bailout).

531.    On this news, shares of Patriot National declined from $2.55 per share at close on March 15, 2017, to $2.25 per share at close on March 17, 2017, an 11.8% drop, on unusually heavy volume.

**T.    *April 3, 2017 Press Release (BDO investigation).***

532.    On April 3, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders that it was forced to delay the filing of its annual report on Form 10-K for 2016:

Patriot National Delays Filing of Annual Report on Form 10-K

Company Release - 4/3/2017 4:15 PM ET

FORT LAUDERDALE, Fla., April 03, 2017 (GLOBE NEWSWIRE) -- Patriot National, Inc. (NYSE: Patriot National) ("Patriot National" or "[Patriot National]") today announced that it is delaying the filing of its Annual Report on Form 10-K for the year ended December 31, 2016 (the "Annual Report").

[Patriot National] is delaying the filing of its Annual Report on Form 10-K because it is still finalizing the Form 10-K and continues to prepare analyses and provide documentation requested by its auditor. ***In addition, on March 29, 2017, the Audit Committee of [Patriot National]'s Board of Directors, with the assistance of independent counsel and advisors, commenced an internal review regarding certain accounting matters related to transactions between [Patriot National] and Hospitality Supportive Systems, LLC, Selective Risk Management and Carman***

*Corporation, and their affiliates which, as previously reported, [Patriot National] entered into during calendar year 2015*.

On March 17, 2017, [Patriot National] filed with the Securities and Exchange Commission a Notification of Late Filing on Form 12b-25 with respect to the Annual Report.  At the time of that filing, [Patriot National] expected that it would be able to file its Annual Report within the 15-day extension period provided by Form 12b-25.  *[Patriot National] is not in a position to file its Form 10-K until after it finalizes the Form 10-K with its auditor and the Audit Committee completes its internal review and [Patriot National]'s independent auditor assesses the Audit Committee's findings.  The Audit Committee continues to work vigorously with its independent counsel and advisors to complete the review as soon as possible*.

533.    The above press release was filed as Exhibit 99.1 to the Form 8-K filed by Patriot National with the SEC on April 4, 2017.

534.    On this news, shares of Patriot National declined from $2.73 per share at close on April 3, 2017, to $2.59 per share at close on April 4, 2017, a 5.1% drop, on unusually heavy volume.

**U.    *April 4, 2017 Press Release (Global HR SALE).***

535.    On April 4, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders that it sold Global HR less than two years after buying Patriot National from Shanfelter:

Patriot National Announces Sale of Global HR Research

Company Release - 4/4/2017 6:45 AM ET

FORT LAUDERDALE, Fla., April 04, 2017 (GLOBE NEWSWIRE) -- Patriot National, Inc. (NYSE: Patriot National) ("Patriot National" or "[Patriot National]"), a leading provider of technology and outsourcing solutions to the insurance industry, today announced that it sold, on April 3, 2017, substantially all of the assets of Global HR Research ("Global HR"), a pre-hire intelligence solutions provider, to a subsidiary of Renovo Capital, LLC for total consideration of up to $30 million.

The transaction reflects Patriot National's strategic plan to focus on its core businesses, workers' compensation insurance services and technology.  The Board of Directors of Patriot National approved the sale.

The purchase price for the sale of Global HR is up to $30 million, plus the assumption of certain liabilities.  Specifically, $20 million was paid to Global HR in cash at closing and $5 million will be deposited into escrow for possible purchase price and working capital adjustments, satisfaction of certain post-closing conditions and any indemnification claims.  In addition, Global HR may receive an earnout payment of up to an additional $5 million.  [Patriot National] expects that the sale of Global HR will impact its prior 2017 financial guidance, issued on March 14, 2017, for Fee Income and Adjusted EBITDA for the balance of the year by $13 million and $2 million, respectively.

536.    The above press release was filed as Exhibit 99.2 to the Form 8-K filed by Patriot National with the SEC on April 4, 2017.

537.    On this news, shares of Patriot National declined from $2.59 per share at close on April 4, 2017, to $2.41 per share at close the following day, a 7% drop, on unusually heavy volume.

**V.    *April 4, 2017 Form 8-K***

538.    On April 4, 2017, Patriot National filed a Form 8-K with the SEC, attached as exhibits Patriot National's press releases on April 3 and 4, 2017, detailed above, concerning the audit investigation, delay in annual statement filing, and the sale of Global HR less than two years after buying Patriot National from Shanfelter, stating:

On March 31, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent, and the other lenders party thereto (the "Credit Agreement"), consented to extending the time by which [Patriot National] must deliver its audited financial statements to the lenders from March 31, 2017 to May 1, 2017.

***

During the first quarter of 2017, [Patriot National] paid down approximately $36.0 million principal of the Term Loan under its Credit Agreement, $20.0 million of which was attributable to the sale of Global HR.

539.    Additionally, the filing informed stockholders that Mariano removed Smith and Walsh from the Board:  "On March 30, 2017, [Patriot National] received a written consent signed by Steven M. Mariano, Steven Mariano Trust, [GIC] Company, Blue Ridge Insurance Company, LLC and [GIC] Group, Inc., which collectively hold of record at least a majority in voting power

of all outstanding shares of [Patriot National], removing Quentin P. Smith and Charles H. Walsh from the Board of Directors of [Patriot National], effective immediately."

540.    The above statement was false and misleading because it did not disclose that it was required to pay Cerberus in order to avoid a default of the Cerberus Credit Agreement, and that Mariano removed Smith and Walsh from the Board in order to obtain an excessive employment agreement.

541.    On this news, shares of Patriot National declined from $2.59 per share at close on April 4, 2017, to $2.41 per share at close the following day, a 7% drop, on unusually heavy volume.

**W.    *April 27, 2017 Form 8-K (new Board members)***

542.    On April 27, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders that Mariano had further exercised his improper dominance over Patriot National:

> **Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> ***On April 23, 2017, Patriot National, Inc. (the "Company") received written consents signed by Steven M. Mariano, Steven Mariano Trust, [GIC] Company, Blue Ridge Insurance Company, LLC and [GIC] Group, Inc., which collectively hold of record at least a majority in voting power of all outstanding shares of [Patriot National], removing Michael Purcell from the Board of Directors of [Patriot National] (the "Board") and appointing Terry Coleman and Glenn Hibler to the Board, effective immediately. Mr. Coleman will serve as a Class III director and Mr. Hibler will serve as a Class II director***.
>
> On April 26, 2017, the Board appointed Ernest Csiszar to the Board, effective immediately, to fill the vacancy. Mr. Csiszar will serve as a Class III director.
>
> On April 26, 2017, Jeff Rohr resigned from the Board, effective immediately.
>
> On April 27, 2017, the Board appointed Messrs. Hibler and Csiszar to the Audit Committee; Messrs. Coleman and Hibler to the Compensation Committee; and Mr. Coleman to the Nominating and Corporate Governance Committee. Mr. Csiszar was appointed as the chairman of the Audit Committee; Mr. Hibler was appointed as the chairman of the Compensation Committee; and Mr. Coleman was appointed as the chairman of the Nominating and Corporate Governance Committee.

214

*The Board has determined that Messrs. Coleman, Csiszar, and Hibler each meet all applicable independence requirements to serve on such committees*, including those set forth in [Patriot National]'s Corporate Governance Guidelines, under New York Stock Exchange rules and under the rules and regulations of the Securities and Exchange Act of 1934, as amended.

Messrs. Coleman, Csiszar and Hibler will each receive a pro rata portion of [Patriot National]'s standard compensation for service on the Board. In 2016, each of our non-employee directors was entitled to director compensation of (i) a cash retainer of $70,000, payable quarterly and (ii) an equity award of $70,000 under [Patriot National]'s 2014 Omnibus Incentive Plan. [Patriot National] may reimburse directors for any reasonable expenses incurred by them in connection with their service as directors.

[Patriot National] expects each of Messrs. Coleman, Csiszar and Hibler to enter into the standard director indemnification agreement that [Patriot National] has with its directors. A copy of a substantially similar form of the indemnification agreement is filed as Exhibit 10.16 to [Patriot National]'s Registration Statement on Form S-1 filed on December 15, 2014 (File No. 333-200972)

543.    On April 25, 2017, Patriot National issued a press release announcing the appointment of Hibler and Coleman to the Board.  In the press release, Mariano stated: "We are pleased to welcome Mr. Coleman and Mr. Hibler to our Board of Directors…As the former Speaker of the House for the State of Georgia, Mr. Coleman brings to the Board tremendous leadership, government and public policy experience.  Mr. Hibler has a long and successful career that includes building successful insurance services companies and has particular expertise in technology-enabled solutions and benefits design."

544.    On April 27, 2017, Patriot National issued a press release announcing the appointment of Csiszar to the Board.  The press release stated in pertinent part:

"We are pleased to welcome Mr. Csiszar to our Board of Directors," said Steven M. Mariano, Chairman, President and CEO of Patriot National. "Mr. Csiszar has more than ten years of experience serving on public and private company boards, and he brings extensive experience in insurance and risk management, executive leadership and advisory in financial matters."

Prior to his retirement, Mr. Csiszar served as President and Chief Executive Officer of the Property Casualty Insurers Association of America, the property and casualty insurance industry's principal trade association. Previously, he served as Director of Insurance for the State of South Carolina and as President of the National

Association of Insurance Commissioners. He currently serves on the Board of Directors of American Integrity Insurance Company, a property and casualty insurance company, and is a member of the Board of Directors and Audit Committee for MasTec, Inc.

"I am familiar with [Patriot National] and welcome the opportunity to serve the interests of Patriot National's shareholders," said Mr. Csiszar.

### X.    *May 30, 2017 Form 8-K (2017 Special Committee).*

545.    On May 30, 2017, Patriot National filed a Form 8-K with the SEC announcing that the Board formed a new special committee to explore and review a range of strategic alternatives for Patriot National.  Attached as Exhibit 99.1 to the Form 8-K and is incorporated by reference was Patriot National's May 30, 2017 press release, which stated:

> FORT LAUDERDALE, Fla., May 30, 2017 (GLOBE NEWSWIRE) — Patriot National, Inc. (NYSE: Patriot National) (the "Company"), a leading provider of technology and outsourcing solutions to the insurance industry, announced today that its Board of Directors has formed a new special committee of independent directors (the "Special Committee") to explore and review a range of strategic alternatives for [Patriot National].
>
> There is no assurance that this review will result in any strategic alternatives being announced or consummated. Patriot National does not intend to discuss or disclose further developments during this process unless and until the Board of Directors of [Patriot National] has approved a specific action or otherwise determined that further disclosure is appropriate.

546.    On this news, shares of Patriot National declined from $2.63 per share at close on May 30 2017, to $2.49 per share at close the following day, a 5.3% drop, on unusually heavy volume.

### Y.    *May 5, 2017 Form 8-K*

547.    On May 5, 2017, Patriot National filed a Form 8-K with the SEC disclosing that "On May 1, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent, and the other lenders party thereto, executed a waiver consenting

to extend the time by which [Patriot National] must deliver its audited financial statements to the lenders from May 1, 2017 to May 26, 2017."

### Z.     May 9, 2017 Form 8-K

548.    On May 9, 2017, Patriot National filed a Form 8-K with the SEC disclosing that "On May 3, 2017, James O'Brien resigned from the Board of Directors of [Patriot National], effective immediately. As previously disclosed, on February 27, 2017 Patriot National, Inc. (the "Company"), [GIC] Group, Inc. ("GIG"), and Steven Mariano, the Chairman, Chief Executive Officer and majority owner of [Patriot National] and GIG, entered into an agreement (the "Agreement"). Mr. O'Brien stated that his resignation was due to disagreements regarding non-compliance with the terms of the Agreement."

### AA.    July 14, 2017 Form 8-K (Mariano Resignation)

549.    On July 14, 2017, Patriot National filed a Form 8-K with the SEC disclosing Mariano's purported resignation from the Board:

> *Departure of Steven M. Mariano as President, Chief Executive Officer, Chairman, and Director*
>
> On July 10, 2017, Steven M. Mariano tendered his resignation as President, Chief Executive Officer, director and Chairman of the Board of Directors (the "Board") of Patriot National, Inc. (the "Company"). On July 12, 2017, the Board accepted his resignation, effective immediately.
>
> In connection with his separation from [Patriot National], [Patriot National] and Mr. Mariano entered into a Confidential Separation and Severance Agreement and General Release (the "Separation Agreement") on July 12, 2017, effective immediately, that specifies the terms of, and the benefits he is eligible to receive in connection with, his departure from [Patriot National]. Subject to his compliance with the terms and conditions of the Separation Agreement, Mr. Mariano (i) received a payment of $6.0 million and will receive $4.0 million to be paid over four annual payments beginning August 1, 2018, which payments shall accelerate upon a change of control (the $6.0 million payment and $4.0 million payment are collectively referred to as the "Severance Payment") and (ii) will receive a continuation of group health plan coverage until the earlier of July 13, 2019 or the time he obtains group health plan coverage with a new employer.  The Severance Payment is subject to clawback by [Patriot National].

At the option of [Patriot National], Mr. Mariano will serve in a consulting role where he will assist [Patriot National] as reasonably requested by the Board or Chief Executive Officer, and be available upon request to the Special Committee of independent directors to explore and review a range of strategic alternatives for [Patriot National].

Under the Separation Agreement, Mr. Mariano provided a general waiver and release of claims against [Patriot National] and is subject to certain cooperation and restrictive covenants, including confidentiality, non-disparagement, non-solicitation, and non-competition.

**BB.**    *July 20, 2017 Form 8-K.*

550.    On July 20, 2017, Patriot National filed a Form 8-K with the SEC disclosing that "On July 14, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent ("Cerberus"), and the other lenders party thereto, executed a waiver consenting to extend the time by which [Patriot National] must deliver its audited financial statements to the lenders, provided that (i) [Patriot National] deliver such financial statements to the lenders on or prior to August 11, 2017, (ii) the $30.0 million total revolving credit commitment is terminated in full on the waiver effective date, and (iii) from and after the waiver effective date, [Patriot National] does not pay any dividends or make other cash distributions in respect of or repurchase any of its equity interests. The effectiveness of the waiver is subject to the fulfillment of certain conditions precedent, including [Patriot National]'s payment of a non-refundable waiver fee equal to $400,000 to Cerberus, in its capacity as administrative agent, for the account of the lenders. The waiver effective date was July 14, 2017."

**CC.**    *August 17, 2017 (Shields Resignation) Form 8-K*

551.    On August 17, 2017, Patriot National filed a Form 8-K with the SEC disclosing that the "*Departure of Thomas Shields as Executive Vice President and Chief Financial Officer*", stating:

On August 11, 2017, Thomas Shields, the Executive Vice President and Chief Financial Officer of Patriot National, Inc. (the "Company") agreed to resign from [Patriot National] effective September 15, 2017 (the "Effective Date") to pursue other opportunities. On August 11, 2017, Thomas Shields and [Patriot National] entered into a Confidential Separation Agreement and General Release (the "Separation Agreement"), effective on the Effective Date, that specifies the terms of, and the benefits he is eligible to receive in connection with, Mr. Shields' departure from [Patriot National]. Subject to his compliance with the terms and conditions of the Separation Agreement, Mr. Shields will receive (i) a total of $920,000, of which $370,000 shall be paid on the Effective Date with the remaining to be paid over six monthly installments beginning October 15, 2017, which payments shall accelerate upon a change of control, (ii) 23,529 restricted shares of [Patriot National]'s common stock pursuant to the vesting schedule established in his employment agreement as if his employment had not been terminated or, alternatively, the cash equivalent of such shares on September 15, 2017, and (iii) continuation of group health plan coverage until the earlier of September 15, 2019 or the time he obtains group health plan coverage with a new employer.

In order to provide a smooth transition of leadership, Mr. Shields shall serve as a consultant to his successor as [Patriot National]'s Chief Financial Officer until March 15, 2018, and shall receive a lump sum of $35,000 for any month in which he provides consulting work.

### DD.  *September 29, 2017 (NYSE Delisting Risk) Form 8-K.*

552.  On September 29, 2017, Patriot National filed a Form 8-K with the SEC disclosing that "on September 25, 2017 it received a notification (the "Notice") from the New York Stock Exchange (the "NYSE") that it was not in compliance with the NYSE's continued listing standards set forth under Rule 802.01B of the NYSE Listed Company Manual because the average global market capitalization of [Patriot National]'s common stock was less than $50 million over a consecutive 30 trading-day period while its last reported stockholders' equity was less than $50 million.  As a result of the Notice, [Patriot National] became subject to the suspension and delisting procedures set forth in Sections 801 and 802 of the NYSE Listed Company Manual."

### EE.  *November 22, 2017 (GIC Receivership) Form 8-K.*

553.  On November 22, 2017, Patriot National finally disclosed the severity of the issues at Patriot National and the ways in which it can affect Patriot National in a Form 8-K filed with the SEC (the "GIC Receivership Form 8-K"):

*[Patriot National's] largest customer, [GIC] Company ("GIC"), which has historically accounted for approximately 60-70 percent of [Patriot National]'s business, consented to be placed into receivership on November 13, 2017.* [Patriot National] has met with the Florida Office of Insurance Regulation (the "OIR") on various occasions, including most recently on November 20, 2017, seeking to obtain both payment for past services rendered to GIC and an agreement that would allow [Patriot National] to provide and receive payment for future services while GIC is in receivership. *However, based on the most recent meeting with the OIR and other authorities now engaged in respect of GIC, [Patriot National] does not believe these efforts will be successful. Accordingly, a major portion of [Patriot National]'s revenue and cash flow going forward will cease.*

Based on [Patriot National]'s deteriorating financial condition, and in compliance with the Worker Adjustment and Retraining Notification Act, [Patriot National] has notified approximately 250 employees, representing *approximately one-third of its workforce, of the immediate termination of their employment.* [Patriot National] is currently unable in good faith to make a determination of an estimate of the costs associated with the termination. [Patriot National] will file an amended Current Report upon determination of the estimate or range of estimate of costs.

554.    The GIC Receivership Form 8-K also disclosed that Patriot National entered into a

Forbearance Agreement with Cerberus, pushing off bankruptcy until December 3, 2017:

On November 17, 2017, Patriot National, Inc. (the "Company") obtained and entered into a Forbearance Agreement (the "Forbearance Agreement") with the lenders party to that certain Financing Agreement, dated as of November 9, 2016, with Cerberus Business Finance, LLC ("Cerberus"), as collateral agent and administrative agent, and the lenders party thereto (the "Credit Agreement"). [Patriot National] is currently in default of the Credit Agreement due to its failure to deliver timely financial statements, its non-payment of interest due November 1, 2017 and its failure to comply with financial covenants.

Pursuant to the Forbearance Agreement, Cerberus and the lenders party thereto have agreed not to accelerate the maturity of the loans nor exercise their related rights and remedies in relation to the defaults under the Credit Agreement until December 3, 2017, subject to certain limitations and conditions (the "Forbearance Period"). The Forbearance Agreement also contemplates that Cerberus may make, in its sole and absolute discretion, advances of up to $4.0 million to [Patriot National]. There can be no assurance that the foregoing advance will be sufficient for [Patriot National] to sustain operations during or beyond the Forbearance Period. In addition, effective July 15, 2017, the outstanding obligations and other amounts payable under the Credit Agreement and related loan documents (together with the Credit Agreement, the "Loan Documents") accrue interest at the contract rate otherwise applicable to such debt plus two (2.0) percent per annum. As required by the Forbearance Agreement, [Patriot National] has engaged a chief restructuring

officer, and will engage an executive vice president of finance. As long as the Forbearance Agreement is in effect, [Patriot National] will be required to comply with certain restrictive and affirmative obligations set forth in the Credit Agreement.

Upon termination or expiration of the Forbearance Period, Cerberus and/or the lenders party thereto shall be entitled to exercise any of their respective rights and remedies under the Forbearance Agreement and/or the Loan Documents, or applicable law, including, without limitation, the right to enforce any and all of the liens on, and security interests in, the collateral described in the Loan Documents and to accelerate the maturity of the loans under the Credit Agreement.

555.     The above corrective disclosure confirmed to stockholders the seriousness of the

regulatory issues at GIC.  Moreover, it revealed the full extent to which Patriot National is affected

by GIC's loss of business.

556.     On this news, shares of Patriot National declined from $1.00 per share at close on

November 22, 2017, to $0.36 per share at close on November 24, 2017, a 64% drop, on unusually

heavy volume.

**FF.**     ***November 28, 2017 Form 8-K (Patriot National Bankruptcy).***

557.     On November 28, 2017, Patriot National filed a Form 8-K with the SEC disclosing

the RSA and its plans to file voluntary bankruptcy petitions for relief under Chapter 11:

Patriot National, Inc. (the "Company") announced today that it has reached an agreement in principle with its secured lenders to recapitalize [Patriot National]. Under the terms of the agreement, [Patriot National] anticipates that it will reduce its debt, significantly improve its liquidity and financial condition, and improve its ability to service its customers.

On November 28, 2017, [Patriot National] entered into a restructuring support agreement (the "RSA") with the lenders under its Financing Agreement, dated as of November 9, 2016, with and among Cerberus Business Finance, LLC, as the collateral agent and administrative agent, and certain funds and accounts managed by each of Cerberus Business Finance, LLC and its affiliates and TCW Asset Management Company LLC, as the lenders party thereto (the "Lenders") (the "Credit Agreement," and the claims and other obligations arising thereunder, the "Lender Claims."). The RSA contemplates that [Patriot National] and its direct and indirect U.S.-based subsidiaries will file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to

221

implement the recapitalization in accordance with the RSA and the term sheet for a plan of reorganization attached thereto as Exhibit A (the "Term Sheet").

Pursuant to the terms of the RSA and definitive documentation to be negotiated, the Lenders will provide [Patriot National] with debtor-in-possession ("DIP") financing and use of cash collateral to permit [Patriot National] to continue its operations during the Chapter 11 cases and pending completion of a comprehensive reorganization to be implemented pursuant to a Chapter 11 plan of reorganization (the "Plan") for [Patriot National] and each of its direct and indirect subsidiaries that are debtors in the Chapter 11 cases (the "Subsidiary Debtors").

[Patriot National] expects that it will continue to operate its business in the ordinary course and the Chapter 11 filing is not expected to have a meaningful impact on [Patriot National]'s day-to-day operations. Specifically, [Patriot National] intends to continue to provide the same level of service to all of its carrier customers in accordance with the terms of the current agreements. Furthermore, it is anticipated that all commissions due to brokers who commit to continue their business relationships with [Patriot National] will be paid in the ordinary course of business or in full under the Plan. [Patriot National] expects the reorganization, which is subject to the completion of definitive documentation and regulatory approval, to be completed early in the second quarter of 2018.

The RSA, together with the Term Sheet and the other documents described therein, sets forth the material terms of the Plan. Pursuant to the Plan, all of the issued and outstanding equity interests in [Patriot National] and each of the Subsidiary Debtors will be extinguished, and the Lenders (or their designees) will receive 100% of the newly issued equity interests in Reorganized Patriot National, Inc. ("Reorganized Patriot National, Inc.") and each of the Reorganized Subsidiary Debtors (the "Reorganized Subsidiary Debtors") on account of a portion of the Lender Claims. After giving effect to the transactions contemplated by the Plan, [Patriot National] and its direct and indirect subsidiaries will be owned and controlled by funds and accounts managed by Cerberus Business Finance, LLC and its affiliates and TCW Asset Management Company LLC.

558.    The filing further informs Patriot National stockholders that they "will not receive

or retain any property on account of such equity interests, and such holders will be deemed to have

rejected the Plan."

## COUNT I

### Violation of Section 11 of the Securities Act
### Against Defendants Mariano, Shields, Del Pizzo,
### <u>Shanfelter, BDO, UBS, BMO, SunTrust, JMP, and William Blair</u>.

559.    Plaintiffs repeat and reallege the allegations contained above.

560.    This claim, brought under Section 11of the Securities Act, 15 U.S.C. §§ 77k, is based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of the defendants' investigation of the true facts underlying the alleged misstatements.

561.    Plaintiffs' Securities Act claims are premised on the material untrue statements and omissions contained in the following filings by Patriot National with the SEC in connection with its IPO: (i) the Registration Statement filed on Form S-1 on December 16, 2014; (ii) the Amended Registration Statement filed on Form S-1/A on January 6, 2015; (iii) and the Amended Registration Statement filed on Form S-1/A on January 14, 2015 (the "Registration Statement").

562.    As set forth above, Patriot National's Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

563.    Patriot National's Registration Statement was signed by Mariano, Shields, Del Pizzo, and Shanfelter on behalf of Patriot National.  Each of them were directors of or executives of Patriot National at the time of the filing of the Registration Statement and when it became effective and are liable pursuant to Sections 11(a)(1)(2) and 11(a)(1)(3) of the Securities Act, 15 U.S.C. §77k(a)(1)(2) and (3).

564.    The Underwriter Defendants were underwriters with respect to the Patriot National securities offered in the IPO and are liable pursuant to Section 11(a)(5) of the Securities Act, 15 U.S.C. § 77k(a)(5).

565.    BDO's opinion was signed and included in the Registration Statement with BDO's consent and BDO is liable pursuant to Section 11(a)(4) of the Securities Act, 15 U.S.C. § 77k(a)(4).

566.     Patriot National was the Registrant for the IPO, while Mariano, Shields, Del Pizzo, Shanfelter, BDO, and the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.   Consequently, Mariano, Shields, Del Pizzo, Shanfelter, BDO, and the Underwriter Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to liability for violations of Section 11 of the Securities Act.

567.     Underwriter Defendants were underwriters of the IPO.   The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired DDMG securities issued in the IPO.

568.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

569.     Plaintiff McIntire and other members of the Class who acquired the securities in the IPO pursuant to the Registration Statement did not know of the misrepresentations alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

570.     Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.   Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

571.    Plaintiff McIntire and the other members of the Class have sustained damages.  The value of Patriot National's shares sold in the IPO has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

572.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiff McIntire and the other members of the Class who purchased or otherwise acquired Patriot National shares in or traceable to the IPO pursuant to the Registration Statement.

**COUNT II**

**Violation of Section 12(a)(2) of the Securities Act**
**Against the Underwriter Defendants**

573.    Plaintiffs repeat and reallege the allegations contained above.

574.    Plaintiffs' claim under Section 12 of the Securities Act, 15 U.S.C. §§ 77l, is premised on the material untrue statements and omissions contained in the Prospectus filed on Form 424B4 on January 20, 2015 and is based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of Underwriter Defendants' investigation of the true facts underlying the alleged misstatements.

575.    The Underwriter Defendants offered or sold Patriot National securities by the use of means or instruments of transportation or communication in interstate commerce or the mails.

576.    The Underwriter Defendants offered or sold Patriot National securities by means of a prospectus or oral communication.

577.    The prospectus or oral communication by which the Underwriter Defendants offered or sold Patriot National securities contained untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements not misleading.

578.    The Underwriter Defendants knew, or could have known through the exercise of reasonable care, of the untrue statements and omissions in the Prospectus.

579.    Persons liable under Section 12 include persons who pass title, or any person that engages in solicitation.

580.    As set forth in the Registration Statement, Patriot National offered to investors "the shares of our common stock described in this prospectus through the underwriters named below. UBS Securities LLC, BMO Capital Markets Corp. and SunTrust Robinson Humphrey, Inc. are acting as joint book-running managers of this offering and UBS Securities LLC is acting as the sole representative of the underwriters.  We and the selling stockholders have entered into an underwriting agreement with the representative.  Subject to the terms and conditions of the underwriting agreement, each of the underwriters has severally agreed to purchase, and we and the selling stockholders have agreed to sell to the underwriters, the number of shares of common stock listed" set forth below.

| Underwriters | Number of Shares |
|---|---|
| UBS Securities LLC | 4,157,850 |
| BMO Capital Markets Corp. | 1,663,140 |
| SunTrust Robinson Humphrey, Inc. | 1,663,140 |
| JMP Securities LLC | 415,785 |
| William Blair & Company, L.L.C. | 415,785 |
| Total | 8,315,700 |

581.    The Registration Statement further provided that:

The underwriting agreement provides that the underwriters must buy all of the shares of common stock if they buy any of them. However, the underwriters are not required to pay for the shares covered by the underwriters' option to purchase additional shares as described below.

Our common stock is offered subject to a number of conditions, including:

- receipt and acceptance of our common stock by the underwriters; and

- the underwriters' right to reject orders in whole or in part.

226

We have been advised by the representative that the underwriters intend to make a market in our common stock but that they are not obligated to do so and may discontinue making a market at any time without notice.

582.     In the IPO, Patriot National passed title to the IPO shares to the Underwriter Defendants.  The Underwriter Defendants then sold shares of Patriot National common stock in the IPO and passed title to members of the Class.  Patriot National shares were delivered by the Underwriter Defendants to members of the Class on January 22, 2017.

583.     In the IPO, one of the Underwriter Defendants passed title to 100 shares of Patriot National common stock to Plaintiff McIntire.  Similarly, the Underwriter Defendants passed title to members of the Class.

584.     As set forth above, the Prospectus contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements not misleading, including defendants' failure to disclose material information regarding, *inter alia*, GIC's ability to operate as a going concern and the effect that would have on Patriot National.

585.     Plaintiffs and other members of the Class did not know that the Prospectus contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements not misleading.

586.     Plaintiff McIntire and other members of the Class who purchased Patriot National securities in the IPO from the Underwriter Defendants have sustained damages as a result of the untrue statements of material facts and omissions in the Prospectus, for which they hereby elect to rescind and tender their shares of Patriot National common stock in return for the consideration paid for Patriot National common stock with interest.

587.     This claim was brought within the applicable statute of limitations.

588.    By virtue of the foregoing, the Underwriter Defendants have violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) and are liable for violations of Section 12 to Plaintiff McIntire and the other members of the Class who purchased or otherwise acquired Patriot National shares from the Underwriter Defendants by means of the Prospectus.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against Mariano, Shields, Del Pizzo, and Shanfelter

589.    Plaintiffs repeat and reallege the allegations contained above.

590.    Mariano participated in and controlled the operation and management of Patriot National at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Patriot National's business affairs.   Mariano was Chairman, President, and Chief Executive Officer of Patriot National.   Mariano was also the controlling stockholder of Patriot National at all relevant times.   Moreover, Mariano was controlling stockholder of GIC, which accounted for 70% of Patriot National's reported revenue and was acutely intertwined with the above-detailed materially false and/or misleading statements and/or omission.

591.    Shields served as Patriot National's Executive Vice President, CFO, and Treasurer.

592.    Mariano and Shields were involved in the day-to-day operations of Patriot National at the highest levels.

593.    At the time the Registration Statement became effective, Del Pizzo served as a Director of Patriot National and acted as the "Lead Director."

594.    At the time the Registration Statement became effective, Shanfelter served as a Director of Patriot National and acted as the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

595.    By virtue of their positions at Patriot National, Mariano, Shields, Del Pizzo, and Shanfelter were privy to confidential proprietary information concerning Patriot National and its business and operations.

596.    Due to their positions of control and authority, Mariano, Shields, Del Pizzo, and Shanfelter were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

597.    Mariano, Shields, Del Pizzo, and Shanfelter signed, or caused to be signed on their behalf, the Registration Statement.

598.    Mariano, Shields, Del Pizzo, and Shanfelter were controlling persons of Patriot National under the Securities Act at the time the Registration Act became effective.

599.    Patriot National's conduct, as alleged herein, constitutes a violation of Sections 11 of the Securities Act.  Mariano, Shields, Del Pizzo, and Shanfelter are liable to Plaintiffs under Section 15 of the Securities Act, 15 U.S.C. § 77o, and the other members of the Class, jointly and severally with and to the same extent as Patriot National, for its violations of the Securities Act.

## COUNT IV

### Violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5
### Against Mariano and Shields

600.    Plaintiffs repeat and reallege the allegations contained above.

601.    During the Class Period, Mariano and Shields carried out a plan, scheme and course of conduct which was intended to and did, throughout the Class Period: (a) deceive the investing public regarding Patriot National's business, operations, management and the intrinsic value of its common stock; (b) enable defendants to enrich themselves at the expense of Patriot National and its public shareholders through the causing self-interested transactions and obtaining personal benefits, while in possession of material adverse nonpublic information about Patriot National;

and (c) cause Plaintiffs and all other members of the Class to purchase the Patriot National's common stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Mariano and Shields, jointly and individually (and each of them) took the actions set forth herein.  Accordingly, Mariano and Shields are liable to Plaintiffs and all other members of the Class pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. 240.10b-5.

602.     Mariano and Shields: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National's common stock in an effort to maintain artificially high market prices for Patriot National's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

603.     Mariano and Shields, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Patriot National as specified herein.

604.     Mariano and Shields employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patriot National's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Patriot National and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set

forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National common stock during the Class Period.

605.     Each of the Individual Defendant's primary liability arises from the following facts: (a) Mariano and Shields were high-level executives and/or directors at Patriot National during the Class Period and members of its management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of Patriot National was privy to and participated in the creation, development and reporting of Patriot National's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of Patriot National's management team, internal reports and other data and information about its finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of Patriot National's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading, or omitted to state material facts necessary to make the statements not misleading.

606.     Mariano and Shields had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe recklessness in disregarding the truth in that they failed to ascertain and to disclose such facts.  Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately for the purpose and effect of concealing Patriot National's operating condition and future business prospects from the investing public and supporting the artificially-inflated price of its common stock.  As demonstrated by Mariano and Shields' overstatements, omissions, and misstatements about Patriot National's business, operations, and earnings throughout the Class Period, defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading, or omitted to state material facts necessary to make the statements not misleading.

607.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Patriot National common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Patriot National's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Mariano and Shields, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by Mariano and Shields but not disclosed in public statements by defendants during the Class Period, Plaintiffs and all other members of the Class acquired Patriot National common stock during the Class Period at artificially-high prices and were damaged thereby.

608.    At the time of said misrepresentations and omissions, Plaintiffs and all other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and all other members of the Class and the marketplace known the truth about Patriot National that were not disclosed by Mariano and Shields, Plaintiffs and all other members of the Class would not have purchased or otherwise acquired their shares of Patriot National's common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

609.    By virtue of the foregoing, when the truth about Mariano and Shields' false and misleading statements began to be revealed, the price of Patriot National shares precipitously

dropped causing a loss to Plaintiffs and all other members of the Class. Thus, as a direct and proximate result of Mariano and Shields' wrongful conduct, Plaintiffs and all other members of the Class suffered damages in connection with their respective purchases and sales of the Patriot National's common stock during the Class Period.

610. It is appropriate to treat Mariano and Shields as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in Patriot National's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly-defined group of defendants identified above. Each of the above officers or directors, by virtue of their high-level positions with Patriot National, directly participated in its management, was directly involved in the day-to-day operations of Patriot National at the highest levels, and was privy to confidential proprietary information concerning Patriot National and its officers' backgrounds, its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Mariano and Shields were involved in drafting, producing, reviewing and/or disseminating false and misleading statements and information, and were aware or knew and/or were severely reckless in not becoming aware or knowing that false and misleading statements were being issued regarding Patriot National and its officers' backgrounds, business, operations, products, growth, financial statements, and financial condition, and approved or ratified these statements, in violation of the federal securities laws.

611. Each of Mariano and Shields had a duty to ensure that they complied with all legal obligations and requirements, and a duty to ensure that Patriot National was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

612.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and, during the Class Period, was traded on New York Stock Exchange, and governed by the provisions of the federal securities laws, Mariano and Shields each had a duty to disclose and disseminate promptly, accurate and truthful information with respect to Patriot National's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Patriot National's publicly-traded common stock would be based upon truthful and accurate information.  Mariano and Shields' misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

613.     Mariano and Shields participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, and other communications complained of herein and knew or were aware of, or were severely reckless in not knowing or becoming aware of, the materially false and misleading nature of misstatements contained therein and omissions therefrom.  Because of their membership on the Board of Directors and/or executive and managerial positions with Patriot National, each of the defendants had access to the adverse undisclosed information about Patriot National's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects and knew, or were severely reckless in not knowing, that adverse facts rendered the positive representations made by or about Patriot National and its financial condition and

performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects issued or adopted by Patriot National were materially false and misleading.

614.    Mariano and Shields, because of their positions of control and authority as officers and/or directors of Patriot National, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Patriot National and issued during the Class Period.  Each of Mariano and Shields was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of them is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein or omissions therefrom.

615.    Mariano and Shields are each liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Patriot National common stock by engaging in misleading transactions between Patriot National and other companies controlled by Mariano, particularly GIC, and disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme was accomplished through both misleading transactions, self-dealing, and through false and misleading statements and the omission of material information.  The scheme: (a) deceived the investing public regarding Patriot National's business, operations, management, and the intrinsic value of Patriot National's common stock; (b) enabled Mariano and Shields to enrich themselves and their associates and friends at the expense of Patriot National's public shareholders, while in possession of material, adverse nonpublic information about Patriot National; and, (c) caused Plaintiffs and other members of the

Class to purchase Patriot National's common stock at artificially-inflated prices and to be damaged thereby.

616.    As alleged herein, Mariano and Shields each acted with scienter in that each knew that the public documents and statements issued or disseminated in the name of Patriot National were materially false and misleading or omitted to state material facts; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Moreover, as set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Patriot National, their control over, and/or receipt and/or modification of Patriot National's allegedly materially misleading misstatements and/or their associations with Patriot National, GIC, and other companies as alleged herein, made them privy to confidential proprietary information concerning Patriot National, participated in the fraudulent scheme alleged herein.

617.    Mariano and Shields were motivated to materially misrepresent or omit to state material facts to investors because by deceiving the investing public regarding Patriot National's business, operations, management, and the intrinsic value of Patriot National's common stock, Mariano was able to arrange transactions transferring millions of dollars to himself which he used to support an extravagant lifestyle as well as to keep the fraudulent scheme involving Patriot National, GIC, and other companies going.  Essential to this scheme was keeping the truth about Patriot National hidden from the public and the SEC and inflating market demand for Patriot National shares in the IPO, the Secondary Offering, PIPE transaction, and the failed Strategic Review.

618.    Mariano's and Shields' scienter is also established due to the importance of GIC's revenue to Patriot National.  While Patriot National sought to expand its customer base beyond GIC, it was never able to do so.  As such, from the time of the IPO to the Patriot National Bankruptcy, GIC has represented at least 60% of its revenue.

619.    The touchstone for each of the above false and misleading statements relate to Mariano's and Shields' attempts to conceal GIC's operational losses, capital shortfalls, and regulatory issues.  Mariano and Shields knew (or were recklessly unaware) of GIC's precarious financial and regulatory issues.  Indeed, once GIC fell under state receivership, Patriot National was immediately forced to fire over 250 of its employees and will be pushed into bankruptcy.

620.    Mariano's scienter is demonstrated by his conflicts of interests.  At all times during the Class Period, Mariano was in dire need of additional capital for GIC, Ashmere, and/or his lavish lifestyle.  It was these reasons that led Mariano to cause Patriot National to, *inter alia*, (1) acquire his personal companies, (2) over pay for contracts with GIC, (3) announce the Secondary Offering, (4) enter into the PIPE transaction, (5) approve the Repurchase Program, (6) engage in a self-interest Strategic Review Process, (7) reject Ebix's offer for $475 million, (8) approve the Leverage Recap, and (9) provide his private company with the GIC Bailout.  Nevertheless, Mariano signed the above-detailed public filings and statements while knowingly hiding the true purpose of those transactions.

621.    Furthermore, due to Mariano's ownership of GIC and GIC's capital base founded upon Patriot National stock, Mariano knowingly issued false and misleading statements designed to artificially inflate Patriot National's stock.  In doing so, Mariano sought to minimize the amount of capital he would be required to pump into GIC to cover its losses at year-end.  Additionally, Mariano artificially inflated Patriot National's stock price because it allowed him to sell his shares

at inflated prices in the attempted Secondary Offering, the PIPE transaction, and failed Strategic Review.  Moreover, inflating Patriot National's stock price assisted Mariano in his fight with the PIPE Investors.

622.    Shields's scienter is demonstrated here by his excessive compensation.  Shields knowingly issued false and misleading statements designed to artificially inflate Patriot National's stock so that he could continue to earn excessive compensation as Patriot National's CFO far above the compensation earned by CFOs at insurance companies with market capitalizations far exceeding Patriot National's market capitalization.  The table below shows Shields's 2015 compensation at Patriot National (the only reported year) as compared to the 2015 compensation of CFO's at other insurance companies:

|   | Name | Market Cap (in billions) | 2015 CFO compensation |
|---|---|---|---|
| 1 | The Progressive Corporation | $32.34 | $      5,122,462 |
| 2 | Marsh & McLennan Companies, Inc. | $41.45 | $      4,334,683 |
| 3 | Patriot National, Inc. | $0.4 | $      3,613,768 |
| 4 | Arthur J. Gallagher & Co. | $11.47 | $      3,209,490 |
| 5 | Employers Holdings, Inc. | $1.40 | $      1,671,116 |
| 6 | Amerisafe, Inc. | $1.17 | $      1,131,833 |
| 7 | Brown & Brown, Inc. | $7.28 | $      1,121,097 |
| 8 | Crawford & Company | $0.49 | $        625,505 |
| 9 | Kinsale Capital Group, Inc. | $0.92 | $        461,821 |

## LOSS CAUSATION AND ECONOMIC LOSS

623.    During the Class Period, as detailed herein, Mariano and Shields made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Patriot National's securities and operated as a fraud or deceit on Class Period purchasers of Patriot National's securities by materially misleading the investing public.   Later, when their prior misrepresentations and fraudulent conduct became apparent to the market, the price of Patriot National's securities materially declined, as the prior artificial inflation came out of the price over time.   As a result of their purchases of Patriot National's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

624.    As the truth emerged through partial disclosures, investors became more and more aware of certain risks that were withheld by Mariano and Shields throughout the Class Period. These risks pertained to the intentional disregard and knowing violation GAAP and PCAOB standards, undisclosed unique benefits being provided to Company insiders and their associates, and undisclosed material risks pertaining to approximately 70% of Patriot National's business. Each decline in Patriot National's stock price in connection with the above-pleaded partial corrective disclosures is evidence that the risks concealed by Mariano and Shields gradually materialized.   The total decline in Patriot National's stock price is attributable to Mariano and Shields' fraudulent and/or reckless conduct pursuant to the materialization-of-the-risk doctrine.

## PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

625.    At all relevant times, the market for Patriot National's common stock was an efficient market for the following reasons, among others:

  a.   Patriot National's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

    b.   Patriot National communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    c.   Patriot National was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

    d.   Unexpected material news about Patriot National was reflected in and incorporated into Patriot National's stock price during the Class Period.

626.    As a result of the foregoing, the market for Patriot National's common stock promptly digested current information regarding Patriot National from all publicly available sources and reflected such information in Patriot National's stock price.    Under these circumstances, all purchasers of Patriot National's common stock during the Class Period suffered similar injury through their purchase of Patriot National's common stock at artificially inflated prices, and a presumption of reliance applies.

627.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

628.    In the alternative, Patriot National's common stock should not have been introduced into the market at the time of the IPO because it was objectively unmarketable. Contrary to the information represented in Patriot National's Registration Statement, Patriot National was not a viable business as it has been operating for the improper benefit of insiders,

namely Mariano and GIC.  Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market, because they relied on the integrity of the market rather than on individual fraudulent disclosures.  Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance.

## NO SAFE HARBOR

629.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

630.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

631.    Mariano and Shields are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Patriot National who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by Mariano, Shields, or Patriot National were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Patriot National, Mariano, and/or Shields expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT V

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against BDO.

632.    Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

633.    BDO: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National's common stock in an effort to maintain artificially high market prices for Patriot National's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

634.    BDO, individually and in concert with the other defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Patriot National as specified herein.

635.    BDO employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patriot National's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Patriot National and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National common stock during the Class Period.

636. BDO's primary liability arises because BDO purportedly audited Patriot National's financial statements as well as GIC's financial statements and issued unqualified audit opinions, which was false and misleading. Without the materially false and misleading unqualified audit opinions, the scheme alleged would not have been possible.

637. BDO was conflicted due to its longstanding relationship with GIC. BDO had been GIC's public auditor since at least 2007. Moreover, in that time BDO was found to have approved numerous improper accounting practices at GIC. Accordingly, BDO was unwilling to issue statements which would have revealed the true and accurate depiction of GIC, and consequently, Patriot National, because it (1) threatened its fees from Patriot National and GIC, and (2) exposed it to liability for approving Patriot National's transactions in 2015 and 2016. Only after the Wasik Action truly exposed the wrongdoing at Patriot National did BDO attempt to save face and conduct an appropriate audit of Mariano's companies.

638. As set forth above, in its opinions dated November 14, 2014, March 31, 2015, and March 18, 2016, BDO stated that Patriot National's financial statements were in conformity with the generally accepted accounting principles, having full, complete and intimate knowledge of Patriot National's financial reporting practices that showed the adverse facts alleged herein concerning Patriot National's and Mariano's improper conduct. Thus, BDO knowingly, or recklessly, issued a false and misleading unqualified audit opinions during the Class Period.

639. BDO contributed and advanced Mariano and Shields' fraudulent scheme by failing to disclose material information about Patriot National and by issuing the unqualified opinions.

640. BDO failed to have procedures in place designed to provide reasonable assurance of detecting illegal acts, designed to identify related party transaction that are material to the

financial statements and evaluate whether there is substantial doubt about the ability of the issuer to continue as a going concern during the fiscal year.

641.     BDO failed to disclose or was severely reckless in not knowing or disregarding the illegal acts and the fraudulent scheme in place and/or ignoring clear and present evidence that Patriot National, Mariano, and Shields were engaged in an illegal scheme to inflate the price of Patriot National stock.

642.     BDO also failed to disclose or was severely reckless in not knowing or disregarding that Patriot National's disclosures were not adequate and that Patriot National had no meaningful internal financial accounting and reporting controls or mechanisms in place necessary to provide adequate assurance to satisfy the financial accounting and reporting requirements of GAAP, GAAS and/or the Sarbanes-Oxley Act of 2002.

643.     As a result of issuing of the unqualified opinions, BDO violated Section 10(b) of the Securities Exchange Act, and Rule 10b-5.

644.     As a direct and proximate result of BDO's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of Patriot National's common stock during the Class Period.

## COUNT VI

**Violations of Section 20(a) of the Exchange Act**
**Against Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith**

645.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

646.     As set forth above, during the Class Period, Patriot National committed violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by the acts and omissions alleged in this complaint.

647.     During the Class Period, Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith participated in the operation and management of Patriot National, and conducted and participated, directly and indirectly, in the conduct of its business affairs.  Because of their senior positions, they knew the adverse non-public information about Patriot national's business and its misstatement of income and expenses and false financial statements.

648.     As officers and/or directors of a publicly owned company, Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith had a duty to disseminate accurate and truthful information with respect to Patriot National's financial condition and results of operations, and to correct promptly any public statements issued by Patriot National which had become materially false or misleading.

649.     Because of their positions of control and authority as senior officers, Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith were able to, and did, control the contents of the various reports, press releases and public filings which Patriot National disseminated in the marketplace during the Class Period concerning its results of operations.  Throughout the Class Period, Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith exercised their power and authority to cause Patriot National to engage in the wrongful acts complained of herein. Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, and Smith therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Securities Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Patriot National securities.

650.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Securities Exchange Act for the violations committed by Patriot National.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, or rescission;

(c)     Awarding recissionary damages in favor of Plaintiffs and other members of the Class who purchased Patriot National shares directly from the Underwriter Defendants pursuant to the Prospectus dated January 15, 2015.

(d)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury.

Dated: January 12, 2018                            CULLIN O'BRIEN LAW, P.A.

                                           _____/s/ Cullin O'Brien_____

                                           CULLIN O'BRIEN LAW, P.A.
                                           CULLIN A. O'BRIEN
                                           Florida Bar No. 597341
                                            6541 NE 21st Way
                                            Ft. Lauderdale, FL  33308
                                            Telephone:  561/676-6370
                                           561/320-0285 (fax)
                                           cullin@cullinobrienlaw.com

                                           *Attorneys for Plaintiffs*

OF COUNSEL:

LEVI & KORSINSKY, LLP
Eduard Korsinsky (ek@zlk.com)
Nicholas Porritt (nporritt@zlk.com)
Amy Miller (amiller@zlk.com)
William J. Fields (wfields@zlk.com)
Jonathan Lindenfeld (jlindenfeld@zlk.com)
30 Broad Street, 24th Floor
New York, New York 10004
(212) 363-7500
(212) 363-7171